IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                No. CR 15-2218 JB

BRUCE BECKNER,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States' Sentencing Memorandum, filed December 22, 2022 (Doc. 218)("U.S. Sentencing Memo."); (ii) the Defendant's Objection's to PSR and Sentencing Memorandum,[1] filed January 2, 2023 (Doc. 219)("Beckner Objections"); and (iii) the Defendant Bruce Beckner's Sentencing Memorandum, filed January 2, 2023 (Doc. 220)("Beckner Sentencing Memo."). The Court held a hearing on the U.S. Sentencing Memo., Beckner Objections, and Beckner Sentencing Memo. on January 4, 2023. See Clerk's Minutes at 1, filed January 4, 2023 (Doc. 226)("Sentencing Clerk's Minutes"). The primary issues are: (i) whether Defendant Bruce Beckner acted as a leader of an "otherwise extensive" fraud scheme such that his base offense level is subject to a 4-level increase pursuant to § 3B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"); (ii) whether Beckner used sophisticated means in furtherance of his fraudulent scheme such that

---

[1] Defendant Bruce Beckner filed the Defendant's Objection's to PSR and Sentencing Memorandum on January 2, 2023 (Doc. 219). Later that day, he filed Defendant Bruce Beckner's Sentencing Memorandum (Doc. 220)("Beckner Sentencing Memo."). In the Beckner Sentencing Memo., Beckner explains that he "erroneously captioned his objection to the PSR as including the sentencing memorandum." Beckner Sentencing Memo. at 1 n.1. Accordingly, the Court hereinafter refers to Defendant's Objection's to PSR and Sentencing Memorandum (Doc. 219) as "Beckner Objections."

his base offense level is subject to a 2-level increase pursuant to U.S.S.G. § 2B1.1; (iii) whether Beckner obstructed justice by fleeing from law enforcement on September 7, 2011, such that his base offense level is subject to a 2-level increase pursuant to U.S.S.G. § 3C1.1; (iv) what Beckner's Guideline imprisonment range is; and (v) what sentence the Court will impose on Beckner.  The Court concludes that: (i) Beckner's base offense level is subject to a 4-level increase pursuant to U.S.S.G. § 3B1.1(a), because Beckner was a leader of an "otherwise extensive" fraud scheme; (ii) Beckner's base offense level is subject to a 2-level increase pursuant to U.S.S.G. § 2B1.1(b)(10), because Beckner used sophisticated means in furtherance of his fraudulent scheme; (iii) Beckner's base offense level is not subject to a 2-level increase pursuant to U.S.S.G. § 3C1.1, because Beckner did not obstruct justice by fleeing from law enforcement; (iv) Beckner's offense level is 35 and criminal history category is III, such that his Guideline imprisonment range is 210 to 262 months; and (v) the Court will sentence Beckner at the low end of the Guideline range and impose a sentence of 210 months, plus a five-year term of supervised release.

## FACTUAL BACKGROUND

When considering an objection to a presentence report, and when neither party challenges the sufficiency of a presentence report's factual allegations, the Court can accept the presentence report's factual allegations as true.  See Fed. R. Crim. P. 32(i)(3)(A).  Where, as here, a party objects to some or all of the facts in a presentence report, a court must "rule on the dispute or determine that a ruling is unnecessary . . . ."  Fed. R. Crim. P. 32(i)(3)(B).  Here, Beckner raises three objections to the factual allegations in the Presentence Report, filed September 6, 2022 (Doc. 211)("PSR").  See Beckner Objections at 12-17.  The Court resolved the factual objections at the January 4, 2023, hearing.  See Draft Transcript of Hearing (taken January 4, 2023) at 57:2-66:16

(Court, Ray, Hartstein, Sullivan)("January 4 Tr.").[2]  Accordingly, the Court takes its facts from the PSR -- as the Court and the parties amended at the sentencing hearing -- as well as the Presentence Investigation Report, filed May 1, 2017 (Doc. 46)("Herlihy PSR");[3] Plea Agreement, filed February 3, 2017 (Doc. 43)("Herlihy Plea Agreement"); from the trial testimony, see Draft Transcript of Trial (taken April 4-7, 2022)("Trial Tr.");[4] from the evidence admitted at trial; and from the facts that the parties provide in the U.S. Sentencing Memo., Beckner Objections, and Beckner Sentencing Memo.  Because the case involves numerous individuals and corporate entities, the Court begins by introducing the individuals and businesses at issue.

    **1.**    <u>**Individuals**</u>**.**

    1.    Beckner is the Defendant at issue.  <u>See</u> PSR at 1.

    2.    At trial, the jury found Beckner guilty of Bank Fraud, Wire Fraud, and Conspiracy in connection with his operation of a truck stop.  <u>See</u> PSR at ¶ 2, at 4.

    3.    At various points during the relevant time period, Beckner used the alias "Bill Evans."  <u>See</u>, <u>e.g.</u>, PSR ¶¶ 6, 8, at 5.

---

[2]The Court's citations to the January 4 Tr. refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[3]Arthur Herlihy is Beckner's co-Defendant.  <u>See</u> Indictment at 1, filed June 14, 2015 (Doc. 2).  The Herlihy PSR is the presentence report that the United States Probation Office ("USPO") prepared when the Court sentenced Herlihy.  Similarly, the Herlihy Plea Agreement is the plea agreement that Herlihy entered into with the United States. <u>See</u> Plea Agreement, filed February 3, 2017 (Doc. 43). Neither the Herlihy PSR nor the Herlihy Plea Agreement are at issue in this Memorandum Opinion and Order. Accordingly, the parties did not object to the Herlihy PSR or the Herlihy Plea Agreement in their papers or at the January 4 sentencing hearing.  The Court, therefore, draws on the Herlihy PSR and the Herlihy Plea Agreement in a limited capacity and only for foundational, background facts that relate to Herlihy, and not to Beckner.

[4]The Court's citations to the trial transcript are to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

4.      From 1986 to 2010, Beckner was married to Sandra Lee Franklin.  See PSR ¶ 53, at 14.

5.      Beckner and Franklin's marriage was tumultuous, and they endured "many separations."  PSR ¶ 54, at 15.

6.      Franklin passed away in 2010.  See PSR ¶ 53, at 14.

7.      Beckner and Franklin have three children together: two sons and a daughter.  See PSR ¶ 53, at 15.

8.      One of Beckner and Franklin's sons passed away in 2002.  See PSR ¶ 53, at 15.

9.      Sean Curtis is a childhood friend of one of Beckner and Franklin's sons.[5]  See Trial Tr. at 351:23-352:3 (Sullivan, Curtis).

10.     Beckner began dating Rita Xiomara Romero.  See PSR ¶ 55, at 15.

11.     Beckner and Romero have three children together.  See PSR ¶ 55, at 15.

12.     Defendant Arthur Herlihy is a businessman and academic based in Santa Fe, New Mexico.  See Herlihy PSR ¶ 98, at 19.

13.     Maurice Bonal is a liquor license broker based in New Mexico.  See Trial Tr. at 225:17-23 (Hartstein, Bonal).

14.     Toni Wright was a general manager at the truck stop.  See Trial Tr. at 462:16-22 (Ray, Curtis).

15.     Jason Duarte was also a general manager at the truck stop.  See Trial Tr. at 499:23-

---

[5]Although Curtis met Beckner through one of Beckner's sons, by trial, Curtis had married Beckner's daughter, and Curtis is now Beckner's son-in-law.  See Trial Tr. at 351:23-352:5 (Sullivan, Curtis); id. at 402:8-15, 415:5-7 (Sullivan, Curtis)(indicating that Curtis married Beckner's daughter in 2018).

500:23 (Wright, Sullivan).

16.     John Beach was the truck stop's project manager.  <u>See</u> Trial Tr. at 374:1-4 (Sullivan, Curtis).

17.     Janet Robinson was the truck stop's bookkeeper.  <u>See</u> Trial Tr. at 408:15-23 (Sullivan, Curtis).

18.     In 2011, Benjamin Baker was a Special Agent with the State of New Mexico Securities Division.  <u>See</u> Trial Tr. at 795:20-21 (Baker).

19.     In his capacity as Special Agent at the New Mexico Securities Division, Baker "investigate[d] allegations of criminal conduct and administrative violations of the law in New Mexico."  Trial Tr. at 796:15-18 (Baker).

    **2.      <u>Corporate Entities</u>.**

20.     The truck stop is located in Deming, New Mexico.[6]  <u>See</u> PSR ¶ 6, at 5.

21.     Between 2005 and 2009, Beckner, Herlihy, Curtis, and Franklin incorporated numerous corporate entities associated with the truck stop. <u>See</u> Trial Tr. at 368:4-5 (Curtis).

22.     Franklin incorporated Fuel 4 Less, LLC in New Mexico in September, 2005.  <u>See</u> Government's Trial Exhibit 3 at 3, admitted April 4, 2022.

23.     Curtis incorporated Savoy Travel Center, LLC in New Mexico in November, 2007.[7]  <u>See</u> Government's Trial Exhibit 4 at 2, admitted April 4, 2022.

_____

    [6]Deming is a small city in Luna County, New Mexico.  <u>See</u> Google Maps, Deming, NM, https://google.com/maps (type "Deming, NM" into the search bar in the upper lefthand corner)("Deming Map").  Deming sits along Interstate 10 between Las Cruces, New Mexico and Tucson, Arizona.  <u>See</u> Deming Map.

    [7]From here on out, when referring to the truck stop generally, the Court will use "Savoy Travel."  As explained in more detail below, Beckner, Herlihy, and Curtis formed Savoy Travel

24.     Herlihy incorporated Truckers Paradise, LLC in New Mexico in February, 2008. See Government's Trial Exhibit 5 at 3, admitted April 4, 2022.

25.     Curtis incorporated Savoy Sand & Gravel, LLC in New Mexico in February, 2008. See Government's Trial Exhibit 6 at 3, admitted April 4, 2022.

26.     Beckner, proceeding as Bill Evans, incorporated Savoy Development Company, LLC in New Mexico in March, 2008. See Government's Trial Exhibit 7 at 3, admitted April 4, 2022.

27.     Curtis incorporated Savoy Holdings, LLC in New Mexico in July, 2008. See Government's Trial Exhibit 8 at 3, admitted April 4, 2022.

28.     Curtis incorporated Savoy Terminal, LLC in New Mexico in March, 2009. See Government's Trial Exhibit 9 at 3, admitted April 4, 2022.

29.     Herlihy incorporated The Savoy Group, LLC in New Mexico in September, 2009. See Government's Trial Exhibit 10 at 3, admitted April 4, 2022.

30.     Beckner formed Capital Resources Management Limited SA in Panama. See Trial Tr. at 849:11-17 (Sullivan, Curtis).

31.     Beckner, proceeding as Bill Evans, formed Top Management. See Trial Tr. at 381:2-19 (Sullivan, Curtis).

32.     Petro Fuels Limited SA is a Panamanian corporation. See Trial Tr. at 359:20-21 (Sullivan, Curtis).[8]

_____

Center LLC, among other LLCs. To avoid confusion, when referring to Savoy Travel Center LLC specifically, the Court will use "Savoy Travel LLC."

[8]Before trial, the Court ordered that the parties were not to use the names of the foreign jurisdictions at issue in this case. During trial, counsel and the witnesses referred to Honduras as "Country A" and Panama as "Country B." Accordingly, the trial transcript uses "Country A" and

33.     Romero was the "beneficial owner" of Petro Fuels, meaning that "everything that came into that company was for the benefit of Ms. Romero."  Trial Tr. at 849:2-6 (Sullivan, Layne).

34.     Seashell Fuel Corporation is a Panamanian corporation.  See Trial Tr. at 397:16-17 (Sullivan, Curtis).

35.     Curtis was the general manager of Seashell Fuel.  See Trial Tr. at 399:4-8 (Sullivan, Curtis).

36.     Curtis also had power of attorney for Seashell Fuel.  See Trial Tr. at 848:20-23 (Sullivan, Layne).

### 3.     Beckner's Prior Financial Crimes.

37.     Between 1991 and 1992, Beckner and others operated a company called "Monkey Business."  PSR ¶ 40, at 11.

38.     Beckner and his Monkey Business associates would encourage potential investors to invest in Monkey Business, but then use those investments "to pay interest to other victims and for personal expenses."  PSR ¶ 40, at 11.

39.     In total, Beckner and his Monkey Business associates collected $3,428,581.00 from 559 investors.  See PSR ¶ 40, at 11.

40.     Between March, 1993, and June 1994, Beckner operated the Cross Financial Services note sale program.  See PSR ¶ 41, at 12.

41.     As part of that program, Beckner "obtained money and property by means of untrue statements of material securities."  PSR ¶ 41, at 12.

---

"Country B," as well.  The Court will refer to Honduras and Panama by their real names in this Memorandum Opinion and Order.

42.     On June 20, 1996, Nevada State Police confiscated $13,300.00 in American Express travelers' checks from Beckner.  See PSR ¶ 39, at 11.

43.     Beckner falsely reported that he had lost the travelers' checks.  See PSR ¶ 39, at 11.

44.     A Nevada State court later convicted Beckner on one count of obtaining money under false pretenses and ordered Beckner to pay a $1,000.00 fine.  See PSR ¶ 39, at 11.

45.     In January, 1997, Beckner was arrested in connection with the Cross Financial Services note sale program.  See PSR ¶ 41, at 12.

46.     In May, 1997, Beckner was arrested again in connection with the Monkey Business scheme.  See PSR ¶ 40, at 12.

47.     Beckner was charged in the United States District Court for the Central District of California with Conspiracy to commit Mail Fraud, Mail Fraud, and Securities Mail Fraud in connection with his Monkey Business scheme and his Cross Financial Services scheme.  See PSR ¶¶ 40-41, at 11-12

48.     The Honorable John Davies, United States District Judge for the United States District Court for the Central District of California, sentenced Becker in connection with both schemes.  See PSR ¶¶ 40-41, at 11-12.

49.     Judge Davies imposed a 33-month sentence, plus a three-year term of supervised release.  See PSR ¶¶ 40-41, at 11-12.

50.     Judge Davies also ordered that Beckner pay $15,601,742.00 in restitution for the offenses.  See PSR ¶¶ 40-41, at 11-12.

51.     Beckner was released from custody on June 10, 1999.  See PSR ¶ 40, at 11.

52.     Beckner completed his supervised release term on June 9, 2002.  See PSR ¶ 40, at

11.

53.     To date, Beckner has not paid the entire $15,601,742.00 he owes in restitution.  <u>See</u> U.S. Sentencing Memo. at 7; PSR ¶¶ 40-41, at 11-12.

    **4.**     **<u>Beckner's Life After His Sentence for His Prior Financial Crimes</u>.**

54.     When Beckner completed supervised release, Beckner and Franklin moved their family to Roatan, Colombia.  <u>See</u> Beckner Sentencing Memo. at 2.

55.     By 2006, Beckner and Franklin were involved with Savoy Travel.  <u>See</u> Beckner Sentencing Memo. at 3 (indicating that Franklin had invested in Savoy Travel).

56.     Savoy Travel was performing poorly financially.  <u>See</u> Beckner Sentencing Memo. at 3.

57.     Franklin asked Beckner to go to the United States and learn why Savoy Travel was performing so poorly.  <u>See</u> Beckner Sentencing Memo. at 4.

58.     Beckner traveled to New Mexico with Curtis.  <u>See</u> Beckner Sentencing Memo. at 3.

59.     At the time, Curtis was nineteen years old and had been living in Los Angeles, California.  <u>See</u> Trial Tr. at 357:17-21 (Sullivan, Curtis).

60.     Beckner and Curtis visited Savoy Travel and found that it barely was functioning: the gas pumps were inoperable, the store was stocked poorly, and the facilities were run-down.  <u>See</u> Trial Tr. at 360:7-13 (Sullivan, Curtis)(describing Savoy Travel's condition when he arrived); Beckner Sentencing Memo. at 3 (including a photo showing Savoy Travel at the time Beckner and Curtis arrived).

61.     At the time of Beckner and Curtis' visit to Savoy Travel, at least three other individuals were already involved in Savoy Travel.  <u>See</u> Trial Tr. at 358:4-11 (Sullivan, Curtis).

5.      **Beckner's Early Involvement at Savoy Travel**.

62.     At some point after arriving in Deming, Beckner rented a home there. See Beckner Objections at 2.

63.     Beckner became involved in managing and renovating Savoy Travel.  See PSR ¶ 6, at 5.

64.     Beckner and Curtis intended to expand and improve Savoy Travel.  See PSR ¶ 7, at 5.

65.     The following year, in 2007, Beckner recruited Herlihy to work at Savoy Travel as well.  See PSR ¶ 7, at 5.

66.     Herlihy acted as a "consultant," and advised Beckner and Curtis on obtaining "institutional funding" and "build[ing] business plans."  Trial Tr. at 365:3-10 (Sullivan, Curtis).

67.     In 2008, Beckner and Herlihy arranged to purchase a liquor license for Savoy Travel so they could open a restaurant on the premises.  See PSR ¶ 7, at 5.

68.     Beckner and Herlihy worked with Bonal to secure the license.  See PSR ¶ 7, at 5.

69.     Bonal agreed to broker and partially finance the transaction.  See PSR ¶ 7, at 5.

70.     As part of their agreement with Bonal, Beckner and Herlihy agreed that they would not "pledge the liquor license as collateral in any subsequent transaction."  PSR ¶ 7, at 5.

6.      **First New Mexico Bank Loan**.

71.     In July, 2009, Beckner, Herlihy, and Curtis -- along with the corporate entities Fuel 4 Less and Savoy Travel LLC -- applied for a loan from First New Mexico Bank to cover their debt to Bonal.  See PSR ¶ 8, at 5.

72.     Beckner completed and signed the loan documents using his alias, "Bill Evans."

PSR ¶ 8, at 5.

73.     Herlihy knew that Beckner used an alias, but he did not correct the misstatement for First New Mexico Bank.  See Herlihy Plea Agreement at 5 (admitting that he "knew that Beckner's true name was not 'Bill Evans' and that Beckner used the alias 'Bill Evans' to conceal his true identity after a previous criminal conviction for a financial crime").

74.      Curtis also knew that Beckner used an alias, but he also did not correct the misstatement.  See Trial Tr. at 393:25-394:10 (Sullivan, Curtis)(testifying that he knew that "Bill Evans" was not Beckner's true name and admitting that he never told the bank).

75.     Additionally, Beckner submitted a false personal financial statement in the name Bill Evans as part of the application.  See PSR ¶ 8, at 5.

76.     Both the application and the personal financial statements contained provisions that required the signer to attest that the information contained therein is true and correct.  See PSR ¶ 8, at 5.

77.     The trio ultimately obtained a loan for $135,165.00 from First New Mexico Bank.  See PSR ¶ 8, at 5.

### 7.     New Markets Tax Credit Program Loan.

78.     Finance New Mexico operates the New Markets Tax Credit Program[9] in New

---

[9]The New Markets Tax Program is a program that the United States Department of the Treasury, Community Development Financial Institutions Fund runs.  See New Markets Tax Credit Fact Sheet at 1, https://www.cdfifund.gov/sites/cdfi/files/2022-11/New_Markets_Tax_Credit_Program_FactSheet.pdf ("NMTCP Fact Sheet").  The program operates by giving financial intermediaries called "Community Development Entities" ("CDEs") tax credit authority.  NMTCP Fact Sheet at 1.  "CDEs use their authority to offer tax credits to investors in exchange for equity in the CDE.  Using the capital from these equity investments, CDEs can make loans and investments to businesses operating in low-income communities on better rates and terms and more flexible features than the market."  NMTCP Fact Sheet at 1.

Mexico.  See PSR ¶ 9, at 5.

79.     Beckner, Herlihy, and Curtis applied for funding for Savoy Travel from Finance New Mexico.  See PSR ¶ 9, at 5.

80.     As part of the loan application, Beckner signed documents as a personal guarantor, using the alias "Bill Evans."  PSR ¶ 9, at 5.

81.     Beckner also signed an indemnity concerning hazardous substances using the alias "Bill Evans."  PSR ¶ 9, at 5.

82.     Beckner also represented on the loan application that he was only Savoy Travel's facilities and operating manager.  See PSR ¶ 9, at 6.

83.     The trio obtained funding from Virtual Realty Enterprises ("VRE") and U.S. Bank Development Corporation through the New Markets Tax Credit Program (collectively "the New Markets Tax Credit Program Loan").  See PSR ¶¶ 9, 10, at 5, 6.

84.     The VRE loan is for $12,000,000.00.  See PSR ¶ 10, at 6.

85.     The U.S. Bank loan is for $4,000,000.00.  See PSR ¶ 10, at 6.

86.     Savoy Travel defaulted on the New Markets Tax Credit Program Loan in 2011 when it went into receivership and chapter 11 bankruptcy.  See PSR ¶ 9, at 6.

**8.     Soliciting Individual Investors.**

87.     Beckner also sought funding for Savoy Travel from individual investors.  See PSR ¶ 11, at 6.

88.     Beckner told prospective individual investors that that their investments "would be used by one truck stop entity to acquire fuel from external suppliers and sell that fuel to another truck stop entity at a mark-up."  PSR ¶ 11, at 6.

89.     More specifically, Beckner solicited individual investors using the telephone, email, in-person meetings, and advertisements in the Los Angeles Times and other newspapers. See PSR ¶ 11, at 6.

90.     Wright and others at Savoy Travel called potential individual investors on the telephone.  See Trial Tr. at 520:22-24 (Sullivan, Wright).

91.     Beckner provided Wright with a script to use when speaking to potential investors. See Trial Tr. at 520:25-521:1 (Sullivan, Wright); Government's Trial Exhibit 56, admitted April 4, 2022 ("Investor Script").

92.     The Investor Script directs the reader to tell prospective individual investors that their money will "be used to purchase diesel fuel through our fuel terminal and then resold to our truck stop at a profit."  Investor Script at 1.

93.     Additionally, the Investor Script advertises: "Your money is secured by the fuel and hard assets of our company."  Investor Script at 1.

94.     Similarly, one Savoy Travel print advertisement states: "Refinery/Retail Fuel Company, 24 percent return paid monthly, asset secured."  Trial Tr. at 798:9-11 (Baker)(reading an advertisement he encountered in the course of his Savoy Travel investigation).

95.     In reality, Savoy Travel did not use individual investors' funds to buy and resell fuel at a profit.  See Trial Tr. at 523:14-18 (Sullivan, Wright).

96.     Instead, Savoy Travel would use individual investors' funds to purchase fuel for its "underground tanks that were supplying the pumps."  Trial Tr. at 523:21-23 (Wright).

97.     Additionally, in reality, Savoy Travel did not own the fuel it was selling, and Savoy Travel already had used its assets as collateral for the Finance New Mexico loan.  See PSR ¶ 11, at 6.

98.     As part of the individual investment program, Beckner executed promissory notes and Uniform Commercial Code filings for individual investments that purported that collateral, including Savoy Travel's assets and fuel inventory, secured the funds.  See PSR ¶ 11, at 6.

99.     The Savoy Travel promissory notes were signed.  See Trial Tr. at 532:3-5 (Sullivan, Wright).

100.    Savoy Travel would always use Herlihy's signature on the promissory notes.  See Trial Tr. at 532:9-20 (Sullivan, Wright).

101.    Beckner directed Savoy Travel employees to use a stamp of Herlihy's signature to sign the promissory notes.  See Trial Tr. at 533:7-20 (Sullivan, Wright).

102.    Beckner also directed Robinson and Duarte to notarize the promissory notes that were stamped with Herlihy's signature.  See Trial Tr. at 535:14-24 (Sullivan, Wright).

103.    Savoy Travel did not always have enough money to pay its individual investors.  See Trial 524:20-22 (Sullivan, Wright).

104.    When Savoy Travel was unable to pay individual investors, Beckner would decide what to do.  See Trial Tr. at 525:15-21 (Wright).

105.    Beckner would tell Savoy Travel employees what to say when "fielding angry phone calls from these investors."  Trial Tr. at 525:17-18 (Wright).

106.    The things that Beckner told his employees to tell angry investors were not always true.  See Trial Tr. at 526:2-9 (Sullivan, Wright).

107.    Beckner also would triage individual investors, and tell employees "which [investors] to pay and which ones not to pay" in a given month.  Trial Tr. at 525:19-21 (Wright).  See id. at 526:10-12 (Sullivan, Wright)(testifying that Beckner decided "who was paid and when").

108.    In sum, Savoy Travel collected $2,529,982.00 from twenty-five individual

investors.  See PSR ¶ 12, at 7.

109.    Most of the individual investors live outside of New Mexico, and many live in southern California.  See Government's Trial Exhibit 49-i at 1-2, admitted April 4, 2022 (chart reflecting Savoy Travel's investors as of November 30, 2010, including investors from: Avis, Pennsylvania; Los Angeles, California; Redlands, California; and San Diego, California, among others)("Individual Investor Chart").

### 9.    **Savoy Travel Operations.**

110.    Beckner, Herlihy, and Curtis used some of the loans and investments from the institutional and individual investors to make improvements to Savoy Travel.  See Beckner Sentencing Memo. at 5-6 (photos depicting the truck stop as it stands today); Defendant's Trial Exhibit B-1, admitted April 4, 2022 (same); Defendant's Trial Exhibit B-5, admitted April 4, 2022 (same); Defendant's Trial Exhibit B-7, admitted April 4, 2022 (same); and Defendant's Trial Exhibit B-9, admitted April 4, 2022 (same).

111.    The improvements included: renovations to the convenience store, see Trial Tr. at 427:7-428:14 (Ray, Curtis), and tire shop, see Trial Tr. at 431:8-19 (Ray, Curtis); repairs to the fuel pumps, see Trial Tr. at 423:8-19 (Ray, Curtis); and the addition of a restaurant, see Trial Tr. at 432:8-10 (Ray, Curtis), and volunteer fire department, see Trial Tr. at 361:19-25 (Curtis).

112.    The improvements helped Savoy Travel become a profitable business.  See Beckner Sentencing Memo. at 4.

113.    By 2011, there were sixty-nine employees on Savoy Travel's payroll.  See Beckner Sentencing Memo. at 4.

114.    Curtis acted as the operating manager of Fuel 4 Less.  See Trial Tr. at 369:5-8 (Sullivan, Curtis).

115.    Although Herlihy joined Savoy Travel as a "consultant," he later became a salaried employee and became the operating manager of Savoy Travel LLC.  Trial Tr. at 365:17-19, 370:4-10 (Sullivan, Curtis).

116.    Beckner, Herlihy, and Curtis worked together to renovate and operate Savoy Travel.  See Trial Tr. at 371:8-372:9 (Sullivan, Curtis).

117.    Beckner focused on construction.  See Trial Tr. at 371:8-13 (Sullivan, Curtis).

118.    Curtis also focused primarily on construction.  See Trial Tr. at 370:14-16 (Curtis).

119.    Herlihy focused primarily on business operations and financing.  See Trial Tr. at 371:2-7 (Sullivan, Curtis).

120.    When Beckner, Herlihy, and Curtis made business decisions, they would "fight it out" and come to an agreement.  Trial Tr. at 371:14-21 (Curtis).

121.    Herlihy would sign off on all business decisions as Savoy Travel LLC's operating manager.  See Trial Tr. at 372:5-9 (Curtis, Sullivan).

**10.    Curtis Marries Romero.**

122.    In 2008, Beckner asked Curtis to marry Romero, Beckner's girlfriend at the time. See Trial Tr. at 400:8-24 (Sullivan, Curtis).

123.    Beckner told Curtis that his relationship with Romero was strained, because he resided in New Mexico, and she resided in Honduras, and that Curtis marrying Romero would be the "path of least resistance" for Romero to get a visa to come to the United States.  Trial Tr. at 400:18-24 (Sullivan, Curtis).

124.    Curtis and Romero got married in Las Vegas, Nevada, on April 26, 2008.  See Trial Tr. at 402:1-5 (Sullivan, Curtis).

125.     Curtis and Romero remained married until 2018.  See Trial Tr. at 402:6-9 (Sullivan, Curtis).

**11.     Use of the First New Mexico Bank Loan.**

126.     Savoy Travel did not use the proceeds of the First New Mexico Bank Loan for the purpose it indicated it would in its loan application, i.e., to pay Bonal.  See PSR ¶ 8, at 5.

127.     First New Mexico Bank deposited the funds -- $135,165.00 -- into Savoy Travel LLC's First New Mexico Bank account on July 9, 2009.  See Trial Tr. at 845:9-846:8 (Layne).

128.     Over the following three weeks, various individuals and entities also deposited funds into Savoy Travel LLC's First New Mexico Bank account.  See Trial Tr. at 845:9-846:19 (Layne)(summarizing deposit history).

129.     By July 31, 2009, there was $85,000.00 in Savoy Travel LLC's First New Mexico Bank account.  See Trial Tr. at 846:6-8 (Layne).

130.     Between July 9, and July 31, 2009, the money leaving Savoy Travel LLC's First New Mexico Bank account was used to purchase fuel from Dansk Investments, repay another loan, and cover other operations expenses.  See Trial Tr. at 846:9-17 (Layne)(summarizing expense history).

131.     Over the same period, there were no payments made to Bonal.  See Trial Tr. at 846:17-848:6 (Layne, Sullivan)(forensic accounting expert testifying that she did not identify any payments during any time period "that would be consistent with paying [Bonal] for the liquor license.").

**12.     Use of New Markets Tax Credit Program Loan.**

132.     Savoy Travel did not use all of the proceeds from the New Markets Tax Credit

Program loan for their intended purpose.  See PSR ¶ 9, at 5-6.

133.    For example, VRE wired $5.1 million of its twelve-million-dollar loan to a Seashell

Fuels foreign bank account.  See Trial Tr. at 852:2-7 (Layne).

134.    Of that $5.1 million, Seashell Fuels wired three-million dollars back to Fuel 4 Less.

See Trial Tr. at 852:8-9 (Layne).

135.    Fuel 4 Less used the three-million dollars primarily to "pay back people who had

invested in the truck stop in 2006 and 2007."  Trial Tr. at 853:6-8 (Layne).

136.    Seashell Fuels wired the remaining $2.1 million to a Petro Fuels account at Stanford

International Bank.[10]  See Trial Tr. at 852:9-11 (Layne).

137.    Romero was the "beneficial owner" of Petro Fuel's Stanford International Bank

account.  Trial Tr. at 852:12-13 (Layne).

138.    Savoy Travel later refinanced and defaulted on the VRE loan.  See Trial Tr. at

853:18-20 (Layne).

**13.    Use of the Individual Investors' Investments.**

139.    Savoy Travel did not use "significant portions" of individual investor's investments

for their intended purpose, i.e., to purchase and resell fuel at a marked-up price.  PSR ¶ 11, at 6.

140.    For example, Brian Wakil, an individual investor, invested $100,000.00 in Savoy

Travel.  See Trial Tr. at 861:1-4 (Sullivan, Layne).

141.    Savoy Travel deposited Wakil's investment in Savoy Travel LLC's Wells Fargo

---

[10]Stanford International Bank was a bank that operated in the Caribbean until the Securities and Exchange Commission filed charges against it and its founder in February, 2009.  See Press Release: SEC Charges R. Allen Stanford, Stanford International Bank for Multi-Billion Dollar Investment Scheme, Securities and Exchange Commission, https://www.sec.gov/news/press/2009/2009-26.htm (last visited May 26, 2023).

account.  See Trial Tr. at 861:12-13 (Layne).

142.    Other individuals and entities also deposited funds into Savoy Travel LLC's Wells Fargo account around the same time that Savoy Travel deposited Wakil's investment.  See Trial Tr. at 862:12-19 (Layne)(summarizing deposit history).

143.    Savoy Travel used the funds in its Wells Fargo account to make payments to investors, purchase fuel, pay employees, and make a $6,600.00 payment to Seashell Fuel.  See Trial Tr. at 862:22-863:4 (Layne)(summarizing expenses).

144.    Seashell Fuel transferred $6,000.00 of the $6,600.00 it received from Savoy Travel to "a foreign bank account held by Bruce Beckner."  Trial Tr. at 863:9-10 (Layne).

145.    Similarly, Chester Pugh, an individual investor, invested $60,000.00 in Savoy Travel.  See Trial Tr. at 867:20-22 (Layne).

146.    Beckner, Herlihy, and Curtis deposited Pugh's funds in Savoy Terminal's Wells Fargo account.  See Trial Tr. at 867:22-24 (Layne).

147.    Savoy Terminal transferred the funds to Savoy Group's Wells Fargo account.  See Trial Tr. at 868:2-4 (Layne).

148.    Savoy Group transferred $41,500.00 to another Savoy Group Wells Fargo account.  See Trial Tr. at 8688:10-11 (Layne).

149.    Savoy Group transferred $9,600.00 of the $41,500.00 to Seashell Fuel, and another $6,700.00 to Top Management.  See Trial Tr. at 868:12-13 (Layne).

150.    Seashell Fuel transferred $9,500.00 of the $9,600.00 to "a foreign-held bank account in the name of Bruce Beckner."  Trial Tr. at 868:16-18 (Layne).

151.    Similarly, Thomas Fenedy, another individual investor, made two investments in Savoy Travel: one in January, 2010, for $100,000.00, see Trial Tr. at 870:7-8 (Layne), and another

in September, 2010, for $50,000.00. see Trial Tr. at 871:8-9 (Layne).

152.   Fenedy wired funds to Savoy Travel LLC's Wells Fargo account.  See Trial Tr. at 871:10-11 (Layne).

153.   Savoy Travel also deposited revenue into its Wells Fargo account around the same time.  See Trial Tr. at 871:14-15 (Layne).

154.   Savoy Travel used the funds to cover operating expenses, and payroll, and to pay investors -- including Fenedy.  See Trial Tr. at 871:18-22 (Layne).

155.   On a third occasion, Fenedy invested an additional $25,000.00 in Savoy Travel. See Trial Tr. at 872:8-9 (Layne).

156.   Fenedy deposited his investment in the Savoy Terminal bank account.  See Trial Tr. at 872:9-10 (Layne).

157.   Savoy Terminal transferred $17,000.00 of the $25,000.00 to Savoy Group's Wells Fargo account.  See Trial Tr. at 872:11-13 (Layne).

158.   Savoy Group transferred $7,000.00 of the $17,000.00 to Top Management.  See Trial Tr. at 872:17-19 (Layne).

159.   By 2010, Savoy Travel had ceased making interest payments to individual investors.  See PSR ¶ 44, at 10.

**14.   <u>Payments from Top Management to Beckner</u>.**

160.   Top Management acquired a bank account with First New Mexico Bank in March, 2008.  See Trial Tr. at 876:9-10 (Sullivan, Layne); id. at 877:11 (Layne).

161.   Curtis' name was associated with the account.  See Trial Tr. at 877:14-16 (Sullivan, Layne).

162.   Various individuals and entities contributed to the account, including Curtis, Beach,

Herlihy, Seashell Fuel, and Savoy Travel.  See Trial Tr. at 876:16-877:8 (Layne)(summarizing deposit history); id. at 877:25-878:3 (Sullivan, Layne).

163.    Savoy Travel made monthly deposits to the Top Management account that ranged in value from $600.00 to $23,000.00, but were often about $6,000.00 or $7,000.00.  See Trial Tr. at 878:4-11 (Sullivan, Layne)

164.    Savoy Travel paid Beckner through the Top Management account.  See Trial Tr. at 878:12-17 (Sullivan, Layne).

165.    Between March, 2008, and September, 2011, when Savoy Travel went into receivership, $480,657.09 went into Top Management's bank account.  See Trial Tr. at 877:19-23 (Sullivan, Layne).

166.    Some of the Top Management funds were used for Beckner's personal expenses, including, approximately: $128,000.00 for tuition for Beckner's children, $47,000.00 for Beckner's rent, $44,000.00 for Romero, and $22,000 for travel, among other expenses.  See Trial Tr. at 880:1-25 (Layne)(summarizing expenses); United States Trial Exhibit 39 at 13, admitted on April 4, 2022 ("Top Management Outflows Chart").

167.    In total, Beckner received $422,712.81 through Top Management.  See Government's Trial Exhibit 39 at 9, admitted April 4, 2022 ("Beckner/Romero Payments Chart").

**15.    Savoy Travel Investigation.**

168.    In 2011, the New Mexico Securities Division learned of "allegations" concerning Savoy Travel, specifically, "that conduct involving investments and a promise of a return had resulted in a loss of financial benefits for citizens."  Trial Tr. at 797:1-4 (Baker).

169.    In 2011, Baker began investigating Savoy Travel.  See Trial Tr. at 796:19-24 (Hartstein, Baker).

170.    On September 7, 2011, the State of New Mexico put Savoy Travel into receivership.  See Trial Tr. at 800:10-14 (Baker).

171.    The same day, the New Mexico Securities Division issued a Cease and Desist Order against Savoy Travel.  See Government's Trial Exhibit 24 at 1-2, admitted April 4, 2022.

172.    Also, that same day, Baker went to Savoy Travel.  See Trial Tr. at 800:15-17 (Hartstein, Baker).

173.    There were several other law enforcement officers present at Savoy Travel, some from the New Mexico Securities Division and some from the United States Secret Service.  See Trial Tr. at 801:5-14 (Hartstein, Baker).

174.    There also was a "large cadre of personnel" associated with the receivership proceeding present.  Trial Tr. at 802:25 (Baker).

175.    Neither Baker nor the other law enforcement officers identified themselves as law enforcement.  See Trial Tr. at 802:15-803:20 (Hartstein, Baker).

176.    Baker's goal was to work "undercover" and "blend in" with the receivership group.  Trial Tr. at 802:20-24 (Baker).

177.    People present at the truck stop "didn't know [Baker and the other officers] were law enforcement officers."  Trial Tr. at 803:13-15 (Hartstein, Baker).

178.    Similarly, Beckner did not know that a criminal investigation was underway.[11]  See

---

[11]The Court makes this finding of fact, because the United States expressly asked the Court to make a finding of fact in this Memorandum Opinion and Order whether Beckner knew that a criminal investigation was underway when officers interviewed him at Savoy Travel on September 7, 2011.  See January 4 Tr. at 50:3-51:3 (Sullivan).  The Court honors the United States' request.  Accordingly, the Court finds that Beckner did not know that a criminal investigation was underway at the time he spoke with officers on September 7, 2011.

The Court acknowledges, however, that the United States presents contrary evidence.  The United States presents Curtis' Grand Jury testimony.  See Transcript of Sean Curtis Grand Jury

Trial Tr. at 803:13-15 (Hartstein, Baker).

----

Testimony (dated June 23, 2015), filed December 22, 3022 (Doc. 218-3)("Curtis Grand Jury Tr."). Curtis testified before the Grand Jury that he spoke with Beckner on the telephone on the evening of September 7, 2011.  See Curtis Grand Jury Tr. at 3:13 (Curtis).  Curtis testified that Beckner

> mentioned that VRE had a court order to install a receiver, and that [Beckner] said that there were other people with VRE that didn't identify themselves, according to [Beckner], that were asking questions.  [Beckner] said that he thought it was the feds.  And [Beckner] said, I don't really know what's going on.  I'm trying to figure it out.

Curtis Grand Jury Tr. at 3:14-20 (Curtis).  According to the United States, Beckner's statement about "the feds" shows that Beckner had an "awareness of a federal investigation" on September 7, 2011.  See U.S. Sentencing Memo. at 10.  The United States contends that Beckner knew that at least some of the officials at Savoy Travel were "criminal investigators, federal investigators." See January 4 Tr. at 52:3-4 (Sullivan).

    The Court disagrees with the United States' interpretation of Beckner's statement concerning "the feds."  In common parlance, "the feds" generally refers to federal law enforcement, oftentimes the FBI.  See Fed, New Oxford American Dictionary (3d Ed. 2010)("a federal agent or official, esp. a member of the FBI"); Fed, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Fed (last visited May 18, 2023)("slang for an agent from the FBI").  Nevertheless, the Court determines that, in context, Beckner's statement that he thought that some of the officials at Savoy Travel were "the feds" does not support a finding by a preponderance of the evidence that Beckner knew that a criminal investigation was underway. Taken together, Beckner's statements to Curtis convey a sense of panic: Beckner knew that there was "court order to install a receiver" and that there were many government officials at his business, but he did not know what was "going on," why the officials were at Savoy Travel, or what the officials were doing.  Curtis Grand Jury Tr. at 3:14-20 (Curtis).  The Court finds that Beckner knew that some kind of government action was afoot on September 7, 2011, but the Court concludes that it is a bridge too far to find that Beckner knew that a criminal investigation was underway at that time.  Beckner could have believed "the feds" were from any number of federal entities, including the FBI, or the Securities and Exchange Commission.  At bottom, however, Beckner did not know "what's going on" and wanted "to figure it out."  Curtis Grand Jury Tr. at 3:14-20 (Curtis).  Accordingly, the Court finds that Beckner did not know that a criminal investigation was underway on September 7, 2011.

179.    Baker and other undercover law enforcement officers spoke with a man who identified himself as Bill Evans.  See Trial Tr. at 804:25-805:24 (Hartstein, Baker).

180.    Beckner -- portraying himself as Bill Evans -- asked the officers about the receivership.  See Trial Tr. at 805:8-15 (Baker).

181.    The other undercover officers asked Beckner about Savoy Travel's investments.  See Trial Tr. at 805:8-15 (Baker).

182.    Beckner indicated that he had not "conducted an investment in over a year."  Trial Tr. at 805:23-24 (Baker).

183.    Baker then asked Beckner for photographic identification.  See Trial Tr. at 806:15-20 (Baker).

184.    Beckner indicated that his identification was in his vehicle.  See Trial Tr. at 806:20-21 (Baker).

185.    Beckner got up from the table and went outside.  See Trial Tr. at 806:23-24 (Baker).

186.    Beckner got into Beach's vehicle.  See Trial Tr. at 806:25 (Baker); id. at 824:16-20 (Moss, Baker).

187.    Beach drove the vehicle, and together Beach and Beckner drove away at a high rate of speed.  See Trial Tr. at 824:12-20 (Moss, Baker); id. at 807:1-4 (Hartstein, Baker).

188.    Curtis and Beckner had "a series of conversations" after Beckner left Savoy Travel.  Trial Tr. at 411:14 (Curtis).

189.    During one conversation, Beckner told Curtis that "VRE was [at Savoy Travel] with people," but that "he wasn't sure who they were."  Trial Tr. at 411:3-5 (Curtis).

190.    Beckner indicated that he "didn't really know what was going on," but that "he was

in the process of finding out" and "[w]hatever it is, it's not good." Trial Tr. at 410:16-22 (Sullivan, Curtis).

191.    At some point during one of the conversations, Beckner indicated that "he suspected the people with VRE might be from the government." Trial Tr. at 411:13-17 (Sullivan, Curtis).

192.    The following day, September 8, 2011, Baker went to Beckner's home in Deming. See Trial Tr. at 808:1-12 (Hartstein, Baker).

193.    Baker served Beckner with an Order to Cease and Desist the Sales of Securities in the State of New Mexico. See Trial Tr. at 808:16-809:18 (Baker).

194.    Baker also identified himself as a law enforcement officer and showed Beckner his badge and photo identification. See Trial Tr. at 809:20-24 (Baker).

195.    Beckner told Baker: "You can tell them that you've served the person also known as Bill Evans." Trial Tr. at 810:2-3 (Baker).

196.    Beckner then "indicated that this was in the hands of the lawyers now." Trial Tr. at 810:13-14 (Baker).

197.    Beckner then asked Baker to leave. See Trial Tr. at 810:15-16 (Hartstein, Baker).

198.    Beckner remained in the United States for two months following September 7, 2011. See Beckner Objections at 2; Trial Tr. at 411:23 (Curtis)(describing that Beckner stayed in New Mexico for "a couple more months" after September 7, 2011).

199.    Beckner spent some portion of those two months in Deming. See Trial Tr. at 411:23 (Curtis).

200.    Beckner also spent some portion of those two months in Santa Fe with Herlihy.

See Beckner Objections at 2.

201.    Beckner also spend some portion of those two months in California with Curtis. See Beckner Objections at 2-3.

202.    After the two months, Beckner went home to Honduras.  See Beckner Objections at 3.

203.    Beckner remained in Honduras until April, 2019.  See PSR ¶ 15, at 8.

204.    While Beckner was in Honduras between 2011 and 2019, he did not know of the charges against him.  See Beckner Objections at 5.

205.    Honduran law enforcement officials arrested and extradited Beckner to the United States in April, 2019.  See PSR ¶ 15, at 8.

206.    Beckner consented to his extradition.  See Beckner Objections at 5.

**16.    Savoy Travel Scheme's Financial Impact.**

207.    Savoy Travel defaulted on the First New Mexico Bank loan.  See PSR ¶ 8, at 5.

208.    Savoy Travel defaulted on the New Markets Tax Credit Program loan.  See PSR ¶ 9, at 6.

209.    Savoy Travel stopped regularly paying individual investors interest by 2010.  See Trial Tr. at 525:25-526:3 (Wright)(explaining "[w]e didn't have enough money in the account. The business was operating in the red a lot.  And, I mean, there just wasn't money some months to pay any of them or all of them.  There just wasn't.").

210.    Many individual investors lost the entire principal of their investments, "in some cases, representing most or all of their retirement savings."  PSR ¶ 13, at 7.

211.    In total, Romero received $2,102,298.70 from Savoy Travel, Petro Fuels, and

related entities.  See Beckner/Romero Payments Chart.

212.    Beckner received $666,174.20 from Top Management and Seashell Fuel.  See Beckner/Romero Payments Chart.

213.    Combined, Beckner and Romero profited $2,768,472.00 from Savoy Travel, Petro Fuels, Top Management, and Seashell Fuel.  See Beckner/Romero Payments Chart.

## PROCEDURAL BACKGROUND

Having provided the factual background, the Court now turns to the relevant procedural history.  The Court begins by describing the pre-trial and trial proceedings.  Next, the Court summarizes the PSR and the parties' objections therein.  Finally, the Court provides an overview of the sentencing hearing.

### 1.      Pretrial Proceedings and Trial.

On June 24, 2015, the Grand Jury indicted Beckner and Herlihy on five counts: (i) Bank Fraud, in violation of 18 U.S.C.§ 1344; (ii) Wire Fraud, in violation of 18 U.S.C. § 1343; (iii) Wire Fraud, in violation of 18 U.S.C. § 1343; (iv) Mail Fraud, in violation of 18 U.S.C. § 1341; and (v) Conspiracy, in violation of 18 U.S.C. § 1349.  See Indictment, filed June 14, 2015 (Doc. 2). More specifically, the Grand Jury indicted Beckner on Counts 1, 2, and 5 -- Bank Fraud, Wire Fraud, and Conspiracy, respectively -- and indicted Herlihy on Counts 1, 3, and 4 -- Bank Fraud, Wire Fraud, and Mail Fraud, respectively.  See Docket Text accompanying Indictment.  The Indictment alleges that Beckner and Herlihy

> devised and executed a scheme and artifice to defraud.  The core of the scheme and artifice was to use false representations to obtain money as alleged loans or investments in connection with the operation of, and alleged improvements to, the truck stop, while in reality the proceeds would be used for other purposes, including being kept by [Beckner] and [Herlihy].

Indictment ¶ 3, at 2.

On February 3, 2017, Herlihy pled guilty to one count of making false statements to a bank in violation of 18 U.S.C. § 1014. See Herlihy Plea Agreement at 2. Herlihy pled pursuant to rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and his plea featured an agreed-upon imprisonment range of 0 to 18 months. See Herlihy PSR ¶ 107, at 24. The Court sentenced Herlihy to the Bureau of Prisons' custody for a term of one day or time served, whichever was less, plus three years of supervised release. See Judgment in a Criminal Case at 2-3, filed June 9, 2020 (Doc. 101). Beckner was arrested in Honduras in April, 2019. See PSR ¶ 15, at 8. He was extradited to the United States. See PSR ¶ 15, at 8. Beckner proceeded to trial on Counts 1, 2, and 5 on April 4, 2022. See Clerk's Minutes at 1, filed April 4, 2022 (Doc. 201)("Trial Clerk's Minutes").

At trial, Plaintiff United States of America called several fact witnesses, including Bonal, Curtis, Wright, Baker, several Savoy Travel employees, and several individual investors. See Trial Clerk's Minutes at 4-9. The United States also called Anne Layne, a forensic accounting expert. See Trial Clerk's Minutes at 9-10. Beckner called one fact witness, and Martin G. Laffer, a forensic accounting expert. See Trial Clerk's Minutes at 10-11. On April 7, 2022, the jury found Beckner guilty on all three counts.[12] See Verdict at 1, filed April 7, 2022 (Doc. 199).

**2.    The PSR.**

On September 6, 2022, the United States Probation Office ("USPO") filed the PSR. See PSR at 1. The PSR indicates that Beckner's base offense level is 7. See PSR ¶ 15, at 9. The PSR applies four enhancements to Beckner's base offense level. See PSR ¶¶ 26-31, at 9-10. First, the PSR applies a 20-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(K), because the loss amount

---

[12]The Indictment charges Beckner with Counts 1, 2, and 5. See Docket Text accompanying Indictment. The Court renumbered Counts 1, 2, and 5 as Counts 1, 2, and 3 when it gave the jury instructions, so the jury returned a verdict that finds Beckner guilty of Counts 1, 2, and 3. See Verdict at 1.

exceeds $7,000,000.00.  See PSR ¶ 26, at 9.  Second, the PSR applies a 2-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involves ten or more victims.  See PSR ¶ 27, at 10.  Third, the PSR applies a 2-level increase under U.S.S.G. § 2B1.1(b)(10), because Beckner: (i) relocated, or participated in relocating, the scheme to another jurisdiction to evade law enforcement; (ii) conducted a substantial part of the scheme outside of the United States; or (iii) used sophisticated means in furtherance of the scheme.  See PSR ¶ 28, at 10.  Finally, the PSR applies a 2-level increase under U.S.S.G. § 3C1.1 for obstructing justice, because: (i) Beckner willfully obstructed or impeded, or attempted to obstruct or impede, the investigation, prosecution, or sentencing of this offense; or (ii) Beckner's obstructive conduct (a) is related to this offense and relevant conduct, or (b) is related to a closely related offense.  See PSR ¶ 31, at 10.  The PSR does not apply any decreases to Beckner's offense level.  In sum, the PSR indicates that Beckner's total offense level is 33.  See PSR ¶ 15, at 10.  With an offense level of 33 and a criminal history category of III, the PSR indicates that Beckner's Guideline imprisonment range is 168 to 210 months.  See PSR ¶ 68, at 17.

### 3.    United States' Objection to the PSR.

On December 22, 2022, the United States filed the U.S. Sentencing Memo.  See U.S. Sentencing Memo. at 1.  In the U.S. Sentencing Memo., the United States asks the Court to sentence Beckner to 300 months.  See U.S. Sentencing Memo. at 4.  In so arguing, the United States asserts that the USPO properly applies all four enhancements to Beckner's base offense level.  See U.S. Sentencing Memo. at 2-3.  The United States also objects to the PSR, however, on the grounds that the USPO should have applied a fifth enhancement to Beckner's base offense level, because Becker was a leader of the Savoy Travel scheme.  See U.S. Sentencing Memo. at 3-4.

First, the United States asserts that the PSR properly applies the 2-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A), because Beckner used mass marketing and harmed more than ten victims, both of which merit U.S.S.G. § 2B1.1(b)(2)(A)'s application. See U.S. Sentencing Memo at 8. The United States notes that Beckner took out advertisements in the Los Angeles Times and "reached a target audience of potential victims much bigger than the population of Deming." U.S. Sentencing Memo. at 8. The United States also asserts that Beckner "victimized at least 25 individual investors and three institutional lenders -- far more than the 10 required." U.S. Sentencing Memo. at 8. The United States emphasizes that Beckner caused financial and emotional harm to many, including individual investors, the State government, and Savoy Travel employees. See U.S. Sentencing Memo. at 8-9.

Second, the United States contends that the PSR properly applies the 2-level enhancement under U.S.S.G. § 2B1.1(b)(10), because Beckner committed a substantial portion of the scheme outside of the United States and used otherwise sophisticated methods, both of which merit U.S.S.G. § 2B1.1(b)(10)'s application. See U.S. Sentencing Memo. at 9. The United States highlights that Beckner used offshore shell corporations and bank accounts to conceal the money he generated through his scheme. See U.S. Sentencing Memo. at 9. The United States also underscores that Beckner fled to Honduras after Savoy Travel went into receivership in September, 2011, and that he remained there until he was extradited in April, 2019. See United States Sentencing Memo. at 9.

Third, the United States asserts that the PSR properly applies a 2-level increase under U.S.S.G. § 3C1.1, because Beckner obstructed justice. See U.S. Sentencing Memo. at 9-10. The United States stresses that Beckner fled from officials when they attempted to interview him on

September 7, 2011, in Deming.  See U.S. Sentencing Memo. at 9-10.  According to the United

States, Beckner knew that "the feds" were "scrutinizing his activity" when they came to Savoy

Travel to interview him, and that he had "an exit strategy," i.e., fleeing to Honduras.  U.S.

Sentencing Memo. at 10 (relying, in part, on Curtis' grand jury testimony, which suggests that

Beckner suspected the government officials at Savoy Travel on September 7, 2011, were "the

feds").  The United States contends that "awareness of a federal investigation is sufficient for the

upward adjustment for obstruction of justice to apply, especially when [Beckner] remained outside

of the jurisdiction of American courts for so many years."  U.S. Sentencing Memo. at 11 (citing

United States v. Perrault, 995 F.3d 748, 778 (10th Cir. 2021)("Perrault")).

Fourth, the United States asserts that the Court also should apply a 4-level enhancement

under U.S.S.G. § 3B1.1, because Beckner was "a leader and organizer in extensive criminal

activity."  U.S. Sentencing Memo. at 11.  The United States contends that Beckner is a "textbook

leader," because he played a managerial or supervisory role at Savoy Travel, exercised control

over Savoy Travel operations, profited more than his co-conspirators, used an alias, and fled the

country.  U.S. Sentencing Memo. at 11-12.  The United States further contends that the Savoy

Travel scheme is an "otherwise extensive" fraud scheme.  U.S. Sentencing Memo. at 13 (quoting

U.S.S.G. § 3B1.1).  The United States concedes that "this case involve[s] only a small group of

participants with criminal intent and knowledge."  U.S. Sentencing Memo. at 13.  Nevertheless,

the United States contends that the fraud was extensive, because it involved many unwitting

participants and extended over a long period of time.  See United States Sentencing Memo. at 13.

In the alternative, the United States also contends that U.S.S.G. § 3B1.1 is applicable,

because Beckner "exercised managerial responsibility for the truck stop property, assets, and

activities."  U.S. Sentencing Memo. at 14.  The United States invokes U.S.S.G. § 3B1.1's

commentary, which establishes that "[a]n upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets or activities of a criminal organization."  U.S. Sentencing Memo. at 13-14 (quoting U.S.S.G. § 3B1.1 Application Note 2).  The United States contends that Beckner managed Savoy Travel's property and assets and used "lack[ies]" -- Curtis and Romero -- to assist him in managing Savoy Travel's property and assets.  U.S. Sentencing Memo. at 14.

4.    **Beckner's Objections to the PSR.**

Beckner filed the Beckner Objections on January 2, 2023.  See Beckner Objections at 1. In the Beckner Objections, Becker asks the Court: (i) not to apply the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1; (ii) not to apply the sophisticated-means enhancement under U.S.S.G. § 2B1.1(10); (iii) to overrule the United States' objection that the leadership enhancement under U.S.S.G. § 3B1.1 applies; and (iv) to correct "factual inaccuracies" in the PSR. Beckner Objections at 2-17.    First, Beckner states that the U.S.S.G. § 3C1.1 obstruction enhancement is inapplicable.  See Beckner Objections at 1-5.  Beckner emphasizes that, after he fled from the authorities on September 7, 2011, he stayed in New Mexico for two months before returning home to his family in Honduras.  See Beckner Objections at 2-3.  Beckner also asserts that the United States' reliance on Perrault is misplaced, because "the enhancement became applicable [in Perrault] not because the defendant left the country, but because he fought his extradition after he learned of the pending charges."  Beckner Objections at 4 (citing Perrault, 995 F.3d at 779).  Beckner underscores that, although he stayed in Honduras for several years before the grand jury indicted him, he never knew that the grand jury had indicted him.  See Beckner Objections at 5.

Second, Beckner asserts that the enhancement under U.S.S.G. § 2B1.1(10) is inapplicable. See Beckner Objections at 5-8. Beckner contends that he did not relocate any aspect of Savoy Travel in order to evade law enforcement or regulators. See Beckner Objections at 6. Beckner also contends that he did not use sophisticated means. See Beckner Objections at 6-8. Beckner asserts that he did nothing more than use "an alias, [make] misrepresentations about the status of the collateral, and commingl[e] . . . invested funds in the business' operating account," none of which amount to "sophisticated means" within U.S.S.G. § 2B1.1(10)'s meaning. Beckner Objections at 7 (citing U.S.S.G. § 2B1.1(10)). He alleges that the United States invokes the "Honduras component" of this case to "sexy up" the facts, when, in reality, there is "no illegal offshoring of business activity or large sums of money, and complex intrigue." Beckner Objections at 8. Beckner also reminds the Court that Herlihy's sentence is not subject to the U.S.S.G. § 2B1.1(10) enhancement. See Beckner Objections at 8.

Third, Beckner asks the Court to overrule the United States' objection and not apply the leadership enhancement under U.S.S.G. § 3B1.1. See Beckner Objections at 8-9. Beckner asserts that the United Sates "perpetuate[s] the fiction that Mr. Beckner had an outsized role," when, in fact, "Herlihy was at least equally culpable." Beckner Objections at 8. Beckner emphasizes that Herlihy played a large role at Savoy Travel, especially with respect to securing the New Markets Tax Credit Program Loan and soliciting individual investors. See Beckner Objections at 8-9.

Finally, Beckner raises several factual objections to the PSR. See Beckner Objections at 9-17. First, Beckner asserts that PSR ¶ 10, at 6, is erroneous, because it falsely asserts that Beckner is the borrower on the Finance New Mexico loan. See Beckner Objections at 9-10; PSR ¶ 10, at 6. Second, Beckner states that PSR ¶ 11, at 6, is misleading, because it underplays Herlihy's role

in soliciting individual investors.  See Beckner Objections at 11-14; PSR ¶ 11, at 6.  Third, Beckner asserts that PSR ¶ 17, at 8, is misleading, because it suggests that Beckner did not use loan and investment proceeds for their intended purpose.  See Beckner Objections at 14-17; PSR ¶ 17, at 8. Beckner highlights that many investments were used to make substantial improvements to Savoy Travel.  See Beckner Objections at 14-17 (including before and after photographs of Savoy Travel).

5.     **Beckner Sentencing Memo.**

Later that day, Beckner also filed the Beckner Sentencing Memo.  See Beckner Sentencing Memo. at 1.  In the Beckner Sentencing Memo., Beckner asks the Court to impose a sentence of time served.  See Beckner Sentencing Memo. at 1.  In support of that contention, Beckner highlights that Savoy Travel is a "legitimate business" that employs dozens of people, generates considerable revenue, and is "beneficial" to Deming.  Beckner Sentencing Memo. at 9-10. Beckner also asserts that to "preserve a sense of fundamental fairness," the Court should sentence Beckner proportionately to Herlihy.  Beckner Sentencing Memo. at 10-13.  Beckner reminds the Court that it sentenced Herlihy to one day or time served, and that Beckner had already served 1,398 days at the time Beckner filed the Beckner Sentencing Memo.  See Beckner Sentencing Memo. at 13. Beckner implores the Court not to "exacerbate an already gross sentencing disparity" between Beckner and Herlihy.  Beckner Sentencing Memo. at 10.  Beckner also asks for leniency, because he did not profit more from Savoy Travel than his co-participants, and because he needs to be in Honduras to support his family.  See Beckner Sentencing Memo. at 13-14.

6.     **The PSR Addendum.**

On January 3, 2023, the USPO filed the Addendum to the Presentence Report (Doc. 222) ("PSR Addendum").  In the PSR Addendum, the USPO summarizes and responds to the parties'

objections.  See PSR Addendum at 1-3.  First, the USPO declines to amend the PSR to include the leadership enhancement under U.S.S.G. § 3B1.1.  See PSR Addendum at 2.  The USPO asserts that "the information provided regarding the defendant's and co-defendant Arthur Herlihy's roles did not establish support for an enhancement."  PSR Addendum at 2.  The USPO references several instances in which Beckner and Herlihy both played large roles, including securing the New Markets Tax Credit Program Loan and soliciting individual investors.  See PSR Addendum at 2.  Second, the USPO declines to change the PSR to strike the obstruction enhancement under U.S.S.G. § 3C1.1.  See PSR Addendum at 2.  The USPO highlights that Beckner fled from officials on September 7, 2011, after "the investigation of the instant offense had begun."  PSR Addendum at 2.  Third, the USPO declines to amend the PSR to strike the enhancement under U.S.S.G. § 2B1.1(b)(10).  See PSR Addendum at 3.  The USPO asserts that Beckner used offshore bank accounts and shell corporations, both of which amount to sophisticated means for U.S.S.G. § 2B1.1(b)(10)'s purposes.  See PSR Addendum at 3.

The USPO also responds to Beckner's factual objections.  See PSR Addendum at 3-5. First, the USPO declines to amend PSR ¶¶ 9 and 10, at 5, 6, to clarify that Beckner was not the borrower on the New Markets Tax Credit Program Loan.  See PSR Addendum at 3; PSR ¶¶ 9, 10, at 5, 6.  The USPO states that Beckner signed the loan documents and certificate of indemnity for the New Markets Tax Credit Program Loan.  See PSR Addendum at 3.  Second, the USPO declines to change PSR ¶ 11, at 6, to reflect Herlihy's role.  See PSR Addendum at 3; PSR ¶ 11, at 6.  The USPO asserts that PSR ¶ 11, at 6, reflects the information that the USPO received from the United States about Herlihy's role in soliciting individual investors.  See PSR Addendum at 3; PSR ¶ 11, at 6.  Third, the USPO asserts that it "will omit the word 'alleged' as well as the phrase 'including being kept by Beckner' from the first sentence of paragraph 17."  PSR Addendum at 4.  See PSR

¶ 17, at 8.

    **7.**    **Sentencing Hearing.**

The Court held a sentencing hearing on January 4, 2023.  <u>See</u> Sentencing Clerk's Minutes at 1.  The Court provided counsel with a preview of its thinking on the parties' objections.  <u>See</u> January 4 Tr. at 3:12-11:24 (Court).  The Court then heard argument on each objection.  <u>See</u> January 4 Tr. at 3:12-14 (Court).

    **a.**    **Argument Regarding U.S.S.G. § 3B1.1.**

The Court began with the United States' U.S.S.G. § 3B1.1 objection.  <u>See</u> January 4 Tr. at 3:12-14 (Court).  The Court indicated that it is inclined to believe that U.S.S.G. § 3B1.1 applies, because Beckner was the leader of an otherwise extensive fraud scheme.  <u>See</u> January 4 Tr. at 3:18-11:24 (Court).  More specifically, the Court explained that it is inclined to conclude that Beckner is a leader of the Savoy Travel scheme, because he exercised "significant control" over Curtis, recruited Herlihy to join Savoy Travel, and played a prominent role in soliciting investments.  January 4 Tr. at 6:8-8:1 (Court).  Additionally, the Court explained that it is inclined to find that the Savoy Travel scheme is otherwise extensive, because it spanned across several States and countries, lasted at least two years, implicated millions of dollars, harmed dozens of victims, and involved three participants, as well as many unwitting participants -- including numerous rank-and-file Savoy Travel employees.  <u>See</u> January 4 Tr. at 9:4-11:24 (Court).

The United States agreed with the Court's analysis.  <u>See</u> January 4 Tr. at 12:3-4 (Hartstein).  The United States stated that the Court should view Beckner's attempt to downplay his role in brokering the New Markets Tax Credit Program Loan with "utmost skepticism."  January 4 Tr. at 12:15 (Hartstein).  The United States contended that Beckner intentionally held Herlihy out as the "front man" during that transaction in an effort to deceive lenders.  January 4 Tr. at 12:10-11

(Hartstein).  See id. at 13:7-14:7 (Hartstein).  The United States also emphasized that "Beckner repeatedly used Sean Curtis and controlled Sean Curtis to further his own ends."  January 4 Tr. at 13:4-6 (Hartstein).

The Court asked the United States for its views on whether the Court should consider "unwitting participants" in determining whether the scheme was "otherwise extensive" for U.S.S.G. § 3B1.1's purposes.  January 4 Tr. at 15:4-22 (Court).  In so asking, the Court noted that the United States Court of Appeals for the Tenth Circuit has not announced a rule for determining who amounts to an "unwitting participant," but indicated that it was considering relying on a test from the United States Court of Appeals for the Second Circuit.  January 4 Tr. at 15:4-22 (Court)(referencing United States v. Carrozzella, 105 F.3d 796, 804 (2d Cir. 1997)).  The United States indicated that it agreed that the Court should rely on the Second Circuit's test.  See January 4 Tr. at 15:24 (Hartstein).  It asserted that applying the test to the evidence presented at trial suggests that there were many unwitting participants in the Savoy Travel scheme, including Wright, Duarte, Robinson, and the other Savoy Travel employees.  See January 4 Tr. at 15:23-16:8 (Hartstein).  See id. at 26:10-27:6 (Hartstein).

Beckner indicated that he maintains his position on the U.S.S.G. § 3B1.1 issue.  See January 4 Tr. at 17:23-24 (Ray).  Beckner began by emphasizing Herlihy's role in the Savoy Travel scheme.  See January 4 Tr. at 18:3-9 (Ray).  The Court reminded counsel that "there can be more than one leader or organizer," and asked, "even if you think Herlihy played a bigger role, how does that help Mr. Beckner?"  January 4 Tr. at 18:12-14 (Court).  Beckner's counsel acknowledged that there can be more than one leader or organizer for U.S.S.G. § 3B1.1's purposes, but argued that, because the Court did not apply the enhancement when sentencing Herlihy, it should not apply the enhancement when sentencing Beckner.  See January 4 Tr. at 18:10-25 (Ray).

Regarding the unwitting participant issue, Beckner contended that the Court should not consider the truck stop employees unwitting participants, because an unwitting participant must have some kind of "tie to [the] criminal activity." January 4 Tr. at 21:7-19 (Ray). Beckner asserted that it would be unfair to call the truck stop employees unwitting participants in the scheme, because "all of their activity was completely tied to legitimate activity" at Savoy Travel. January 4 Tr. at 23:2-3 (Ray). Beckner also noted that caselaw from the United States Court of Appeals for the Sixth Circuit requires a court to consider the "role and performance" of a person before deeming him or her an "unwitting participant." January 4 Tr. at 30:8-12 (Ray)(referencing United States v. Anthony, 280 F.3d 692, 701 (6th Cir. 2002)).

The Court stated that "the leader question boils down to a question of control." January 4 Tr. at 23:12-13 (Court). The Court noted that Tenth Circuit caselaw permits U.S.S.G. § 3B1.1's application where a defendant controlled at least one other participant. See January 4 Tr. at 23:12-19 (Court)(referencing United States v. Zhou, 717 F.3d 1139, 1149-51 (10th Cir. 2013)("Zhou")). The Court indicated that it is inclined to find that Beckner controlled Curtis, and asked the parties to respond. See January 4 Tr. at 23:17-19 (Court). Beckner responded that he did not control Curtis. See January 4 Tr. at 23:21-22 (Ray). Beckner emphasized that "Curtis testified that he made his own decisions." January 4 Tr. at 23:20-21 (Ray). Regarding Curtis' marriage to Romero, Beckner explained that Curtis married Romero "to help close family friends," and not because Beckner was controlling Curtis. January 4 Tr. at 23:20-24:11 (Ray). The Court indicated that its thinking was unchanged and that it is inclined to grant the objection and apply the leadership enhancement to Beckner's base offense level. See January 4 Tr. at 31:3-12 (Court).

   **b.     Argument Regarding U.S.S.G. § 2B1.1(b)(10).**

The Court moved onto the U.S.S.G. § 2B1.1(b)(10) enhancement. See January 4 Tr. at

31:17-20 (Court).  The Court indicated that it is inclined to believe that U.S.S.G. § 2B1.1(b)(10)

applies, because Beckner used sophisticated means in furtherance of the Savoy Travel scheme,

such as shell corporations and foreign bank accounts.  See January 4 Tr. at 31:16-34:6 (Court).

The Court explained that the commentary to U.S.S.G. § 2B1.1(b)(10) establishes that corporate

shells and offshore accounts are sophisticated means for U.S.S.G. § 2B1.1(b)(10)'s purposes.  See

January 4 Tr. at 32:12-25 (Court).  The Court invited Beckner to argue in support of his objection,

but Beckner stood on his papers.  See January 4 at 34:9-11 (Ray).

The United States agreed with the Court's analysis, and emphasized that Beckner used

shell corporations and foreign accounts to conceal the proceeds of the Savoy Travel scheme.  See

January 4 Tr. at 34:15-21 (Hartstein).  The United States also highlighted that Beckner used

Romero as the straw owner of one of the shell corporations, which added an additional layer of

sophistication and concealment.  See January 4 Tr. at 34:15-35:8 (Hartstein).  Beckner rebutted

that he had "preexisting foreign ties" and that it would be a "form of bootstrapping" to enhance

his sentence for those "preexisting foreign ties."  January 4 Tr. at 55:15-56:9 (Ray).  The Court

indicated that it would overrule the objection and apply the sophisticated-means enhancement to

Beckner's base offense level.  See January 4 Tr. at 35:16-17 (Court).

<h3 style="text-align:center">c.     Argument Regarding U.S.S.G. § 3C1.1.</h3>

The Court then moved onto the U.S.S.G. § 3C1.1 obstruction enhancement.  See January

4 Tr. at 35:18-20 (Court).  The Court indicated that it is inclined to sustain the objection, because

Beckner did not obstruct justice when he fled from authorities on September 7, 2011.  See January

4 Tr. at 20-22 (Court).  The Court indicated that U.S.S.G. § 3C1.1 applies in flight cases where the

defendant flees and engages in "other obstructive conduct," such that the flight plus the other

conduct "significantly hinder" an investigation.  January 4 Tr. at 36:12-37:17 (Court)(relying on

United States v. Welbig, No. CR 14-3347 JB, 2015 WL 2225963 (D.N.M. March 15, 2015)(Browning, J.)("Welbig")).   The Court explained that it does not see evidence of "other obstructive conduct" that would merit U.S.S.G. § 3C1.1's application.   See January 4 Tr. at 37:25-38:3 (Court).

Beckner agreed with the Court's analysis.   See January 4 Tr. at 38:21 (Ray).   Beckner emphasized that Baker was undercover on September 7, 2011.   See January 4 Tr. at 38:24-39:7 (Ray).   Beckner also highlighted that Beckner was at his home in Deming on September 8, 2011, and that he accepted service of the Cease and Desist papers on that day.   See January 4 Tr. at 39:18-40:9 (Ray).   Beckner underscored that he "stayed in the United States for a couple of months" and then returned to Honduras.   See January 4 Tr. at 40:10-11 (Ray).   Beckner added that, when he ultimately was arrested in Honduras, he did not resist being extradited to the United States.   See January 4 Tr. at 41:7-12 (Ray).

The Court asked whether Beckner thought that his flight to a foreign country could amount to additional obstructive conduct.   See January 4 Tr. at 41:24-42:4 (Court).   Beckner responded in the negative.   See January 4 Tr, at 42:5 (Ray).   Beckner explained that the Tenth Circuit could have held that flight to a foreign country amounts to additional obstructive conduct in Perrault, but that it did not hold that flight to a foreign country amounts to additional obstructive conduct.   See January 4 Tr. at 42:5-10 (Ray)(citing Perrault, 995 F.3d at 777).   Beckner clarified that the Tenth Circuit applies the obstruction enhancement in Perrault, because Perrault fought extradition from a foreign country, and not because he fled to a foreign country.   See January 4 Tr. at 42:13-17 (Ray)(citing Perrault, 995 F.3d at 778-79).   Beckner argued that a decision that flight to a foreign country amounts to "additional obstructive conduct" for U.S.S.G. § 3C1.1's purposes would have a disparate impact on defendants, like Beckner, who have a "preexisting foreign tie."   January 4

Tr. at 42:18-43:10 (Ray).

The United States disagreed with Beckner's characterization of the Tenth Circuit's <u>Perrault</u> decision.  <u>See</u> January 4 Tr. at 43:15-18 (Hartstein).  The United States contended that <u>Perrault</u> does not reach the question whether flight to a foreign country could, on its own, amount to additional obstructive conduct.  <u>See</u> January 4 Tr. at 43:20-44:2 (Hartstein).  The United States emphasized that the Tenth Circuit does not hold that "flight and remaining in a foreign jurisdiction can never be the something more" that U.S.S.G. § 3C1.1 requires.  January 4 Tr. at 43:24-44:1 (Hartstein).  The United States added that Beckner's "preparation and planning" amounts to additional obstructive conduct.  January 4 Tr. at 44:3-10 (Hartstein).  The United States contended that the evidence supports a finding that Beckner "intended to impede the administration of justice" all along and planned and prepared in anticipation of such.  January 4 Tr. at 44:23-45:12 (Hartstein).

The United States also disagreed with Beckner's contention that Beckner did not know that the officials at Savoy Travel on September 7, 2011, were law enforcement.  <u>See</u> January 4 Tr. at 45:13-46:5 (Hartstein).  The United States noted that, in Curtis' grand jury testimony, Curtis testified that Beckner told him that Beckner knew the officials were "the feds."  January 4 Tr. at 45:19 (Hartstein).  The United States asserted that Beckner "knew that there was a federal investigation afoot" and that his flight is "indicative of this careful plan that Mr. Beckner had . . . to get out of the country."  January 4 Tr. at 45:22-46:12 (Hartstein).  The Court questioned whether something that happened before flight could amount to additional obstructive conduct.  <u>See</u> January 4 Tr. at 47:8-19 (Court).  The United States argued that pre-flight planning should count as additional obstructive conduct when a defendant "avails himself of that planning after the flight."  January 4 Tr. at 47:20-24 (Hartstein).  The Court also asked how the flight plus the

planning impeded the investigation in this case.  See January 4 Tr. at 48:15-17 (Court).  The United

States responded that the flight and planning complicated the investigation in several ways,

including by muddling records acquisition, thwarting funds tracing, and necessitating extradition.

See January 4 Tr. at 48:18-49:18 (Hartstein).

The United States also asked the Court to make explicitly a finding of fact in this

Memorandum Opinion and Order whether Beckner knew that a criminal investigation was afoot

on September 7, 2011.  See January 4 Tr. at 50:3-51:3 (Sullivan).  The Court asked what evidence

supports a finding that Beckner knew that he was under criminal investigation on September 7,

2011.  See January 4 Tr. at 51:4-5 (Court).   The United States responded that Beckner telling

Curtis "I think they were the feds" evinces that Beckner knew that federal agents -- not just New

Mexico State receivership officials -- were at Savoy Travel on September 7, 2011.  January 4 Tr.

at 51:6-22 (Court, Sullivan).

Beckner clarified that Beckner's statements to Curtis regarding "the feds . . . comes after

he has already spoken to Ben Baker."  January 4 Tr. at 52:10-13 (Ray).  Beckner also contended

that the United States is engaging in "bootstrapping" by relying on pre-flight conduct to show post-

flight additional obstructive conduct.  January 4 Tr. at 54:3-8 (Ray).  The Court indicated that it

would give "the feds" issue more thought, but that it would sustain the objection.  January 4 Tr. at

54:18-55:2 (Court).

Later during the January 4, 2023, hearing, the United States reminded the Court that

Beckner has "two prior criminal convictions in federal court for fraud," such that "his use of the

term 'feds' would have a particular meaning to him, based on that personal experience . . . ."

January 4 Tr. at 62:19-22 (Sullivan).  The United States also underscored that, shortly before

making the statement regarding "the feds," Beckner had borrowed from a federal program -- the

New Markets Tax Credit Program -- and a federally insured bank.  January 4 Tr. at 62:25-63:14

(Sullivan).  The United States contended that it is "reasonable to think" that Beckner was thinking,

"I've been prosecuted by the federal criminal authorities in the past.  Since then, I have lied to get

funds backed by a federal program and I have lied to get a loan from the federally insured

institution.  I mean, 'the feds,' . . . I mean I'm under federal criminal investigation again."  January

4 Tr. at 63:15-23.  Beckner responded that the United States' interpretation is speculation and that

the United States "ha[s]n't provided any evidence" that Beckner knew a criminal investigation was

underway on September 7, 2011.  January 4 Tr. at 64:1-13 (Ray).

### d.    Argument Regarding Factual Objections.

The Court then moved onto Beckner's factual objections to the PSR.  See January 4 Tr. at

57:2-7 (Court).  Beckner's counsel indicated that the USPO addressed his third factual objection,

the objection concerning PSR ¶ 17, at 8, and Beckner's use of the of the New Markets Tax Credit

Program Loan.  See January 4 Tr. at 57:8-58:3 (Ray).  Beckner's counsel explained that the USPO

would amend the portion of PSR ¶ 17, at 8, that reads "Beckner used false representations to obtain

money as alleged loans or investments in connection with the operation of, and improvements to,

Savoy Travel Center in Deming, New Mexico, while in reality the proceeds were used for other

purposes, including being kept by Beckner," PSR ¶ 17, at 8, to read "Beckner used false

representations to obtain money as loans or investments in connection with the operation of, and

alleged improvements to, Savoy Travel Center in Deming, New Mexico, while in reality some of

the proceeds were used for other purposes," January 4 Tr. at 57:17-58:3 (Ray)(quoting PSR ¶ 17,

at 8).  Beckner's counsel indicated that he continued to object to the phrase "some of the proceeds,"

because it is "vague," January 4 Tr. at 58:6-15 (Ray), and because it does not reference Herlihy,

January 4 Tr. at 58:24-59:1 (Ray).  The Court indicated that a preponderance of the evidence

supports a finding that the amended version of PSR ¶ 17 is correct.  See January 4 Tr. at 59:2-12 (Court).

Next, the Court and the parties moved onto the factual objection concerning PSR ¶ 9, at 6, and the Finance New Mexico Loan.  See January 4 Tr. at 59:25-60:10 (Ray); PSR ¶ 9, at 6.  The Court asked the United States if it would be amenable to adding "Mr. Beckner was not the borrower on the loans from United States Development Corporation, and it was Herlihy that brokered the [New Market Tax Credit Program Loan] transaction" and "Mr. Beckner was managing the floor, as indicated in the management contract" to PSR ¶ 9, at 6.  January 4 Tr. at 60:11-20 (Court).  The United States indicated that it "would prefer the wording: 'He's not a borrower in his personal capacity.'"  January 4 Tr. at 60:21-23 (Hartstein).  Beckner and the USPO agreed to the additions, as the United States modified them.  See January 4 Tr. at 61:3-10 (Court, Ray, Ortiz y Martinez).

Finally, the Court and the parties addressed the factual objection concerning PSR ¶ 11, at 6.  See January 4 Tr. at 61:11-14 (Court); PSR ¶ 11, at 6.  The Court indicated that it was inclined to leave PSR ¶ 11, at 6, as is, because Beckner's objection to PSR ¶ 11, at 6, is "more argumentative than it is a fact."  January 4 Tr. at 61:21-23 (Court).  Beckner stated that he "understood" the Court's reasoning.  January 4 Tr. at 61:24 (Ray).  Beckner indicated that the Court had dealt with all of his factual objections to the PSR and that Beckner has no further factual objections to the PSR.  See January 4 Tr. at 62:2-8 (Court, Ray).

Later in the January 4, 2023, hearing, Beckner raised an objection that the PSR impermissibly indicates that Beckner's date of arrest is April 19, 2019,[13] and not March 8, 2019.  See January 4 Tr. at 12-23 (Ray).  Beckner asserted that he was arrested in Honduras on March 8,

---

[13]Marshall Ray, Beckner's counsel, misspoke at the hearing.  The PSR indicates that Beckner's arrest date is April 16, 2019.  See PSR at 2.

2019, and that his time in custody should be calculated based on that date. See January 4 Tr. at 12-23 (Ray). The USPO indicated that it was "an oversight on Probation's part" and that USPO would calculate Beckner's time in custody based on the March 8, 2019, date. January 4 Tr. at 66:1-4 (Ortiz y Martinez).

       **e.**      **Imposition of Sentence.**

Having heard argument on the objections and factual objections, the Court proceeded to sentencing. See January 4 Tr. at 66:21-24 (Court). First, the Court heard Beckner's argument. See January 4 Tr. at 67:15 (Court). Beckner asked for a time served sentence. See January 4 Tr. at 81:5-7 (Ray). Beckner noted several factors that should put downward pressure on his sentence, including: (i) the legitimate work that Beckner did at Savoy Travel; (ii) Herlihy's role in perpetrating the scheme; (iii) Beckner's remorse; (iv) the benefit that Savoy Travel provided the Deming community; (v) Herlihy's time served sentence; (vi) the hardships associated with incarceration during the COVID-19 pandemic; and (vii) Beckner's minor children and family in Honduras. See January 4 Tr. at 67:16-81:11 (Ray). Next, the Court heard the United States' argument. See January 4 Tr. at 82:6-7 (Court). The United States asked for a sentence at the upper end of the Guideline range. See January 4 Tr. at 103:9-16 (Hartstein). The United States had several individual investors address the Court via Zoom and written statements. See January 4 Tr. at 82:8-14 (Hartstein). The United States emphasized several factors that put upward pressure on Beckner's sentence, including: (i) the emotional and financial impact on the investors; (ii) Beckner's flight to Honduras; (iii) Beckner's criminal history; (iv) the loss amount's magnitude; (v) the amount Beckner profited; (vi) Beckner's lavish lifestyle in Honduras; and (vii) the need to deter similar conduct in the future. See January 4 Tr. at 83:17-103:16 (Sullivan, Hartstein).

The Court indicated that with an offense level of 35 and criminal history category of III,

the Guideline imprisonment range is 210 to 262 months.  See January 4 Tr. at 104:10-13 (Court).

The Court identified some "factors that put some downward pressure on the sentence," including

that: (i) one of Beckner's sons passed away; (ii) Beckner likely will lose contact with his other

children if he is incarcerated; and (iii) the Court is obligated not to impose a sentence that is greater

than necessary.  January 4 Tr. at 105:6-17 (Court).  The Court identified, however, other "factors

that put upward pressure on the sentence to keep it in the Guideline range," including: (i) the

offense's seriousness; (ii) the number of victims; (iii) the magnitude of the impact on the victims;

(iv) the need to promote respect for the law; (v) the need to provide just punishment; (vi) general

deterrence; (vii) specific deterrence; (viii) public safety; (ix) Beckner's criminal history; (x)

Beckner's benefit from the scheme; (xi) Beckner's failure to pay restitution in his prior federal

fraud case; and (xii) Beckner's use of aliases.  January 4 Tr. at 105:18-107:3 (Court); id. at 107:23-

108:6 (Court); id. at 109:1-11 (Court).  The Court added that it is "not convinced" that it needs to

take Herlihy's sentence into account while sentencing Beckner.  January 4 Tr. at 107:4-7 (Court).

The Court noted that the disparity between Beckner and Herlihy's sentence can be attributed to

the fact that Herlihy pled guilty and cooperated with the United States, while Beckner did not plead

or cooperate.  See January 4 Tr. at 108:18-20 (Court).  Ultimately, the Court determined that "the

factors that put upward pressure [on Beckner's sentence] . . . overwhelm, both quantitatively and

qualitatively, the very few factors that put downward pressure [on Beckner's sentence]."  January

4 Tr. at 109:12-15 (Court).  Accordingly, the Court sentenced Beckner to the Bureau of Prisons'

custody for 210 months, the bottom of the applicable Guideline range, plus a five-year term of

supervised release.  See January 4 Tr. at 11:21-112:7 (Court).  The Court also ordered that Beckner

make restitution to the victims.  See January 4 Tr. at 115:21-116:14 (Court).

## LAW REGARDING THE SENTENCING GUIDELINES

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L No. 98-473, 98 Stat. 1837, 1987, thus making the Guidelines sentencing ranges effectively advisory.  543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  <u>United States v. Booker</u>, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily-defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) the Guidelines; (ii) the offense's nature, and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines sentences are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007).  The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349).  A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

Finally, the Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445

F.3d at 1264.  This presumption is an appellate presumption, however, and not one that the trial

court can or should apply.  See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v.

United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the

presumption of reasonableness "is an *appellate* court presumption")(emphasis in original).

Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption

in favor of the advisory Guidelines sentence.  See Kimbrough v. United States, 552 U.S. at 90-91;

Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

### LAW REGARDING OBJECTIONS TO A PRESENTENCE REPORT

Before the Court imposes a sentence, the USPO "must conduct a presentence investigation

and submit a report to the court . . . ."  Fed. R. Crim. P. 32(c)(1).  A presentence report must apply

the advisory sentencing Guideline, meaning that it must:

(A)     identify all applicable guidelines and policy statements of the Sentencing
Commission;

(B)     calculate the defendant's offense level and criminal history category;

(C)     state the resulting sentencing range and kinds of sentences available;

(D)     identify any factor relevant to:

(i)      the appropriate kind of sentence, or

(ii)     the appropriate sentence within the applicable sentencing range; and

(E)     identify any basis for departing from the applicable sentencing range.

Fed. R. Crim. P. 32(d)(1).  A presentence report also must provide additional information,

including:

(A)     the defendant's history and characteristics, including:

(i)      any prior criminal record;

(ii)      the defendant's financial condition; and

(iii)      any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in correctional treatment;

(B)      information that assesses any financial, social, psychological, and medical impact on any victim;

(C)      when appropriate, the nature and extent of nonprison programs and resources available to the defendant;

(D)      when the law provides for restitution, information sufficient for a restitution order;

(E)      if the court orders a study under 18 U.S.C. § 3552 (b), any resulting report and recommendation;

(F)      a statement of whether the government seeks forfeiture under Rule 32.2 and any other law; and

(G)      any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a).

Fed. R. Crim. P. 32(d)(2).

After the USPO files a presentence report, the parties have an opportunity to object to the report.  See Fed. R. Crim. P. 32(f).  Parties must make their objections in writing within fourteen days of receiving the presentence report.  See Fed. R. Crim. P. 32(f)(1).  Parties may object to many aspects of the presentence report, "including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report."  Fed. R. Crim. P. 32(f)(1).  For example, a party can object to a presentence report's statement of facts.  See, e.g., United States v. Garcia, No. CR 20-1370 KWR, 2022 WL 2341670 (D.N.M. June 29, 2022)(Riggs, J.)(sustaining in part and overruling in part a defendant's objections that a presentence report misstates material facts regarding the posted speed limit and the circumstances surrounding the

victim's injuries).  If a party raises a factual objection, it must present "information to cast doubt

on" the presentence report's recitation of the facts.  United States v. Yates, 22 F.3d 981, 989 (10th

Cir. 1994).  A party also can object that the USPO miscalculated a defendant's criminal history

category.  See, e.g., United States v. Chavez, No. CR 18-0836 JB, 2018 WL 6621283 (D.N.M.

December 18, 2018)(Browning, J.)(addressing a defendant's objections that the Court should

reduce his criminal history category by several points).  Similarly, a party can object that a

presentence report impermissibly applies a base offense level enhancement, see, e.g., United States

v. Casias-Grove, No. 22-0109 JB, 2022 WL 17830249 (D.N.M. December 21, 2022)(Browning,

J.)(sustaining a defendant's objection that the presentence report impermissibly applies a 4-level

enhancement to his base offense level); that a presentence report should have applied an additional

base offense level enhancement, see, e.g., United States v. Talk, No. CR 19-1994 JB, 2021 WL

1978624 (D.N.M. May 18, 2021)(Browning, J.)(sustaining the United States' objection that the

presentence report should have applied a 4-level enhancement to the defendant's base offense

level); or that a presentence report should have applied a base offense level decrease, see, e.g.,

United States v. Pena, Nos. CR 19-3609 JB, CR 19-3611 JB, 2022 WL 16924000 (D.N.M.

November 13, 2022)(Browning, J.)(sustaining the parties' objections that the presentence report

should have applied a 2-level reduction to the defendant's base offense level).

Ideally, the parties and the USPO can work through objections without the Court's

assistance.  Rule 32(f)(3) establishes that, "[a]fter receiving objections, the probation officer may

meet with the parties to discuss the objections.  The probation officer may then investigate further

and revise the presentence report as appropriate."  Fed. R. Civ. P. 32(f)(3).  In keeping with rule

32(f)(3), long ago in the District of New Mexico, the Court, the United States Attorney's Office,

and the Federal Public Defender's Office agreed that, if there are objections, counsel first will talk

to the USPO and see if they can work to address the objections independently.  If the parties and the USPO cannot work out an objection, then the parties may file an objection with the Court.  If the parties and the USPO cannot resolve an objection, rule 32(g) establishes that, "[a]t least 7 days before sentencing, the probation officer must submit to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them."  Fed. R. Crim. P. 32(g).

If the parties and the USPO cannot resolve an objection on their own, the Court "must . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).  When resolving factual objections, the Court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence.  See United States v. Munoz-Tello, 531 F.3d 1174 (10th Cir. 2008).  Similarly, in considering objections to enhancements to a defendant's criminal history category or base offense level, the Court must determine whether the United States has met its burden of showing that a particular enhancement applies by a preponderance of the evidence.[14]  See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The Court may base its conclusion "on evidence presented at trial, undisputed statements in the PSR, and evidence presented at the sentence[ing] hearing."  United States v. Garcia, 2022 WL 2341670, at *2 (quoting United States v. White, 663 F.3d 1207, 1216 (11th Cir. 2011)).

---

[14]There is some nuance regarding the applicable burden of proof required for sentencing enhancements, which the Court discusses in greater detail in the next section.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR
## ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute."  530 U.S. at 481 (emphasis in original).  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2012)).  In United States v. Booker, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement."  (quoting United States v.

Booker, 543 U.S. at 221)(second alteration added by United States v. Booker)).  More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine.  See United States v. Magallanez, 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50 to 500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount.  See United States v. Magallanez, 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required

to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." United States v. Magallanez, 408 F.3d at 685.

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d at 1105 (quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[15] "[T]he application of an enhancement . . . does not implicate the Supreme Court's

---

[15]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms). Subsequent to United States v. Washington, the Tenth Circuit reiterated the position that preponderance of the evidence is the proper standard, stating: "The Supreme Court has not adopted a heightened standard of proof at sentencing for contested facts, thus we hold that the correct standard of proof in this case was a preponderance of the evidence. This issue has been foreclosed in this Circuit." United States v. Robertson, 946 F.3d 1168, 1171 (10th Cir. 2020)(citing United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)).

holding in *Apprendi v. New Jersey*." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at \*7 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increases his or her sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)(holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").[16] The Court has noted:

---

[16]United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014) is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(unpublished). The Court concludes that United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014); United States v. Martinez, 85 F. App'x 146 (10th Cir. 2004); United States v. Rubio-Sepulveda, 781 F. App'x 769 (10th Cir. 2019); and United States v. Luton, No. 21-1285, 2022 WL 2764202 (10th Cir. July 15, 2022) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

> [A]lthough the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u> . . . expands the rule from <u>Apprendi v. New Jersey</u>, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  <u>See</u> [<u>United States v. Sangiovanni</u>, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. August 29, 2014)(Browning, J.)].

<u>United States v. Cervantes-Chavez</u>, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it,' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt." <u>United States v. Haymond</u>, 139 S. Ct. 2369, 2378 (2019)(quoting <u>Alleyne v. United States</u>, 570 U.S. at 112-14).  Further, the Tenth Circuit has determined that a district court could use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with <u>Alleyne v. United States</u>, "so long as the court does not use its own drug quantity finding to alter the defendant's *statutory* sentencing range." <u>United States v. Cassius</u>, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

## <u>LAW REGARDING U.S.S.G. § 3B1.1(a)</u>

U.S.S.G. § 3B1.1 provides for several enhancements to a defendant's offense level based on a defendant having played an aggravating role in the offense.  Specifically, under U.S.S.G. § 3B1.1(a), "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a).  In other words, U.S.S.G. § 3B1.1(a) applies where two requirements are met: (i) the defendant was a leader or organizer of criminal activity, and (ii) the criminal activity involved five or more

participants, or was "otherwise extensive."  U.S.S.G. § 3B1.1(a).  The Court outlines both

requirements in turn.

    1.    **Leader or Organizer**.

First, the defendant must be a leader or organizer of criminal activity.  See U.S.S.G.

§ 3B1.1(a).  The leader or organizer requirement is disjunctive, and the Court needs to determine

only whether a defendant was a leader or whether a defendant was an organizer, but he need not

be both for the enhancement to apply.  See United States v. Wardell, 591 F.3d 1279, 1304 (10th

Cir. 2009).  In determining whether a defendant is a leader for U.S.S.G. § 3B1.1's purposes, the

commentary to U.S.S.G. § 3B1.1 explains that courts should consider a number of factors,

including

> the exercise of decision making authority, the nature of participation in the
> commission of the offense, the recruitment of accomplices, the claimed right to a
> larger share of the fruits of the crime, the degree of participation in planning or
> organizing the offense, the nature and scope of the illegal activity, and the degree
> of control and authority exercised over others.

See U.S.S.G. § 3B1.1 Application Note 4.  The Tenth Circuit has "elaborated that '[i]n considering

these factors, the sentencing court should remain conscious of the fact that the gravamen of this

enhancement is control, organization, and responsibility for the actions of other individuals

because U.S.S.G. § 3B1.1(a) is an enhancement for organizers or leaders, not for important or

essential figures.'"  United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United

States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)).

In particular, the Tenth Circuit has emphasized that the last factor -- control -- is central to

the leadership analysis.  See Zhou, 717 F.3d at 1149-51.  For example, in Zhou, the defendant pled

guilty to forty-one counts for trafficking and attempted trafficking of counterfeit diet pills.  See

Zhou, 717 F.3d at 1146.  Zhou's presentence report applied a sentencing enhancement under

U.S.S.G. § 3B1.1(a), among other enhancements.  See Zhou, 717 F.3d at 1146.  Zhou objected to the enhancements' applicability.  See Zhou, 717 F.3d at 1146.  Zhou later withdrew his objection to U.S.S.G. § 3B1.1(a)'s applicability.  See Zhou, 717 F.3d at 1151.  The district court found that the leader or organizer prong was satisfied, stating that, "of course, here we know that [Zhou] was a leader or organizer of at least one person, namely the co-defendant, Ms. Hu.  So in that sense that requirement has been satisfied.'"  Zhou, 717 F.3d at 1146 (quoting district court record volume II, at 107)(alterations in Zhou, but not in district court record).

On appeal, Zhou contended that the "district court failed to articulate a sufficient basis" for its determination that U.S.S.G. § 3B1.1(a) applied.  Zhou, 717 F.3d at 1148-49.  The Tenth Circuit reviewed for clear error.  See Zhou, 717 F.3d at 1149.  The Tenth Circuit emphasized that "more than one person can qualify as a leader or organizer of a single criminal association or conspiracy and 'a defendant need not lead or organize at least five individuals . . . .  A defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant.'"  Zhou, 717 F.3d at 1149 (quoting United States v. Damato, 672 F.3d 832, 847 (10th Cir. 2012)("Damato")(citing United States v. Hamilton, 587 F.3d 1199, 1222 (10th Cir. 2009)("Hamilton")).  The Tenth Circuit noted that "[i]t would have been preferable if the district court had been more thorough in articulating the reasons for the enhancement," but nevertheless affirmed U.S.S.G. § 3B1.1(a)'s applicability.  Zhou, 717 F.3d at 1151.

Taken together, Zhou, Damato, and Hamilton underscore that control of others is central to the leadership analysis.  See Zhou, 717 F.3d at 1149; Damato, 672 F.3d at 847; Hamilton, 587 F.3d at 1222.  While all the factors listed in U.S.S.G. § 3B1.1 Application Note 4 are relevant in determining whether a defendant was a leader, the Tenth Circuit gives control particular weight.  See U.S.S.G. § 3B1.1 Application Note 4; Zhou, 717 F.3d at 1149; Damato, 672 F.3d at 847;

Hamilton, 587 F.3d at 1222.  Control over even a single person is sufficient to support a finding

that a defendant is a leader for U.S.S.G. § 3B1.1(a)'s purposes.  See Zhou, 717 F.3d at 1149.

While the leadership analysis focuses on control, the organizer analysis focuses on

orchestration and planning.  Like the leadership analysis, the organizer analysis engages the factors

listed in U.S.S.G. § 3B1.1 Application Note 4.  See United States v. Valdez-Arieta, 127 F.3d 1267,

1271 (10th Cir. 1997).  Yet, unlike in the case of a leader, "[n]othing in the Guidelines requires

that an organizer . . . exercise some direction or control over underlings." United States v. Valdez-

Arieta 127 F.3d at 1271.[17]  Instead, "[a] defendant may be punished as an organizer . . . for

devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and

coordinating and overseeing the implementation of the conspiracy even though the defendant may

not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127

F.3d at 1272.

### 2.     Criminal Activity with Five or More Participants or That Is "Otherwise Extensive".

Second, for U.S.S.G. § 3B1.1(a) to apply, the criminal activity at issue must involve five

or more participants or be "otherwise extensive."  U.S.S.G. § 3B1.1(a).  This requirement is also

disjunctive, and the Court needs to decide only whether the scheme involved five or more

---

[17]The Court notes that United States v. Valdez-Arieta concerns U.S.S.G. § 3B1.1(c), and not U.S.S.G. § 3B1.1(a).  Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with fewer than five persons.  See U.S.S.G. § 3B1.1(c).  The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization.  The Tenth Circuit "interpret[s] the Sentencing Guidelines according to accepted rules of statutory construction." United States v. Nacchio, 573 F.3d 1062, 1066 (10th Cir. 2009).  "[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning." IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005).

participants, or whether it was "otherwise extensive."  U.S.S.G. § 3B1.1(a).  The Court walks through the two prongs in turn.

U.S.S.G. § 3B1.1(a) applies where criminal activity involves five or more participants.  See U.S.S.G. § 3B1.1(a).  The commentary to U.S.S.G. § 3B1.1(a) establishes that "a 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 Application Note 1.  The Guidelines do not define "criminally responsible."  The United States Court of Appeals for the Third Circuit has clarified, however, that an individual is "criminally responsible" for U.S.S.G. § 3B1.1(a)'s purposes if "s/he . . . committed all of the elements of a statutory crime with the requisite *mens rea*."  United States v. Badaracco, 954 F.2d 928, 935 (3d Cir. 1992)(Sloviter, J.)(italics in original).  See United States v. Campbell, No. 05-10218-01-WEB, 2006 WL 3050800, at *2 (D. Kan. October 24, 2006)(Brown, J.)(indicating that a person must act with the "requisite criminal intent" to be considered "criminally responsible" (citing United States v. Martinez, 85 F. App'x 146, 149 (10th Cir. 2004)).  The defendant is included as a participant.  See United States v. Reid, 911 F.2d 1456, 1464 (10th Cir. 1990).

By contrast, the "otherwise extensive" prong is less straightforward, because "[n]either the Guidelines nor the cases interpreting § 3B1.1 provide a precise definition of 'otherwise extensive.'"  United States v. Yarnell, 129 F.3d 1127, 1139 (10th Cir. 1997).  Instead, the Tenth Circuit instructs that courts should consider the "totality of the circumstances."[18]  United States v.

---

[18]There is a split among the Courts of Appeals regarding the meaning of "otherwise extensive."  U.S.S.G. § 3B1.1(a).  Most Courts of Appeals -- including the Tenth Circuit -- rely on a totality of the circumstances test.  See United States v. Yarnell, 129 F.3d at 1138-39; United States v. Dietz, 950 F.2d at 53; United States v. Pabey, 664 F.3d 1084 1096-97 (7th Cir. 2011); United States v. Vasquez-Rubio, 296 F.3d 726, 729 (8th Cir. 2002); United States v. Booth, 309 F.3d 566, 576-77 (9th Cir. 2002).  By contrast, some Courts of Appeals use a headcount approach,

Yarnell, 129 F.3d at 1139 (adopting the United States Court of Appeals for the First Circuit's

totality-of-the-circumstances test from United States v. Dietz, 950 F.2d 50, 53 (1st Cir. 1991)).

More specifically, the Tenth Circuit provides:

> [T]he sentencing court is free to consider the use of unwitting outsiders in
> determining if a criminal enterprise is "extensive" within the contemplation of
> section 3B1.1 . . . .  The extensiveness of a criminal activity is not necessarily a
> function of the precise number of persons, criminally culpable or otherwise,
> engaged in the activity.  Rather, an inquiring court must examine the totality of the
> circumstances, including not only the number of participants but also the width,
> breadth, scope, complexity, and duration of the scheme.

United States v. Yarnell, 129 F.3d at 1139.  In a fraud case, for example, appropriate circumstances

to consider can include, but are not limited to: (i) the number of participants; (ii) the number of

unwitting participants; (iii) the amount of money involved; (iv) the fraud's duration and

geographic span; and (v) the number of victims.  See United States v. Dietz, 950 F.2d at 53.

Although the Tenth Circuit has established that courts can consider "unwitting outsiders"

in their extensiveness analyses, the Tenth Circuit has not defined "unwitting outsider."  United

States v. Yarnell, 129 F.3d at 1139.  See U.S.S.G. § 3B1.1 Application Note 3 ("In assessing

---

in which they ask whether a scheme has "the functional equivalent" of five or more participants
by counting the number of knowing and unknowing participants.  United States v. Skys, 637 F.3d
146, 156-58 (2d Cir.2011).  See United States v. Anthony, 280 F.3d 694, 699-701 (6th Cir. 2002);
United States v. Wilson, 240 F.3d 39, 47-51 (D.C. Cir. 2001); United States v. Helbling, 209 F.3d
226, 244-46 (3d Cir. 2000).

The Court applies the totality of the circumstances test, because it is the binding test in the
Tenth Circuit.  See United States v. Yarnell, 129 F.3d at 1138-39.  Even if Tenth Circuit caselaw
did not compel the Court to apply the totality of the circumstances test, the Court would have
adopted the totality of the circumstances approach, because it is superior to the headcount
approach.  Fraudulent schemes can be extensive for many reasons beyond mere headcount: they
can impact many victims, implicate large sums of money, and span many years or jurisdictions.
This case is illustrative of that point.  The totality of the circumstances test is more flexible than
the headcount test.  In cases like this one, the totality of the circumstances approach permits the
Court to consider all the ways in which a fraud scheme can be sprawling, and not just the number
of people involved.

whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."). Other Courts of Appeal have defined "unwitting outsider" or "unwitting participant." For example, the Sixth Circuit and the Second Circuit define "unknowing participants" as those participants "whose activities were organized or led by the defendant with specific criminal intent," and whose "services . . . were peculiar and necessary to the criminal scheme." United States v. Anthony, 280 F.3d at 701 (quoting United States v. Carrozzella, 105 F.3d 796, 804 (2d Cir. 1997)(disagreed with on other grounds by United States v. Kennedy, 233 F.3d 157, 160-61 (2d Cir. 2000)). In United States v. Carrozzella, the Second Circuit elaborates:

> The number of unknowing participants who were organized or led with specific criminal intent . . . is necessary to separate out service providers who facilitate a particular defendant's criminal activities but are not the functional equivalent of knowing participants. Salespeople who unknowingly conveyed fraudulent misrepresentations at a defendant's request are on an entirely different footing from the taxi driver who brought a leader of the fraudulent scheme to work on a single occasion. The organization of, and direction given to, the salespeople is done with the specific intent of causing victims to be deceived into parting with their money. The direction to the taxi driver will usually be given without any such specific intent. For another example, the services of bank employees who facilitate the activities of a money launderer are on a different footing from those who establish accounts and accept deposits from persons who acquired the money illegally. *See United States v. Allibhai*, 939 F.2d 244, 252-53 (5th Cir. 1991) . . . *see also United States v. Patasnik*, 89 F.3d 63, 68-69 [(2d Cir. 1996)](use of lawyer, accountant, and loan brokers to carry out advance fee loan scam).

United States v. Carrozzella, 105 F.3d at 804.

In the absence of a definition from the Tenth Circuit, the Court applies the Second Circuit and the Sixth Circuit's definition of "unwitting outsider," and determines that an unwitting outsider is a person "whose activities were organized or led by the defendant with specific criminal intent," and whose "services . . . were peculiar and necessary to the criminal scheme." United States v. Anthony, 280 F.3d at 701 (quoting United States v. Carrozzella, 105 F.3d at 804). The Court

adopts this definition for two key reasons.  First, this definition is the definition that at least four Courts of Appeals endorse.  See United States v. Anthony, 280 F.3d at 701; United States v. Carrozzella, 105 F.3d at 804; United States v. Wilson, 240 F.3d 39, 50 (D.C. Cir. 2001)("We agree [with the Court in United States v. Carrozzella] that these criteria are relevant."); United States v. Zada, 706 F. App'x 500, 510 (11th Cir. 2017)(counting individuals that the defendant "directed" and that were "essential" to the scheme as unwitting participants).  Second, and more important, it is a well-crafted definition that allows the Court to sidestep the largest risk associated with considering unwitting participants' roles.  Artificially inflating the perceived scope of the scheme by taking into account people who were tangential to the scheme is the primary risk in considering "unwitting participants" in a U.S.S.G. § 3B1.1(a) analysis.  The Court does not want to exaggerate the breadth of a given scheme by considering extraneous individuals like a fraudster's chauffeur or bank teller.  See United States v. Carrozzella, 105 F.3d at 804.  The definition of "unwitting participant" that the Court has selected reduces that risk of exaggeration.  The "led or organized" prong ensures that the Court takes into account only people whom a defendant directs or manipulates, and not any person who happens to come into contact with a defendant during the course of a scheme.  Additionally, the intent prong ensures that the Court considers only individuals whom the defendant purposefully uses in furtherance of a scheme.  Finally, the "peculiar and necessary" prong offers a third layer of protection and prevents the Court from taking into consideration individuals who played incidental roles in a scheme.  In sum, this definition strikes an appropriate balance between allowing the Court to consider a breadth of potential unwitting participants, without permitting the Court to search so broadly that it captures any person tangentially connected to criminal activity.

## LAW REGARDING U.S.S.G. § 2B1.1(b)(10)(C)

U.S.S.G. § 3B1.1 provides for enhancements to a defendant's offense level in cases involving larceny, embezzlement, other forms of theft, stolen or damaged property, fraud, forgery, and counterfeiting.  See U.S.S.G. § 2B1.1.  Under § 2B1.1(b)(10)

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels.  If the resulting offense level is less than level 12, increase to level 12.

U.S.S.G. § 2B1.1(b)(10).  For U.S.S.G. § 2B1.1(b)(10)(C), Application Note 9.B states:

> "[S]ophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(10) Application Note 9.B.

The Tenth Circuit addresses the enhancement for sophisticated means in the commission of tax evasion in United States v. Rice, 52 F.3d 843 (10th Cir. 1995).[19]  In United States v. Rice, the defendant received a "tax refund based on excessive withholding that was never in fact withheld."  52 F.3d at 845.  The district court applied the sophisticated-means enhancement, "in part because [the defendant] contested the IRS' ability to require him to produce documents during the civil phase of his case."  52 F.3d at 849.  The Tenth Circuit holds that the defendant's tax

---

[19]The district court in United States v. Rice enhanced Rice's sentence for use of sophisticated means under U.S.S.G. § 2T1.3(b)(2), and not under U.S.S.G. § 2B1.1.  See 52 F.3d at 848.  The United States Sentencing Commission has since deleted U.S.S.G. § 2T1.3 and replaced it with U.S.S.G. § 2T1.1.  The Sentencing Guidelines' definitions of "sophisticated means" under U.S.S.G. § 2B1.1 and U.S.S.G. § 2T1.1 are identical, save for the explanatory examples provided for applying the enhancement under U.S.S.G. § 2B1.1.  Compare U.S.S.G § 2B1.1, Application Note 9.b, with U.S.S.G. § 2T1.1, Application Note 5.

evasion scheme was not sophisticated, because it was "the functional equivalent of claiming more in itemized deductions than actually paid." 52 F.3d at 849. In so holding, the Tenth Circuit notes that, if the defendant's scheme was sophisticated, then "every fraudulent tax return will fall within that enhancement's rubric." 52 F.3d at 849.

By contrast, in United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999), the Tenth Circuit concludes that the district court's application of the sophisticated-means enhancement was appropriate, even though the defendant did not use a sham corporation or offshore bank accounts. See 199 F.3d at 1158. The defendant in United States v. Guidry made her embezzlement particularly difficult to detect by using checks that were made payable to a bank, and not to herself, which are harder to trace. See 199 F.3d at 1158. By only depositing a small fraction of her embezzled funds in a bank, the defendant made it more difficult for the IRS to investigate her conduct. See 199 F.3d at 1158. By never withdrawing more than $10,000.00 in one day, the defendant demonstrated that she knew that depositing any more would require the bank to notify the Internal Revenue Service of the deposit, and thus further demonstrated that she understood how to use sophisticated means to conceal her embezzlement. See 199 F.3d at 1158. The Tenth Circuit holds that using multiple storage units to hold items purchased with embezzled funds had a similar effect, and that her case was not simply one of representing to have paid withholding taxes not paid or not disclosing one's income. See United States v. Guidry, 199 F.3d at 1158 (citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d 279, 282 (5th Cir. 1993)).

Similarly, in United States v. Tilga, 824 F. Supp. 2d 1295 (D.N.M. 2011)(Browning, J.), the Court found that an enhancement for the defendant's use of sophisticated means was warranted when the defendant used offshore accounts and shell companies to evade taxes by hiding the

amount of money she earned.  See 824 F. Supp. 2d at 1330-34.  The Court explains that the application notes to the Sentencing Guidelines regarding the use of sophisticated means recognizes that the enhancement applies because of the inherent complexity of the entities a defendant uses, and not because a defendant used the entities "in an especially complex or novel manner."  See 824 F. Supp. 2d at 1330-31.  Moreover, the Court explains that the caselaw addressing the use of sophisticated means does not require that a defendant create the sophisticated means, but, rather, "[t]here is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement."  824 F. Supp. 2d at 1332.

More recently, in United States v. Pangburn, 467 F. Supp. 3d 1103 (D.N.M. 2020) (Browning, J.), the Court declines to apply the U.S.S.G. § 2B1.1(b)(10) enhancement.  See 467 F. Supp. 3d at 1114.  The defendant in United States v. Pangburn was an office manager at a business in Albuquerque, New Mexico, who used Quickbooks, a standard accounting software program, to give herself additional payments above her salary.  See 467 F. Supp. 3d at 1105.  She voided the transactions on Quickbooks to conceal the payments.  See 467 F. Supp. 3d at 1105.  The defendant pled guilty to one count of wire fraud.  See 467 F. Supp. 3d at 1106.  The PSR applied a 2-level enhancement under U.S.S.G. § 2B1.1(b)(10), but the Court does not apply it.  See 467 F. Supp. 3d at 1114.  The Court reasons that the defendant had not used sophisticated means in furtherance of her scheme, because she "did not go to great efforts to execute the fraud, but rather did no more than simply duplicate payments in QuickBooks, a relatively basic accounting program."  467 F. Supp. 3d at 1113.  Similarly, the Court determines that the defendant did not use sophisticated means to conceal her criminal activity, because she did no more than void the transactions on Quickbooks, and a skilled accountant "quickly detected the unauthorized payments."  467 F. Supp. 3d at 1113.

## LAW REGARDING U.S.S.G. § 3C1.1

U.S.S.G. § 3C1.1 provides for an enhancement to a defendant's base offense level where the defendant obstructs or impedes the administration of justice.  See U.S.S.G. § 3C1.1.  U.S.S.G. § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

Application Note 4 to § 3C1.1 provides a non-exhaustive list of conduct that warrants the upward adjustment.  See U.S.S.G. § 3C1.1 Application Note 4.  That conduct includes:

**(A)**   threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

**(B)**   committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;

**(C)**   producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;

**(D)**   destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so . . .

**(E)**   escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;

**(F)**   providing materially false information to a judge or magistrate judge;

**(G)**   providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;

**(H)**   providing materially false information to a probation officer in respect to a presentence or other investigation for the court;

**(I)**   other conduct prohibited by obstruction of justice provisions under Title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511);

**(J)**   failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. 853(p);

**(K)**   threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.

U.S.S.G. § 3C1.1 Application Note 4 (bold in original).

By contrast, Application Note 5 lists a number of acts that do not normally trigger the enhancement.  See U.S.S.G. § 3C1.1 Application Note 5.  They include:

**(A)**   providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense;

**(B)**   making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies;

**(C)**   providing incomplete or misleading information, not amounting to a material falsehood, in respect to a   presentence investigation;

**(D)**   avoiding or fleeing from arrest (see, however, § 3C1.2) (Reckless Endangerment During Flight);

**(E)**   lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release, although such conduct may be a factor in determining whether to reduce the defendant's sentence under § 3E1.1 (Acceptance of Responsibility).

U.S.S.G. § 3C1.1, Application Note 5 (bold in the original).

Courts frequently confront U.S.S.G. § 3C1.1 in cases where defendants flee officers to avoid arrest and, in some cases, where defendants take affirmative steps to avoid detection after fleeing.  See, e.g., United States v. Bliss, 430 F.3d 640 (2d Cir. 2005).  U.S.S.G. § 3C1.1, Application Note 5, however, establishes that "avoiding or fleeing from arrest" does not merit U.S.S.G. § 3C1.1's application.  U.S.S.G. § 3C1.1, Application Note 5.  Accordingly, courts do not apply U.S.S.G. § 3C1.1 in cases involving flight without other obstructive conduct.  See United States v. Madera-Gallegos, 945 F.2d 264, 266-67 (9th Cir. 1991).  For example, in United States v. Alpert, the United States Court of Appeals for the Eleventh Circuit holds that U.S.S.G. § 3C1.1 is inapplicable where defendants moved to another State without telling the authorities and used aliases in that State to avoid detection.  See 28 F.3d at 1107.  The Eleventh Circuit determines that "the § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more."  28 F.3d at 1107.  The Eleventh Circuit adds that the defendants "may have engaged in *additional* conduct while avoiding arrest, however, that would warrant application of the obstruction enhancement, particularly if that conduct significantly hindered the investigation or prosecution of their offenses."  28 F.3d at 1107 (emphasis in original).

Similarly, in United States v. Stites, 56 F.3d 1020 (9th Cir. 1995), the United States Court of Appeals for the Ninth Circuit reverses the district court's application of U.S.S.G. § 3C1.1 where the defendant fled the jurisdiction, assumed an alias, and went into hiding.  See 56 F.3d at 1026. The Ninth Circuit asserts that "flight by itself is not an obstruction of justice."  56 F.3d at 1026.  It elaborates that the defendant's "purpose in remaining away" -- to avoid being caught -- "did not aggravate his flight; and his aliases did not prevent his apprehension."  56 F.3d at 1026.

Additionally, in United States v. Bliss, the Second Circuit concludes that U.S.S.G. § 3C1.1 does not apply where the defendant moves to a different State, assumes an alias, and changes his appearance.  See 430 F.3d at 649-51.  The Second Circuit concludes that, in flight cases, the obstruction-of-justice enhancement requires a showing of flight plus additional obstructive conduct.  See 430 F.3d at 649.  The Second Circuit notes that, while the defendant used a false name after fleeing, the United States did not show that the defendant's "use of an alias 'actually resulted in a significant hindrance to the investigation or prosecution of the instant offense.'"  430 F.3d at 549 (quoting U.S.S.G. § 3C1.1, Application Note 5(A)).  The Second Circuit adds that, while the "fruitlessness of law enforcement efforts and the length of time in which a suspect is able to avoid apprehension reflect a 'calculated and deliberate plan to evade the authorities', . . . the failure of law enforcement authorities to apprehend a fugitive cannot fairly be attributed to the fugitive's cunning."  430 F.3d at 549.  It determines that, "[a]s a corollary to that rule, . . . we will not accept the length of a fugitive's absence as *prima facie* evidence that he obstructed justice.  There must be some showing that *the defendant's obstructive conduct* resulted in the delay in his apprehension."  430 F.3d at 650 (emphasis in original).

The Court reaches a similar conclusion in Welbig.  See 2015 WL 2225963, at *33.  In Welbig, the Federal Bureau of Investigations conducted an investigation into Welbig's tax fraud scheme.  See 2015 WL 2225963, at *1.  When the FBI contacted Welbig for an interview, Welbig left his home State, moved to California, and assumed an alias.  See 2015 WL 2225963, at *1.  Over two decades later, Welbig was arrested and charged in connection with the scheme.  See 2015 WL 2225963, at *2.  Welbig pled guilty.  See 2015 WL 2225963, at *2.  Welbig's presentence report applied an enhancement under U.S.S.G. § 3B1.1, among other enhancements.  See 2015 WL 2225963, at *3.  The Court does not apply the U.S.S.G. § 3B1.1 enhancement to

Welbig's base offense level, however, because the United States must show that Welbig did "something more" than merely flee for the enhancement to apply.  2015 WL 2225963, at *27-34. Accord United States v. Alpert, 28 F.3d at 1107 ("We conclude that the § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more."); United States v. Madera-Gallegos, 945 F.2d at 266-67 ("[F]light, coupled with other 'obstructive' conduct, may justify the § 3C1.1 enhancement.").  The Court adds that "[t]he enhancement's application is based on the flight and the additional deceptive conduct, and not just on the flight.  The only caveat, however, is that the United States must show that the additional conduct plus the fleeing, and not just the fleeing, hindered the investigation."[20]  2015 WL 2225963, at *33.

Finally, the Tenth Circuit recently considered U.S.S.G. § 3C1.1's applicability in flight cases in Perrault.  See 995 F.3d at 777-79.  Perrault was a Catholic priest in Albuquerque, New Mexico.  See 995 F.3d at 754.  A news reporter began investigating Perrault after several people accused him of sexual abuse.  See 995 F.3d at 754.  Perrault then left New Mexico and went to Canada for two weeks, and then Morocco for twenty-five years.  See 995 F.3d at 755.  After those twenty-five years, the Grand Jury indicted Perrault.  See 995 F.3d at 755.  The Moroccan government agreed to extradite Perrault back to the United States.  See 995 F.3d at 755.  Perrault

---

[20]In Welbig, the Court discusses a split among the Courts of Appeals regarding whether taking affirmative steps to avoid arrest merits U.S.S.G. § 3C1.1's application.  See 2015 WL 2225963, at *29-32.  In brief, the Second, Ninth and Eleventh Circuits have determined that affirmative steps to avoid arrest do not warrant U.S.S.G. § 3C1.1's application, while the Seventh and Eighth Circuits have concluded that affirmative steps to avoid arrest can merit U.S.S.G. § 3C1.1's application.  See 2015 WL 2225963, at *29-32.  In Welbig, "[t]he Court finds the Second, Ninth, and Eleventh Circuits' test more persuasive [than] the Seventh and Eighth Circuits'."  2015 WL 2225963, at *30.  For a more fulsome discussion of the split, see 2015 WL 2225963, at *29-32.

fought extradition and even wrote a letter to the Moroccan king asking for permission to stay in Morocco.  See 995 F.3d at 779.  As a result, United States law enforcement officers had to travel to Morocco to retrieve Perrault.  See 995 F.3d at 779.  Perrault went to trial, and a jury found him guilty on all counts.  See 995 F.3d at 758.  At sentencing, the trial judge applied a 2-level increase to Perrault's base offense level under U.S.S.G. § 3C1.1, because Perrault had fled to Morocco. See 995 F.3d at 759.

On appeal, the Tenth Circuit concludes, among other things, that the trial court did not plainly err by applying U.S.S.G. § 3C1.1.  See 995 F.3d at 777.  Although the Tenth Circuit affirms the trial court, it does so "on a different ground."  995 F.3d at 777.  The Tenth Circuit explains that Perrault's flight to Morocco does not merit U.S.S.G. § 3C1.1's application, because U.S.S.G. § 3C1.1 applies to obstructive conduct after a law enforcement investigation has begun.  See 995 F.3d at 778 (citing United States v. Gacnik, 50 F.3d 848, 851 (10th Cir. 1995)).  Because a reporter was investigating Perrault when he fled to Morocco, and not law enforcement, the Tenth Circuit reasons that U.S.S.G. § 3C1.1 did not apply to his flight to Morocco.  See 995 F.3d at 778.  By contrast, the Tenth Circuit concludes that U.S.S.G. § 3C1.1 applies, because "Perrault fought his removal from Morocco."  995 F.3d at 779.  The Tenth Circuit notes that "[o]ther circuits have concluded that putting the government to the expense and hassle of retrieving a defendant from a foreign country constitutes obstruction of justice."  995 F.3d at 778 (citing United States v. Nduribe, 704 F.3d 1049, 1050-51(7th Cir. 2013); United States v. Carty, 264 F.3d 191, 195 (2d Cir. 2001)).  The Tenth Circuit notes that, after Perrault was indicted, he was "well-aware of the charges against him," but "still put the government to the expense and trouble of retrieving him from abroad.  This supports the district court's imposing the obstruction-of-justice enhancement . . . ."  995 F.3d at 779.  Accordingly, the Tenth Circuit determines that the 2-level enhancement

applies to Perrault's base offense level.  See 995 F.3d at 779.

## ANALYSIS

The Court: (i) sustains the objection in the U.S. Sentencing Memo.; and (ii) sustains in part and overrules in part the Beckner Objections.   More specifically, the Court concludes: (i) Beckner's base offense level is subject to a 4-level increase pursuant to U.S.S.G. § 3B1.1(a), because he was the leader of an "otherwise extensive" fraud scheme; (ii) Beckner's base offense level is subject to a 2-level increase pursuant to U.S.S.G. § 2B1.1(b)(10), because he used sophisticated means in furtherance of the Savoy Travel scheme; and (iii) Beckner's base offense level is not subject to a 2-level increase pursuant to U.S.S.G. § 3C1.1, because Beckner did not obstruct justice by fleeing from law enforcement on September 7, 2011.  The Court takes each enhancement in turn.  Finally, the Court provides its justification for the sentence it imposes.

## I.   BECKNER'S BASE OFFENSE LEVEL IS SUBJECT TO A 4-LEVEL INCREASE PURSUANT TO U.S.S.G. § 3B1.1(a), BECAUSE HE WAS THE LEADER OF AN "OTHERWISE EXTENSIVE" FRAUD SCHEME.

First, the Court concludes that Beckner's base offense level is subject to a 4-level increase under U.S.S.G. § 3B1.1(a), because Beckner was the leader of an "otherwise extensive" fraud scheme.  U.S.S.G. § 3B1.1(a).  U.S.S.G. § 3B1.1(a) has two prongs: (i) leader or organizer; and (ii) five or more participants or otherwise extensive criminal activity.  The Court addresses the two prongs in turn.

### A.   BECKNER WAS A LEADER OF THE SAVOY TRAVEL SCHEME.

Beckner was a leader of the Savoy Travel scheme.  The Court begins its leadership analysis with the factors in U.S.S.G. § 3B1.1 Application Note 4:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or

organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 Application Note 4.  The Court determines that several of these considerations indicate that Beckner was a leader of the Savoy travel scheme.

First, the "nature of [Beckner's] participation" in the Savoy Travel scheme is significant. U.S.S.G. § 3B1.1 Application Note 4.  The Indictment establishes that the scheme or the illegal activity at issue is "us[ing] false representations to obtain money as alleged loans or investments in connection with the operation of, and alleged improvements to, the truck stop, while in reality the proceeds would be used for other purposes . . . ."  Indictment ¶ 3, at 2.  Beckner's actions at Savoy Travel put him at the forefront of that illegal conduct.  For example, Beckner signed the First New Mexico Bank Loan documents using his alias "Bill Evans."  PSR ¶ 8, at 5.  Similarly, he signed the New Markets Tax Credit Program Loan documents using his alias.  See PSR ¶ 9, at 5.  Beckner also took the lead in soliciting individual investors with misrepresentations.  See PSR ¶ 11, at 6.  Additionally, Beckner formed LLCs using his alias.  See, e.g., Trial Tr. at 875:19-24 (Sullivan, Layne)(indicating that Top Management's Articles of Incorporation listed Bill Evans as Top Management's "organizer").  He also worked with Herlihy to obtain a liquor license from Bonal.  See PSR ¶ 7, at 5.

Together these examples demonstrate that Beckner was a prominent participant in the Savoy Travel scheme.  Beckner emphasizes that Savoy Travel was not a pure Ponzi scheme: it did legitimate and lawful work, like selling gas, tires, and concessions.  See Beckner Sentencing Memo. at 9-10; January 4 Tr. at 23:2-3 (Ray).  The Court agrees that there was lawful work done at Savoy Travel.  Yet, when the Court cuts past the legitimate work that was done at Savoy Travel, and focuses on the enterprise's fraudulent aspects, it finds that Beckner played an outsized role in

those unlawful aspects.  Beckner made material misrepresentations on loan applications, see PSR ¶¶ 8, 9, at 5, Beckner led the charge in misleading individual investors, see PSR ¶ 11, at 6, and Beckner siphoned off some of the proceeds from those transactions for personal use and to offshore bank accounts, see Top Management Outflows Chart 1.  In other words, Beckner was front and center when it came to Savoy Travel's unlawful activity.

Second, and relatedly, because Beckner played a significant role at Savoy Travel, he also exercised considerable "decision making authority," especially with respect to Savoy Travel's investors and funding.  U.S.S.G. § 3B1.1 Application Note 4.  For example, Wright testified that Beckner directed her and other Savoy Travel employees in soliciting individual investors.  See Trial Tr. at 521:6-11 (Sullivan, Wright); Investor Script at 1-2.  She explained that Beckner would tell his employees what to say to investors, and that he would decide "who was paid and when." Trial Tr. at 526:10-12 (Sullivan, Wright).  In sum, Wright's testimony illuminates that Beckner exercised great decision-making authority with respect to the solicitation of individual investors and, by extension, the use of individual investors' funds.    The Court notes, however, that Curtis testified that Beckner, Herlihy, and Curtis ran Savoy Travel together, and that they made business decisions together.  See Trial Tr. at 371:14-21 (Curtis)(indicating that the three would "fight it out" and make business decisions together).  The Court takes Curtis at his word that all three were making decisions at Savoy Travel.  That Curtis and Herlihy also had decision-making authority does not suggest that Beckner did not have decision-making authority.  Multiple people can exercise decision-making authority within a business organization.  Indeed, that structure is very common: chief financial officers make financial decisions while chief operating officers make operations decisions while chief marketing officers make marketing decisions.  That many officers share decision-making power does not erode the authority of any one officer.

Third, Beckner "recruited" Herlihy to join the scheme.  U.S.S.G. § 3B1.1 Application Note 4.  The PSR indicates that, in 2007, Beckner "recruited" Herlihy to join Savoy Travel.   PSR ¶ 7, at 5.   Beckner's efforts were successful, and Herlihy joined Beckner and Curtis in 2007 as a "consultant."  Trial Tr. at 365:17-19 (Sullivan, Curtis).

Fourth, the "nature and scope of the illegal activity" is substantial.  U.S.S.G. § 3B1.1 Application Note 4.  Again, the Court puts aside Savoy Travel's lawful work and focuses on the "illegal activity" alone.  U.S.S.G. § 3B1.1 Application Note 4.  That illegal activity is extensive. Beckner made false statements on loan documents for two separate loans from different financial institutions.  See PSR ¶¶ 8, 9, at 5.  Beckner also misled over twenty individual investors, many of whom lived outside of New Mexico.  See Individual Investor Summary Chart at 1; Investor Script at 1-2.  In total, the loss amount exceeds $14,000,000.00.  See PSR ¶ 81, at 19.

Finally, and perhaps most significantly, Beckner exercised considerable "control and authority" over others, namely Curtis.  U.S.S.G. § 3B1.1 Application Note 4.  There is no better example of Beckner's control over Curtis than Curtis' marriage to Romero.  The record supports a finding that Beckner asked Curtis to marry Beckner's girlfriend, Romero.  See Trial Tr. at 400:8-24 (Sullivan, Curtis).  In other words, Beckner asked his business partner and son's childhood friend to marry Beckner's own girlfriend.  The United States contends that Beckner asked Curtis to marry Romero so that Beckner could have a tighter grip on Romero, who was Seashell Fuel's nominal owner.  See U.S. Sentencing Memo. at 14.  Conversely, Curtis testified that Beckner asked Curtis to marry Romero to help Beckner and Romero work around an immigration issue.  See Trial Tr. at 400:18-24 (Sullivan, Curtis).  Regardless why Curtis agreed to marry Romero, the marriage demonstrates that Curtis would go to great lengths for Beckner and was under Beckner's control. Curtis' marriage to Romero was unconventional.  The Court does not see why Curtis would have

agreed to such an odd arrangement, but for his deep loyalty to Beckner.  Curtis went far beyond what one business partner or friend normally would do for another business partner or friend when he married Romero at Beckner's request.  It follows that Beckner's control over Curtis is sufficient to support a finding that Beckner was a leader of the Savoy Travel scheme.  See Zhou, 717 F.3d at 1149; Damato, 672 F.3d at 847; Hamilton, 587 F.3d at 1222.

The Court recognizes that Curtis testified that he and Beckner "work[ed] together" at Savoy Travel.  Trial Tr. at 359:5-15 (Curtis).  Additionally, at trial, Curtis denied that Beckner was "higher in rank" or acted as Curtis' "boss."  Trial Tr. at 359:7-15 (Curtis).  Curtis also testified that he spearheaded Savoy Travel's volunteer fire department.  See Trial Tr. at 361:10-362:4 (Curtis)(explaining that he "created" the volunteer fire department, "assembled the team," and was "elected to run it").  At first blush, Curtis' testimony has the tendency to show that Curtis was not working under Beckner: Beckner was not Curtis' boss, and Curtis was making his own decisions, particularly with respect to the volunteer fire department.  Yet Curtis' actions speak louder than his words.  The Court understands why Curtis might want to posture while testifying and show that he was making his own decisions at Savoy Travel.  At the end of the day, however, Curtis married Beckner's girlfriend at Beckner's request.  In turn, that marriage allowed Beckner to exercise tighter control over his foreign corporate shells and bank accounts.  See U.S. Sentencing Memo. at 14.  Curtis' decision to marry Romero speaks to the extent of Beckner's control over Curtis and casts doubt on Curtis' own assessment that he was not working under Beckner.

Taken together, these considerations support a finding that Beckner was a leader of the Savoy Travel scheme.  Beckner exercised decision-making authority, participated heavily in the scheme's commission, recruited accomplices, and controlled Curtis.  See U.S.S.G. § 3B1.1 Application Note 4.  The scheme's nature and scope were also significant.  See U.S.S.G. § 3B1.1

Application Note 4. For these reasons, the Court concludes that Beckner was a leader of the Savoy Travel scheme.

Beckner contends, however, that the Court should not deem him a leader, because Herlihy was also a leader. See January 4 Tr. at 18:10-25 (Ray). Beckner's argument on this point holds no water, however, because a scheme can have more than one leader. See Zhou, 717 F.3d at 1149; U.S.S.G. § 3B1.1 Application Note 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). Accordingly, whether Herlihy was also a leader is inapposite, because Beckner and Herlihy both could be leaders.

Similarly, that Herlihy and Curtis both had managerial titles at Savoy Travel and the related business entities does not change the Court's determination that Beckner was a leader at Savoy Travel. The record shows that Herlihy and Curtis both had managerial titles at Savoy Travel and its affiliated corporate entities. See, e.g., Trial Tr. at 399:4-8 (Sullivan, Curtis)(testifying that he was Seashell Fuel's general manager); Trial Tr. at 369:5-9 (Sullivan, Curtis)(testifying that he was Fuel 4 Less' operating manager); Trial Tr. at 367:18-22, 369:1-8 (Sullivan, Curtis)(testifying that Herlihy became Savoy Travel LLC's operating manager). Nevertheless, "[t]itles . . . are not controlling" in a § 3B1.1 analysis. See United States v. Rubio-Sepulveda, 781 F. App'x 769, 772 (10th Cir. 2019)(quoting U.S.S.G. § 3B1.1 Application Note 4). Accordingly, that Herlihy and Curtis had titles that suggest that they had leadership roles at Savoy Travel does not change the Court's determination that Beckner was a leader of the Savoy Travel scheme.

B. **THE SAVOY TRAVEL SCHEME WAS AN "OTHERWISE EXTENSIVE" FRAUD SCHEME.**

Second, the Court concludes that the Savoy Travel scheme was "otherwise extensive." U.S.S.G. § 3B1.1(a). The Court arrives at this conclusion after having considered the totality of

the circumstances. See United States v. Yarnell, 129 F.3d at 1139; United States v. Dietz, 950 F.2d at 53. In particular, the Court focuses its analysis on the factors that the First Circuit provides in United States v. Dietz: the number of participants, the number of unwitting participants, the amount of money involved, the fraud's duration and geographic span, and the number of victims. See 950 F.2d at 53. The Court addresses each of these considerations in turn.

First, the Court concludes that the Savoy Travel scheme involved three participants: Beckner, Herlihy, and Curtis.[21] See United States v. Dietz, 950 F.2d at 53. Here, the scheme involves "us[ing] false representations to obtain money as alleged loans or investments in connection with the operation of, and alleged improvements to, the truck stop, while in reality the proceeds would be used for other purposes." Indictment ¶ 3, at 2. It follows that a "participant" in that scheme is someone who is "criminally responsible" for that conduct, U.S.S.G. § 3B1.1 Application Note 1, meaning that he or she "committed all of the elements of a statutory crime with the requisite *mens rea*," United States v. Badaracco, 954 F.3d at 935 (italics in original). Here, a preponderance of the evidence supports a finding that Beckner, Herlihy, and Curtis were criminally responsible for making false representations to obtain the First New Mexico Bank Loan. All three worked together to obtain the First New Mexico Bank Loan. See PSR ¶ 8, at 5. Beckner used his alias, "Bill Evans," on the loan application, and made other misstatements on the accompanying personal financial statement. See PSR ¶ 8, at 5. Herlihy and Curtis both knew that Beckner used an alias, but neither flagged nor corrected the misstatement for First New Mexico Bank. See Trial Tr. at 393:25-394:10 (Sullivan, Curtis)(testifying that he knew that "Bill Evans"

---

[21]Because the Court determines that the scheme involved three participants, the Court concludes that U.S.S.G. § 3B1.1(a)'s "five or more participants" prong does not apply to Beckner. U.S.S.G. 3B1.1(a).

was not Beckner's true name and admitting that he never told the bank); Herlihy Plea Agreement at 5 (admitting that he "knew that Beckner's true name was not 'Bill Evans' and that Beckner used the alias 'Bill Evans' to conceal his true identity after a previous criminal conviction for a financial crime."). Both Herlihy and Curtis signed the First New Mexico Bank Loan documents. See Trial Tr. at 392:10-393:7 (Curtis)(indicating where he signed the New Mexico First Bank Loan documents); Herlihy Plea Agreement at 4 (admitting that he "agreed to and signed several documents to effectuate the loan"). In short, all three knowingly made false statements on a loan application, in violation of 18 U.S.C. § 1014, and are all "criminally responsible" for that conduct. U.S.S.G. § 3B1.1 Application Note 1.

Second, the Savoy Travel scheme involved dozens of unwitting participants. See United States v. Dietz, 950 F.2d at 53. An "unwitting participant" is someone "whose activities were organized or led by the defendant with specific criminal intent," and whose "services . . . were peculiar and necessary to the criminal scheme." United States v. Anthony, 280 F.3d at 701. Here, that definition applies to Romero. Beckner used Romero as the straw owner of Seashell Fuel. See PSR ¶¶ 16-17, at 8. He did so with the specific criminal intent to conceal the Savoy Travel scheme's proceeds. See PSR ¶¶ 16-17, at 8. Accordingly, Romero played a "necessary" role in the scheme by acting as the nominal owner of an entity who concealed the scheme's proceeds. United States v. Anthony, 280 F.3d at 701. For these reasons, the Court concludes that Romero was an unwitting participant in the Savoy Travel scheme.[22]

_____

[22]The Court thinks that it is possible that Romero was a participant in the Savoy Travel scheme, and not an unwitting participant in the Savoy Travel scheme. There is evidence on the record that supports a finding that Romero knew -- or should have known -- about the Savoy Travel scheme. For example, Romero was Seashell Fuel's straw owner. See PSR ¶¶ 16-17, at 8. She also married Curtis at Beckner's request. See Trial Tr. at 402:1-5 (Sullivan, Curtis). She was entangled with the scheme, and the Court thinks it is likely that Romero knew that unlawful activity

Additionally, the Savoy Travel employees were unwitting participants in the Savoy Travel scheme.  The Court thinks of the Savoy Travel employees in two categories: (i) the back-office staff that worked on the business end, and worked more closely with Beckner, Herlihy, and Curtis; and (ii) the customer-facing employees, like cashiers and tire shop workers.  The Court determines that the employees in both categories are unwitting participants, albeit for slightly different reasons.

Members of Savoy Travel's back-office staff -- namely Wright, Robinson, and Duarte -- were unwitting participants in the Savoy Travel scheme.  Beckner organized and led Wright, Robinson, and Duarte to perpetrate the fraud.  See United States v. Anthony, 280 F.3d at 701.  For example, Wright testified that Beckner provided her with a script to use while talking to individual investors and that the script contained falsehoods.  See Trial Tr. at 520:22-524:22 (Sullivan, Wright).  Similarly, Wright testified that Beckner would sign promissory notes for individual investors as Herlihy using a stamp of Herlihy's signature, and then have Duarte and Robinson notarize those notes even though Herlihy had not actually signed them.  See Trial Tr. 532:24-535:20 (Sullivan, Wright).  Additionally, Wright, Robinson, and Duarte were "peculiar and necessary to the criminal scheme," because they kept the Savoy Travel business running.  United States v. Anthony, 280 F.3d at 701.  But for those employees, Savoy Travel would not have operated, and Beckner would not have been able to perpetrate his scheme.  For these reasons, the

---

was afoot.  Nevertheless, that evidence is insufficient to support a finding by a preponderance of the evidence that Romero was a participant.  Romero did not testify at trial.  Accordingly, the Court only can speculate what Romero knew about the Savoy Travel scheme and whether she participated in the scheme with "the requisite *mens rea*" such that she can be considered a participant.  United States v. Badaracco, 954 F.3d at 935 (italics in original).  The Court cannot determine by a preponderance of the evidence, on the basis of the record before it, that Romero knew of the wider Savoy Travel scheme and acted with intent to further it.  For these reasons, the Court cannot conclude that Romero was a participant in the Savoy Travel scheme.

Court concludes that Wright, Robinson, and Duarte were unwitting participants in the Savoy Travel scheme.[23]

Similarly, the rank-and-file, customer-facing Savoy Travel employees also were unwitting participants in the Savoy Travel scheme. Beckner led and organized the customer-facing employees like he did the back-office employees. See United States v. Anthony, 280 F.3d at 701; Trial Tr. at 440:24-441:2 (Ray, Curtis)(testifying that Beckner dealt "with employees, and the restaurant and the fuel pumps and whatnot" during construction). Further, those customer-facing employees played a necessary role in Beckner's scheme by way of headcount. See United States v. Anthony, 280 F.3d at 701. Beckner's scheme boiled down to making false representations to investors. See Indictment ¶ 3, at 2. To attract investors, Beckner needed to have a legitimate-looking business. After all, large, national investors like U.S. Bank likely would not have invested millions of dollars in three men running a truck stop on their own in the middle of the southern New Mexico desert. Accordingly, Beckner needed to be able to gesture to a robust staff while soliciting investors to demonstrate that Savoy Travel was a healthy, growing business. The rank-and-file, customer-facing employees allowed Beckner to look impressive: they allowed Beckner

---

[23]For the same reasons discussed above with respect to Romero, supra n.22, at 82-83, the Court is unable to conclude that Wright, Robinson, and Duarte were participants in the Savoy Travel scheme. Like Romero, Wright, Robinson, and Duarte were entangled closely with the fraud. A preponderance of the evidence supports a finding that at least Wright knew that some of the business activity at Savoy Travel was unlawful. See Trial Tr. at 535:14-18 (Sullivan, Wright)(testifying that she knew that it was unlawful for Robinson and Duarte to notarize promissory notes that had been stamped with Herlihy's signature). Nevertheless, there is insufficient evidence on the record to show that Wright had "the requisite *mens rea*" such that she can be considered a participant. United States v. Badaracco, 954 F.3d at 935 (italics in original). The Court cannot conclude by a preponderance of the evidence, on the basis of the record before it, that Wright, Robinson, and Duarte knew of the larger Savoy Travel scheme, and acted with the intent to further it. For these reasons, the Court cannot conclude that Wright, Robinson, and Duarte were participants in the Savoy Travel scheme.

to market a business that looked valid to potential investors.  In this way, the rank-and-file employees were a "necessary" component of the Savoy Travel scheme.  United States v. Anthony, 280 F.3d at 701.

Beckner protests, however, that the Court should not consider these rank-and-file, customer-facing employees as unwitting participants, because an unwitting participant must have some kind of "tie to criminal activity."  January 4 Tr. at 21:7-19 (Ray).  Beckner argues that it is unfair to call the truck stop employees unwitting participants in the Savoy Travel scheme, because "all of their activity was completely tied to legitimate activity" at Savoy Travel.  January 4 Tr. at 23:2-3 (Ray).  The Court disagrees with Beckner.  The Court acknowledges that the customer-facing employees were doing legitimate work at Savoy Travel, like selling concessions and repairing cars.  Nevertheless, the legitimate work that the employees did at Savoy Travel was part and parcel of the fraudulent scheme.  Without employees, there would be no business at Savoy Travel, and without business at Savoy Travel, there would be no investments in Savoy Travel.  To use Beckner's words: the employees were "tie[d] to criminal activity" here, because they kept the business afloat, and the business was the vehicle for perpetrating Beckner's fraudulent scheme.  January 4 Tr. at 21:7-19 (Ray).  The Savoy Travel employees were not peripheral players like the bank tellers or taxicab drivers that the Second Circuit describes in United States v. Carrozzella.  See 105 F.3d at 804.  To the contrary, Beckner used the Savoy Travel employees as important pawns in his scheme to defraud investors.  In this way, the Savoy Travel employees played a "necessary" role and unknowingly "facilitate[d]" Beckner's fraud.  United States v. Carrozzella, 105 F.3d at 804.

Third, the Savoy Travel scheme impacted over two dozen victims.  See United States v. Dietz, 950 F.2d at 53.  More specifically, the Savoy Travel scheme harmed three institutional

investors and over twenty individual investors.  See PSR ¶¶ 10, 12, at 6, 7.  The Court also notes

that the Savoy Travel scheme substantially impacted the victims, particularly the individual

investors.  Several individual investors testified at trial, submitted victim impact statements, or

spoke at the sentencing hearing.  See January 4 Tr. at 82:8-14 (Hartstein); Victim Impact

Statements, filed September 6, 2022 (Doc. 211-1); Victim Impact Statement, filed January 3, 2023

(Doc. 222-2); Victim Impact Statement, filed January 3, 2023 (Doc. 222-3)("Howell Impact

Statement"); Victim Impact Statement, filed January 3, 2023 (Doc. 222-4)("Malik Impact

Statement").  These victim impact statements speak to the magnitude of Savoy Travel's harm to

the victims.  See, e.g., Howell Impact Statement at 1 (victim's daughter describing that the Savoy

Travel scheme robbed her father of his "life's savings" and ultimately "put him in the grave");

Malik Impact Statement at 1 (explaining that the Savoy Travel scheme "changed the course of

[his] life," and forced him to abandon business ventures and declare Chapter 7 bankruptcy).  The

PSR adds that "many of the individual investors lost their entire principal investments, in some

cases, representing most or all of their retirement savings."  PSR ¶ 13, at 7.  In sum, the Savoy

Travel scheme not only harmed dozens of individuals and entities, but it harmed those individuals

and entities profoundly.

Fourth, the Savoy Travel scheme involved a significant sum of money.  See United States

v. Dietz, 950 F.2d at 53.  The total loss amount is $14,456,700.00.  See PSR ¶ 81, at 19.  As the

Court describes in greater detail above, the institutional and individual investors bore the brunt of

that steep financial loss.

Fifth, the Savoy Travel scheme lasted at least two years.  See United States v. Dietz, 950

F.2d at 53.  Beckner moved to New Mexico and became involved in Savoy Travel in 2006.  See

Beckner Sentencing Memo. at 3.  Savoy Travel obtained its first loan -- the First New Mexico

Bank Loan -- in July, 2009.  See PSR ¶ 8, at 5.  Beckner used his alias and made misstatements on the First New Mexico Bank Loan application.  See PSR ¶ 8, at 5.  Savoy Travel went into receivership in September, 2011.  See Trial Tr. at 802:10-14 (Baker).  If the Court treats the start of Beckner's involvement at Savoy Travel as the start of the scheme, then the scheme lasted over five years.  If the Court treats Beckner's false statements on the First New Mexico Bank Loan application as the start of the scheme, then the scheme lasted over two years.  Either way, the Court measures the scheme's duration in years, and not in mere months or days.

Finally, the Savoy Travel Scheme spanned across many States and countries.  See United States v. Dietz, 950 F.2d at 53.  Savoy Travel was located in Deming.  See PSR ¶ 6, at 5.  Although Savoy Travel was located in New Mexico, Beckner solicited out-of-state investors, including by advertising for Savoy Travel in the Los Angeles Times.  See PSR ¶ 11, at 6.  Evidently, Beckner's out-of-state advertising efforts were successful, because individual investors in multiple States, including from California and from Pennsylvania, invested in Savoy Travel.  See Individual Investor Summary Chart at 1-2 (providing individual investors' names and addresses).  Further, Beckner concealed the proceeds of his fraudulent scheme using foreign shell corporations and bank accounts, including those in Honduras and Panama.  See PSR ¶ 9, at 6.  In short, the Savoy Travel scheme transcended Deming, and implicated people and entities across the United States and Central America.

Taken together, these considerations indicate that the Savoy Travel scheme is "otherwise extensive" for U.S.S.G. § 3B1.1(a)'s purposes.  U.S.S.G. § 3B1.1(a).  In sum, the scheme involves three participants and dozens of unwitting participants, implicates over fourteen million dollars, impacts over two dozen victims, and spans at least two years, and many States and countries.  Because Beckner is a leader of the Savoy Travel scheme, and the Savoy Travel scheme is an

extensive fraud scheme, the Court sustains the United States' objection and will add a 4-level enhancement to Beckner's base offense level pursuant to U.S.S.G. § 3B1.1(a).

Beckner contends, however, that the Court should not apply the U.S.S.G. § 3B1.1 enhancement to his sentence, because the Court did not apply the U.S.S.G. § 3B1.1 enhancement to Herlihy's sentence. See January 4 Tr. at 18:10-25 (Ray). Beckner's argument is unavailing. The Court sentences Beckner and Herlihy separately and takes the two co-Defendants as they appear before the Court. Although Beckner and Herlihy both participated in the Savoy Travel scheme, they appear before the Court on different footings. On one hand, the Court sentenced Herlihy after Herlihy pled guilty to a single count of making false statements to a bank in violation of 18 U.S.C. § 1014, see Herlihy PSR ¶ 2, at 3, and the United States and Herlihy agreed under rule 11(c)(1)(C) to an imprisonment range of 0 to 18 months, see Herlihy PSR ¶ 107, at 24. On the other hand, the Court sentences Beckner after a jury convicted Beckner of Bank Fraud, Wire Fraud, and Conspiracy. See PSR ¶¶ 2-3, at 4. These differences have a meaningful impact on sentencing, and the disparity between the two sentences can be attributed to these differences. See January 4 Tr. at 108:18-20 (Court). Additionally, the Court is unfamiliar with any rule that requires it to apply the same enhancements to two co-defendants' sentences where the co-defendants are sentenced on different offenses after one pled under rule 11(c)(1)(C) and the other did not. For these reasons, Beckner's argument holds no water, and the Court will apply a 4-level enhancement to Beckner's base offense level under U.S.S.G. § 3B1.1(a).

## II.     BECKNER'S BASE OFFENSE LEVEL IS SUBJECT TO A 2-LEVEL INCREASE PURSUANT TO U.S.S.G. § 2B1.1(b)(10), BECAUSE HE USED SOPHISTICATED MEANS IN FURTHERANCE OF HIS FRAUDULENT SCHEME.

Next, the Court concludes that Beckner's base offense level is subject to a 2-level increase under U.S.S.G. § 2B1.1(b)(10), because Beckner used sophisticated means in furtherance of the

Savoy Travel scheme.  See U.S.S.G. § 2B1.1(b)(10).  U.S.S.G. § 2B1.1(b)(10) provides:

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels.

U.S.S.G. § 2B1.1(b)(10).  Application Note 9.B states:

> "[S]ophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(10) Application Note 9.B.  Here, the Court will apply a 2-level increase to Beckner's base offense level under U.S.S.G. § 2B1.1(b)(10)(C), because Beckner used sophisticated means in furtherance of the Savoy Travel scheme.  The Court determines that § 2B1.1(b)(10)(C) is applicable for two separate, independent bases: (i) Beckner's use of shell corporations; and (ii) Beckner's use of foreign bank accounts.  The Court elaborates on both bases.

First, Beckner used sophisticated means, because he used shell corporations to conceal the Savoy Travel scheme's proceeds.  See U.S.S.G. § 2B1.1(b)(10) Application Note 9.B.  More specifically, Beckner used shell corporations like Top Management, Petro Fuels, and Seashell Fuel to conceal the Savoy Travel scheme's proceeds.   See, e.g., Trial Tr. at 880:1-25 (Layne)(summarizing withdrawals from Top Management's bank account that Beckner used for personal expenses); id. at 852:8-10 (Layne)(explaining that some proceeds from the New Markets Tax Credit Program Loan went into Petro Fuels' bank account); id. at 868:2-3 (Layne)(explaining that the majority of one individual investor's funds went to Seashell Fuel's bank account).  A shell

corporation in and of itself can amount to a "sophisticated means" for § 2B1.1(b)(10)(C)'s purposes. See U.S.S.G. § 2B1.1(b)(10) Application Note 9.B. Accordingly, Beckner's use of Top Management, Petro Fuels, and Seashell Fuel warrants § 2B1.1(b)(10)(C)'s application. Section 2B1.1(b)(10)(C) is especially appropriate here, because some of Beckner's shell corporations were especially sophisticated, given that they involved additional layers of complexity to further conceal the fraudulent activity. For example, Petro Fuels and Seashell Fuel were both foreign corporations. See Trial Tr. at 359:20-21 (Sullivan, Curtis); id. at 397:16-17 (Sullivan, Curtis). Additionally, Romero was the straw owner of Petro Fuels and Seashell Fuel. See PSR ¶ 16, at 18 (explaining that Romero was the "straw owner" of Seashell Fuel); Trial Tr. at 852:8-13 (Layne)(explaining that Romero was the "beneficial owner" of Petro Fuels). These facts demonstrate that Beckner went beyond mere use of corporate shells and took the additional step of making those shells harder to detect by incorporating them abroad or under a straw owner's name.

Second, and separately, Beckner used sophisticated means, because he used offshore bank accounts to conceal the Savoy Travel scheme's proceeds. See U.S.S.G. § 2B1.1(b)(10) Application Note 9.B. Beckner used personal, foreign bank accounts in furtherance of the Savoy Travel scheme. See, e.g., Trial Tr. at 863:7-10 (Layne)(explaining that Savoy Travel sent a significant portion of one individual investor's funds to "a foreign bank account held by Bruce Beckner"). Additionally, Beckner used Petro Fuels and Seashell Fuel's foreign bank accounts in furtherance of the Savoy Travel scheme. See, e.g., Trial Tr. at 852:9-11 (Layne)(explaining that some proceeds from the New Markets Tax Credit Program Loan went into Petro Fuels' foreign bank account at Stanford International); id. at 867:22-868:18 (Layne)(explaining that one individual investor's funds went to Seashell Fuel's bank account and eventually to Becker's personal foreign bank account). These offshore bank accounts amount to "sophisticated means"

for § 2B1.1(b)(10)(C)'s purposes.  See U.S.S.G. § 2B1.1(b)(10) Application Note 9.B.  While Romero was the beneficial owner of Petro Fuels' Stanford International bank account, see Trial Tr. at 852:8-13 (Layne), that fact shows that the Stanford International account was an especially sophisticated means of concealing Beckner's fraudulent activity.  For these reasons, the Court concludes that Beckner used sophisticated means to carry out the Savoy Travel scheme. Accordingly, the Court will overrule Beckner's objection and apply a 2-level increase to Beckner's base offense level pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

The United States contends that, in the alternative, the U.S.S.G. § 2B1.1(b)(10) enhancement applies, because Beckner committed a "substantial part" of the Savoy Travel scheme outside of the United States.  U.S.S.G. § 2B1.1(b)(10)(B).  See U.S. Sentencing Memo. at 9.  The Court disagrees with the United States.  The United States is correct that U.S.S.G. § 2B1.1(b)(10)(B) applies where a defendant committed a "substantial part" of a scheme outside of the United States.  U.S.S.G. § 2B1.1(b)(10)(B).  The Tenth Circuit has not expressly defined "substantial part" for U.S.S.G. § 2B1.1(b)(10)(B)'s purposes, but acknowledges that it is a "fact-focused" inquiry that involves a consideration of where a defendant devised and executed a scheme.  United States v. Luton, No. 21-1285, 2022 WL 2764202, at *3 (10th Cir. July 15, 2022). The Tenth Circuit emphasizes that U.S.S.G. § 2B1.1(b)(10)(B) does not require "that all of the scheme occur[] outside of the United States or that the scheme originated outside of the United States," but simply that a "*substantial* part of the scheme be committed from outside the United States."  United States v. Luton, 2022 WL 2764202, at *4 (emphasis in original).

Here, the Court determines that some aspects of the Savoy Travel scheme occurred outside the United States, but that those international components do not amount to a "substantial part" for

U.S.S.G. § 2B1.1(b)(10)(B)'s purposes.   On one hand, Beckner lived in Honduras before he became involved at Savoy Travel, see Beckner Sentencing Memo. at 2, and he returned to Honduras after Savoy Travel went into receivership, see Beckner Objections at 3.  His girlfriend, Romero, and their children lived in Honduras throughout the Savoy Travel scheme.  See PSR ¶ 55, at 15.  Additionally, Beckner used foreign corporate shells to conceal the Savoy Travel scheme's proceeds, and sent some of the Savoy Travel scheme's proceeds to offshore bank accounts in Honduras and Panama.  See PSR ¶ 9, at 6.  On the other hand, the Savoy Travel scheme took place primarily in the United States.  Savoy Travel -- the main vehicle for Beckner's fraudulent scheme -- is located in Deming, New Mexico.  See PSR ¶ 6, at 5.  Beckner lived in Deming throughout the Savoy Travel scheme.  See Beckner Objections at 2.  More significantly, Beckner perpetrated the scheme from Deming.  For example, Beckner made false statements to institutional and individual investors from Savoy Travel's Deming office.  See PSR ¶¶ 8-11, at 5-6. Ultimately, the scheme impacted institutional and individual investors in the United States.  See ¶¶ 10, 12, at 6, 7.  Viewed in its entirety, the Court determines that the Savoy Travel scheme unfolded primarily in the United States, and that Beckner relied on foreign individuals and instruments to conceal the fruits of his scheme, and not to plan or execute his scheme.  On balance, the Court cannot say that a "substantial part" of the scheme occurred outside the United States, and at most only that some part of the scheme took place abroad.   Accordingly, the Court does not apply the 2-level U.S.S.G. § 2B1.1(b)(10) enhancement on the basis of Beckner's actions abroad during the Savoy Travel scheme.

III.     **BECKNER'S BASE OFFENSE LEVEL IS NOT SUBJECT TO A 2-LEVEL INCREASE PURSUANT TO U.S.S.G. § 3C1.1, BECAUSE BECKNER DID NOT OBSTRUCT JUSTICE BY FLEEING FROM LAW ENFORCEMENT ON <u>SEPTEMBER 7, 2011</u>.**

Finally, the Court concludes that Beckner's base offense level is not subject to a 2-level increase pursuant to U.S.S.G. § 3C1.1, because Beckner did not obstruct justice by fleeing from law enforcement on September 7, 2011.  U.S.S.G. § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

As the Court explains in greater detail above, the U.S.S.G. § 3C1.1 enhancement often is invoked in cases where a defendant flees law enforcement to avoid arrest.  See, e.g., United States v. Bliss, 430 F.3d at 640.  In those cases, courts have held that "instinctive flight" when one finds him or herself in the "power of police" alone does not merit U.S.S.G. § 3C1.1's application.  United States v. Hernandez-Valenzuela, 932 F.2d 803, 805 (9th Cir. 1991)(citing United States v. Garcia, 909 F.2d 389, 392 (9th Cir. 1990)).  Instead, the Court and others have emphasized that the United States must show that the defendant did "something more" than simply flee.  Welbig, 2015 WL 2225963, at *33.  See United States v. Alpert, 28 F.3d at 1107 ("We conclude that the § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more."); United States v. Madera-Gallegos, 945 F.2d at 266-67 ("[F]light, coupled with other 'obstructive' conduct, may justify the § 3C1.1 enhancement.").  Further, the United States must show that the flight plus the additional obstructive conduct "significantly hinder[] an investigation or prosecution."  Welbig, 2015 WL 2225963, at *33.  In other words, "the United States must show that the additional conduct plus the fleeing, and not just the fleeing, hindered the investigation."  Welbig, 2015 WL 2225963, at

*33.

Here, the evidence supports a conclusion that Beckner fled from authorities on September 7, 2011.  Baker testified that, on September 7, 2011, he and other law enforcement officers went to Savoy Travel.  See Trial Tr. at 800:15-17 (Hartstein, Baker).  Baker and the other law enforcement officers were intermixed with other government officials associated with the receivership proceeding.  See Trial Tr. at 801:5-14 (Baker).  Baker and the other law enforcement officials did not announce themselves as law enforcement and attempted to "blend in."  Trial Tr. at 802:20-24 (Baker).  Beckner and others present at Savoy Travel that day "didn't know [Baker and the other officers] were law enforcement officers."  Trial Tr. at 803:13-15 (Hartstein, Baker).  Nevertheless, when Baker and the other officers began to speak with Beckner, see Trial Tr. at 806:15-20 (Baker), Beckner went outside to his car and sped away with Beach, see Trial Tr. at 806: 23-25 (Baker).  Baker located Beckner at Beckner's Deming residence the following day.  See Trial Tr. at 808:1-12 (Baker).  In the months that followed, Beckner stayed in the United States, and spent time in Deming, Santa Fe, and California.  See Beckner Objections at 2-3; Trial Tr. at 411:23 (Curtis).  After approximately two months, Beckner returned home to Honduras.  See Beckner Objections at 3.

Although Beckner fled from officers on September 7, 2011, the record does not support a finding that Beckner engaged in "something more," Welbig, 2015 WL 2225963, at *33, that elevates his flight from mere "instinctive flight" to flight that merits § 3C1.1's application, United States v. Hernandez-Valenzuela, 932 F.2d at 805.  The evidence on the record shows that Beckner fled from law enforcement, but that law enforcement found him at his Deming residence the following day.  See Trial Tr. at 808:1-12 (Hartstein, Baker).  He then stayed in the United States, and spent time in Deming, Santa Fe, and California, and eventually returned home to Honduras.

See Beckner Objections at 2-3; Trial Tr. at 411:23 (Curtis).  A preponderance of the evidence does not support a finding that Becker engaged in any additional obstructive conduct beyond his initial flight on September 7, 2011.  There is no evidence on the record that indicates that Beckner destroyed evidence, threatened a potential witness, or otherwise engaged in some conduct that aggravates his flight from the officials at Savoy Travel.  Instead, it seems that Beckner's flight from officials on September 7, 2011, was "instinctive flight" when Beckner found himself in the "power of police."  United States v. Hernandez-Valenzuela, 932 F.2d at 805.

The United States protests that Beckner engaged in additional obstructive conduct.  See January 4 Tr. at 44:3-10 (Hartstein).  More specifically, the United States contends that Beckner's "preparation and planning" amounts to additional obstructive conduct.  January 4 Tr. at 44:3-10 (Hartstein).  The United States elaborates that the evidence supports a finding that Beckner "intended to impede the administration of justice" all along, and that he planned and prepared in anticipation of such obstruction, that he is eligible for the § 3C1.1 enhancement.  January 4 Tr. at 44:23-45:12 (Hartstein).

The Court disagrees with the United States for three reasons.  First, although the record shows that Beckner had ties to Honduras before he became involved with Savoy Travel, see Beckner Sentencing Memo. at 2, a preponderance of the evidence does not support a finding that Beckner had a long-term plan to flee to Honduras if the Savoy Travel scheme went awry.  Accordingly, there is no evidence on the record to support a finding that Beckner planned and prepared to obstruct justice all along, as the United States suggests he did.  See January 4 Tr. at 44:3-10 (Hartstein).  Second, the United States' argument assumes that Beckner knew he was being investigated on September 7, 2011, and that he put his obstructive plan into action on the basis of that knowledge.  To the contrary, the Court finds above that Beckner did not know he was

being investigated on September 7, 2011.  Accordingly, Beckner could not "avail[] himself" of his investigation exit strategy if he was not aware of an investigation in the first instance. January 4 Tr. at 47:20-24 (Hartstein).  Finally, as the Court explained at the January 4 hearing, the additional obstructive conduct "has to occur after the crime and in conjunction or after the fleeing."  January 4 Tr. at 47:12-14 (Court).  U.S.S.G. § 3C1.1 applies to interferences with "the investigation, prosecution, or sentencing of the instant offense of conviction."  U.S.S.G. § 3C1.1.  It follows that to interfere with "the investigation, prosecution, or sentencing of the instant offense," the "investigation, prosecution, or sentencing" must be underway.  U.S.S.G. § 3C1.1.  Accordingly, the Court is unwilling to reach back to before the "investigation, prosecution, or sentencing" to find evidence of interference with the later "investigation, prosecution, or sentencing."  U.S.S.G. § 3C1.1.  Considering Beckner's alleged advance planning would be reaching back to before the "investigation, prosecution, or sentencing."  U.S.S.G. § 3C1.1.  Additionally, the Court is not familiar with any case in which another court has applied the U.S.S.G. § 3C1.1 enhancement on the basis of advance planning.

Similarly, that Beckner ultimately ended up in a foreign jurisdiction -- Honduras -- after fleeing from law enforcement does not amount to additional obstructive conduct for U.S.S.G. § 3C1.1's purposes without more.  Several Courts of Appeals -- including the Tenth Circuit -- have applied the U.S.S.G. § 3C1.1 enhancement where a defendant flees to a foreign jurisdiction and subsequently fights extradition.  See Perrault, 995 F.3d at 778 (involving a defendant fighting extradition from Morocco); United States v. Nduribe, 704 at 1050-51 (involving a Nigerian national fighting extradition from the Netherlands); United States v. Carty, 264 F.3d at 195 (involving a defendant fighting extradition from the Dominican Republic).  The Courts of Appeals explain that the obstruction-of-justice enhancement applies in those cases, because the defendants

dig in their heels while abroad and fight extradition to the United States after the United States has

located them or initiated extradition.  See Perrault, 995 F.3d at 778-79 (involving a defendant who

"fought his removal from Morocco," and put the United States "to the expense and trouble of

retrieving him"); United States v. Nduribe, 704 at 1050 (involving a defendant who spent "a

year . . . fighting arrest and extradition); United States v. Carty, 264 F.3d at 195 (involving a

defendant who remained in the Dominican Republic after the Drug Enforcement Administration

ordered him to return to the United States).  Importantly, in those cases, the Courts of Appeals

never have taken the additional step of holding that flight to a foreign jurisdiction, on its own,

amounts to additional obstructive conduct for U.S.S.G. § 3C1.1's purposes.  Accordingly, the

Court draws a negative inference from these cases: flight to a foreign country, on its own, does not

amount to additional obstructive conduct for § 3C1.1's purposes.[24]

---

[24]In drawing this negative inference from Perrault, the Court aligns itself with Beckner's reading of Perrault, and not with the United States' reading of Perrault.  At the January 4 hearing, Becker noted that the Tenth Circuit could have held that flight to a foreign country amounts to additional obstructive conduct in Perrault, but that it did not make that holding.  See January 4 Tr. at 42:5-10 (Ray)(citing Perrault, 995 F.3d at 777).  Beckner emphasized that the Tenth Circuit applied the enhancement in Perrault, because Perrault fought extradition from a foreign country, and not because he fled to a foreign country.  See January 4 Tr. at 42:13-17 (Ray)(citing Perrault, 995 F.3d at 778-79).  By contrast, the United States contended that the Tenth Circuit in Perrault did not reach the question whether flight to a foreign country could amount alone to additional obstructive conduct.  See January 4 Tr. at 43:20-44:2 (Hartstein).  The United States emphasized that the Tenth Circuit did not hold that "flight and remaining in a foreign jurisdiction can never be the something more" required under U.S.S.G. § 3C1.1.  January 4 Tr. at 43:24-44:1 (Hartstein).

The Court agrees with Beckner's reading of Perrault.  As explained in greater detail above, the district court in Perrault applied the obstruction enhancement, because Perrault fled to Morocco.  See 995 F.3d at 759.  The Tenth Circuit affirmed, but on different grounds.  See 995 F.3d at 777.  The Tenth Circuit could have affirmed for the reasons the district court had stated, but it did not affirm for the reasons the district court stated.  That decision is telling.  That decision suggests to the Court that the Tenth Circuit does not want to affirm U.S.S.G. § 3C1.1's application merely because a defendant flees to a foreign country.  Instead, the Tenth Circuit's analysis in Perrault indicates that the Tenth Circuit deems U.S.S.G. § 3C1.1 applicable where a defendant flees to a foreign jurisdiction, and later fights arrest or extradition.

The Court, therefore, determines that Beckner's decision to go to Honduras does not amount to additional obstructive conduct.  If Beckner had fought extradition, the Court's U.S.S.G. § 3C1.1 analysis would be different.  See Parrault, 995 F.3d at 778-79; United States v. Nduribe, 704 at 1050; United States v. Carty, 264 F.3d at 195.  The record indicates, however, that, while Beckner was in Honduras, he did not know about the charges against him, and that, when he became aware of the charges against him, Beckner did not fight extradition.  See Beckner Objections at 4-5; Verbal Notes of Honduran Extradition Proceedings (dated April 11, 2019), filed January 2, 2023 (Doc. 219-2)(rough transcript of Beckner's extradition proceeding, written in Spanish).  To the contrary, the record shows that Beckner consented to his extradition in April, 2019.  See Beckner Objections at 5.  The Honorable Jerry H. Ritter, United States Magistrate Judge for the United States District Court for the District of New Mexico, arraigned Beckner later that month.  See Clerk's Minute Sheet, filed April 18, 2019 (Doc. 73).  Unlike the defendants at issue in Perrault, United States v. Nduribe, and United States v. Canty, Beckner did not dig in his heels and fight extradition.  See Parrault, 995 F.3d at 778-79; United States v. Nduribe, 704 at 1050; United States v. Carty, 264 F.3d at 195.  Instead, he came back to the United States willingly after becoming aware of the charges against him.  See Beckner Objections at 5.  For these reasons, the Court determines that it will not consider Beckner's flight to Honduras as "something more" for U.S.S.G. § 3C1.1's purposes.  Welbig, 2015 WL 2225963, at *33.  Additionally, because the United States has not demonstrated that Beckner did "something more" beyond flee from officials, the Court concludes that a preponderance of the evidence does not support a finding that Beckner's flight, plus his additional obstructive conduct, "significantly hindered" the Savoy Travel

investigation.[25]  Welbig, 2015 WL 2225963, at *33.

IV.     **THE COURT SENTENCES BECKNER TO THE BUREAU OF PRISONS'
        CUSTODY FOR A TERM OF 210 MONTHS PLUS A FIVE-YEAR TERM OF
        SUPERVISED RELEASE.**

Having resolved the parties' objections, the Court imposes a sentence.  Beckner's

Guideline imprisonment range is 210 to 262 months.[26]  See January 4 Tr. at 104:10-13 (Court).

The United States asks the Court to impose a sentence of 300 months.  See U.S. Sentencing Memo.

at 4.  By contrast, Beckner asks the Court to impose a sentence of time served, which, at the time

that Beckner filed the Beckner Sentencing Memo., was 1,398 days.  See Beckner Sentencing

Memo. at 1.  In arriving at a sentence, the Court carefully has considered the factors 18 U.S.C. §

3553(a) enumerates.  Specifically, the Court identifies four factors that put downward pressure on

---

[25]The Court acknowledges that at the January 4 sentencing hearing, the United States identified various ways in which Beckner's flight to Honduras made the investigation more difficult.  See January 4 Tr. at 49:1-8 (Hartstein)(explaining that the United States had to get "a Multilateral Assistance Treaty request to Panama and Honduras," because it "couldn't go find Mr. Beckner, and serve him with a subpoena.").  Additionally, the United States alleges that Beckner's presence in Honduras made "the tracing of the disposition of the funds difficult as well."  January 4 Tr. at 49:12-13 (Hartstein).

While the Court understands that Beckner's presence in Honduras may have complicated the United States' investigation and prosecution, the Court has to determine whether Beckner's flight plus his additional obstructive conduct "significantly hindered" the United States' investigation.  Welbig, 2015 WL 2225963, at *33.  Because the Court determines above that flight to a foreign jurisdiction does not amount to additional obstructive conduct, it follows that the United States cannot use Beckner's flight to Honduras as the basis for showing a significant hinderance.  Accordingly, the United States' discussion of how Beckner's presence in Honduras complicated the investigation is beside the point.

[26]The Court notes that the PSR establishes that Beckner's Guideline imprisonment range is 168 to 210 months.  See PSR ¶ 68, at 17.  That Guideline range, however, does not reflect the Court's resolution of the parties' sentencing objections.  The Court re-calculates Beckner's Guideline imprisonment range based on its resolution of the parties' objections and determines that Beckner's adjusted Guideline range is 210 to 262 months.  At the January 4 hearing, the Court confirmed with USPO that its adjusted Guideline range is correct.  See January 4 Tr. at 56:13-21 (Court, Ortiz y Martinez).

Beckner's sentence, and thirty-two factors that put upward pressure on Beckner's sentence to keep his sentence in the Guideline range.  Because the factors that put upward pressure on the sentence overwhelm -- both qualitatively and quantitatively -- the factors that put downward pressure on the sentence, the Court determines that a Guideline sentence is appropriate.  The Court sentences Beckner to the Bureau of Prisons' custody for a term of 210 months, plus a five-year term of supervised release, the low end of Beckner's Guideline imprisonment range.

The Court identifies four factors that put downward pressure on Beckner's sentence to put the sentence below the Guideline range.  These factors include: (i) the Court's obligation to impose a sentence that is reasonable; (ii) the Court's duty to impose a sentence that is not greater than necessary to emphasize the § 3553(a) factors; (iii) Beckner's children with Romero in Honduras will grow up without a father if Beckner is incarcerated; and (iv) Beckner lost one of his children with Franklin.  Taken together, these considerations suggest that the Court should sentence Becker below his Guideline range.

On the other hand, the Court identifies thirty-two factors that put upward pressure on Beckner's sentence to keep his sentence in the Guideline range.  These factors include: (i) the seriousness of the offense; (ii) the need to promote respect for the law; (iii) the Court's duty to provide just punishment; (iv) general deterrence; (v) specific deterrence, particularly after Beckner's prior term of imprisonment on federal fraud charges; (vi) Beckner's criminal history; (vii) Beckner's criminal history involves prior federal crimes;  (viii) that Beckner's criminal history involves a very similar scheme, the Monkey Business scheme; (ix) the victims of Beckner's prior schemes have not received restitution in full; (x) the Court is not optimistic the victims here will receive restitution; (xi) Herlihy does not have the criminal history that Beckner has; (xii) Herlihy was not as much of a leader at Savoy Travel as Beckner was; (xiii) the Savoy Travel

scheme was a Ponzi scheme; (xiv) the Savoy Travel scheme was a more expansive fraudulent scheme than a simple Ponzi scheme; (xv) Beckner used Savoy Travel as a lure to perpetrate his Ponzi scheme; (xvi) Beckner skimmed money off the top of investments and used shell corporations to conceal the proceeds; (xvii) Beckner's fraudulent activities put Savoy Travel in dire financial straits; (xviii) Beckner used aliases as part of the Savoy Travel scheme to cheat victims out of money; (xix) Beckner's actions evince a callous disregard for his family and colleagues; (xx) Beckner's action show a disregard for his investors; (xxi) Beckner benefitted financially from the Savoy Travel scheme; (xxii) Beckner lived well throughout the Savoy Travel scheme; (xxiii) the Savoy Travel scheme impacted over two dozen victims; (xxiv) the Savoy Travel scheme impacted the victims' families; (xxv) the Savoy Travel scheme had a substantial financial impact on the victims, including many victims who lost their retirement savings; (xxvi) many victims lost out on other investment opportunities; (xxvii) the financial impact had a domino effect that created lasting emotional harm on the victims; (xxviii) the Savoy Travel scheme traumatized its victims; (xxix) the Court's desire to protect the public; (xxx) the Court's obligation to avoid unwarranted sentencing disparities between Beckner and similar defendants who have been convicted for similar offenses; (xxxi) the Court's obligation to impose a reasonable sentence; and (xxii) the Court's duty to impose a sentence that sufficiently emphasizes the § 3553(a) factors. Taken together, these considerations suggest that the Court should sentence Beckner within the applicable Guideline range.

On balance, the Court determines that the factors that put upward pressure on Beckner's sentence overwhelm -- both qualitatively and quantitatively -- the factors that put downward pressure on Beckner's sentence, such that it is appropriate to sentence Beckner within the applicable Guideline range. The Court has considered the Guideline's sentencing range for the

applicable category of offense committed by the applicable category of defendant. The Court believes that the punishment set forth in that Guideline range is appropriate for Beckner's offense. In its long career on the bench, the Court has never encountered a defendant with so few factors that put downward pressure on a sentence. Additionally, the Court cannot look past the offense's seriousness, Beckner's criminal history, and the steep financial and emotional impact that the Savoy Travel scheme had on the victims. These considerations justify keeping Beckner's sentence within the Guideline range. Normally, the Court sentences at the bottom of the Guideline range unless there are additional factors that compel the Court to move up into the Guideline range. Here, the Guideline range reflects all the relevant factors, such that the Court does not need to deviate from its practice of sentencing at the low end of the Guideline range. The Court, therefore, will sentence Beckner at the bottom end of the Guideline range, as it normally does, and impose a sentence of 210 months, plus a five-year term of supervised release.

The Court believes that this sentence is reasonable. In determining a sufficient sentence in this case, the Court has considered the § 3553(a) factors, and has imposed a sentence that fully and effectively reflects those factors. More specifically, the Court's sentence reflects the offense's seriousness, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public. See 18 U.S.C. § 3553(a). Further, the Court believes that this sentence is sufficient, without being greater than is necessary to comply with the purposes of the Sentencing Reform Act. See United States v. Conlan, 500 F.3d at 1169 ("[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)."). Further, time in custody will provide Beckner with needed educational or vocational training and medical care. Finally, the Court's Guideline sentence avoids unwarranted sentencing disparities among

defendants with similar records who have been found guilty of similar conduct.  <u>See</u> 18 U.S.C. § 3553(a)(6).

 While the Court carefully considers Beckner's request for a time served sentence, the Court does not believe that a time served sentence would reflect adequately all the § 3553(a) factors, especially deterrence.  Beckner is a con man.  He has a history of running schemes like the Savoy Travel scheme, and he served time in federal custody in connection with those offenses.  Evidently, Beckner did not learn his lesson or change his ways after being punished on federal fraud charges.  Instead, he perpetrated a substantially similar scheme: the Savoy Travel scheme.  In an effort to promote Beckner's respect for the law, dissuade Beckner from committing a similar offense in the future, and protect the public, the Court determines that a Guideline sentence is warranted.  <u>See</u> 18 U.S.C. § 3553(a).

 The Court also carefully considers the United States' request for a sentence of 300 months.  The Court acknowledges the offense's gravity.  The Court carefully has reviewed the Victim Impact Statements, and understands that the Savoy Travel scheme caused real, lasting financial and emotional harm on the victims.   The Court is troubled that Beckner has a history of running schemes like the Savoy Travel scheme and fears that a lighter sentence will not adequately deter Beckner from engaging in this conduct in the future, or deter other con men looking to perpetrate schemes like Beckner's.  Nevertheless, the Court normally sentences at the bottom of the Guideline range, unless there are additional factors that require the Court to move up in the Guideline range.  Here, the Court determines that a sentence above the applicable Guideline range is "greater than necessary" to emphasize the § 3553(a) factors, because there are no additional factors that compel the Court to move up in the Guideline range.  18 U.S.C. § 3553(a).  Deterrence, the seriousness of the offense, and the impact on the victims are baked into the Guideline range, and, therefore,

the Court cannot justify climbing up into the Guideline range on account of deterrence, the offense's seriousness, or victim impact.

**IT IS ORDERED** that: (i) the objection in the United States' Sentencing Memorandum, filed December 22, 2022 (Doc. 218), is sustained; (ii) Defendant Bruce Beckner's base offense level is subject to a 4-level increase under U.S.S.G. § 3B1.1(a); (iii) the objections in the Defendant's Objections to PSR and Sentencing Memorandum, filed January 2, 2023 (Doc. 219), are sustained in part and overruled in part; (iv) the Court overrules Beckner's objection that the 2-level enhancement under U.S.S.G. § 2B1.1(b)(10) should not apply; (v) the Court sustains Beckner's objection that the 2-level enhancement under U.S.S.G. § 3C1.1 should not apply; (vi) the applicable offense level is 35 and criminal history category is III; (vii) the United States Sentencing Guideline range is 210 to 262 months; and (viii) Beckner is sentenced to the Bureau of Prisons' custody for a term of 210 months, plus a five-year term of supervised release.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M. M. Uballez
  United States Attorney
Sean J. Sullivan
Taylor F. Hartstein
  Assistant United States Attorneys

United States Attorney's Office

- 103 -

Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Marshall J. Ray
Law Offices of Marshall J. Ray, LLC
Albuquerque, New Mexico

-- and --

Nicole Moss
The Law Office of Nicole W Moss L.L.C.
Albuquerque, New Mexico

     *Attorneys for the Defendant*