# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

       Plaintiff,

vs.                                                                                          No. CR 15-2218 JB

BRUCE BECKNER, a.k.a. Bill Evans, and
ARTHUR HERLIHY,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States' Motion in Limine to Preclude Evidence or Discussion of Sentencing or Punishment at Trial, filed September 14, 2020 (Doc. 104)("Sentencing MIL"); (ii) the United States' Motion in Limine to Admit Evidence of Defendant's Use of False Alias, Defendant's Prior Criminal Convictions, Defendant's Use of a Co-Conspirator to Engage in Immigration Fraud, and Defendant's Flight to Honduras and Extradition Therefrom, and, in the Alternative, Notice of Intent of Intent to Offer Evidence of Other Crimes or Bad Acts Pursuant to Fed. R. Evid. 404(b), filed January 26, 2021 (Doc. 118)("Alias MIL"); (iii) the Defendant's Motion in Limine to Prohibit Evidence Regarding Alleged Schemes to Bring Xiomara Romero to the United States, filed January 26, 2021 (Doc. 120)("Jimenez MIL"); (iv) the Defendant's Motion in Limine to Prevent Evidence Related to Travel to Honduras and Extradition, filed January 26, 2021 (Doc. 121)("Extradition MIL"); (v) the United States' Amended Motion in Limine to Admit Evidence of Defendant's Prior Criminal Convictions, Defendant's Use of a Co-Conspirator to Engage in Immigration Fraud, Defendant's Flight From Government Investigators Within the United States, and Defendant's Flight to Honduras and Extradition Therefrom, and, in the Alternative, Notice of Intent to Offer

Evidence of Other Crimes or Bad Acts Pursuant to Fed. R. Evid. 404(b), filed September 17, 2021 (Doc. 136)("Amended MIL"); and (vi) the United States' Supplemental Motion in Limine to Admit Evidence of Cease-and-Desist Order, filed December 6, 2021 (Doc. 152)("CAD MIL"). The Court held a hearing on December 8, 2021.  See Clerk's Minutes, filed December 8, 2021 (Doc. 168).  The primary issues are: (i) whether Defendant Bruce Beckner can offer any evidence about, or otherwise mention, the potential sentence that he could receive if the jury convicts him, should the jury convict him; (ii) whether Plaintiff United States of America can discuss or offer any evidence that (a) Beckner uses an alias, and (b) Beckner has a prior criminal conviction for securities fraud; (iii) whether the United States can discuss or offer evidence of Beckner's alleged connections to and travel to and from Central American countries; (iv) whether the United States can discuss or offer any evidence of Beckner's alleged role in immigration fraud by signing fraudulent immigration documents, and entering into a fraudulent marriage with Rita Xiomara Romero Jimenez, for the purpose of conferring immigration benefits on Jimenez; and (v) whether the parties can discuss evidence of Beckner's alleged flight from authorities.  The Court concludes that: (i) although the Court disagrees with the dictates from the Supreme Court of the United States of America and the United States Court of Appeals for the Tenth Circuit, Beckner may not introduce at trial evidence about his possible sentence or otherwise discuss at trial the sentence he could receive if the jury convicts him; (ii) the United States (a) may introduce evidence that Beckner used an alias, because it is intrinsic to the charged crimes, but (b) cannot introduce evidence of Beckner's prior conviction, although the United States may introduce evidence that Beckner has large outstanding monetary debts; (iii) the United States may discuss Beckner's connections to foreign nations, but may not list specifically the countries to which Beckner traveled, because the countries are not necessary to prove the crime charged; (iv) the United States

may introduce some evidence of Beckner's alleged immigration fraud to show that Sean Curtis, Beckner's family friend, would do what Beckner says, but may not introduce evidence that Curtis wrote a letter to Jimenez at Beckner's request or dwell on the alleged fraud aspects of the immigration issues, because evidence of the alleged immigration fraud's risk of prejudice substantially outweighs the alleged immigration fraud's probative value; and (v) the United States may introduce evidence related to Beckner's alleged flight from investigators in Luna County, New Mexico, in 2001, as well as the timing of being served with a cease-and-desist notice and his travel to Honduras two months later.   The Court therefore: (i) grants the Sentencing MIL; (ii) grants in part and denies in part the Alias MIL; (iii) grants in part and denies in part the Jimenez MIL; (iv) grants in part and denies in part the Extradition MIL; (v) grants in part and denies in part the Amended MIL; and (vi) grants in part and denies in part the CAD MIL.

## FACTUAL BACKGROUND

The Court takes its background facts from the Redacted Indictment, filed June 24, 2015 (Doc. 2)("Indictment").  The Court does not set forth these facts as findings or the truth.  The Court recognizes that the factual background largely reflects the United States version of events and that Beckner is presumed innocent.

Sometime between 2000 and 2006, Beckner moved from California to New Mexico.  See Indictment at 1.  Once in New Mexico, Beckner adopted the alias "Bill Evans" and began to manage a truck stop business in Deming, New Mexico.  Indictment at 1.  In 2007, Beckner enlisted Defendant Arthur Herlihy to help develop a business plan, and to secure funds to renovate and to expand the truck stop.  See Indictment at 1.  On July 7, 2009, Beckner and Herlihy obtained a loan for Truckers Paradise, LLC, a "legal entity associated with the truck stop," for approximately $135,165.00 from 1st New Mexico Bank of Deming.  Indictment at 2.  Herlihy "signed loan

documents as both an individual and as a manager of Savoy Travel Center, LLC, a legal entity associated with the truck stop," while Beckner signed the loan documents "as an individual only." Indictment at 2.  Although Beckner and Herlihy told 1st New Mexico Bank that they would pay off a pre-existing loan for a liquor license, they instead used it to pay various expenses related to the truck stop.  See Indictment at 2-3.  Beckner and Herlihy did not tell 1st New Mexico Bank how they used to loan.  See Indictment at 3.  Beckner and Herlihy defaulted on the loan on or about 2011.  See Indictment at 3.

On October 2, 2009, Beckner and Herlihy obtained further loans, this time totaling more than $16,000,000.00 for Fuel4Less, LLC, another legal entity associated with the truck stop.  See Indictment at 3.  These loans included about $12,000,000.00 from Virtual Reality Enterprises and about $4,000,000.00 from U.S. Bank Development Corporation.  See Indictment at 4.  The New Mexico Finance Authority approved the transaction.  See Indictment at 3-4.  The loan was for construction and other truck stop improvements.  See Indictment at 4.  Herlihy signed documents as the Fuel4Less manager, but Beckner signed documents under the name "Bill Evans." Indictment at 4.  Using the name "Bill Evans," Beckner "represented himself to be the 'facilities and operating manager'" of Fuel4Less, and submitted a resume that "omitted material information and falsely stated that he had business experience that he did not have, and stated that he was gainfully employed during periods of time when he was not."  Indictment at 4 (no citation for quotation).  Fuel4Less defaulted on these loans in 2011.  See Indictment at 4.

Beckner and Herlihy also convinced three individuals to invest in the truck stop.  See Indictment at 4.  Using written materials, telephone calls, and emails to solicit investments in a "so-called 'fuel factoring opportunity,'" Beckner and Herlihy convinced C.P., J.D., and T.F. to invest.  Indictment at 4 (no citation for quotation).  Beckner and Herlihy told C.P., J.D., and T.F.

that "one component of the truck stop would purchase fuel from outside suppliers and then re-sell it to another component of the truck stop at a higher price with the profits of these internal sales" shared with the investors.  Indictment at 4.  Instead, "there were no internal sales from one component of the truck stop to another."  Indictment at 4.  The investors' money went into "general operating accounts," which Herlihy operated; Beckner and Herlihy used the money to "repay other investors, or to fund ordinary truck stop expenses, such as payroll."  Indictment at 4.

Becker instructed "many" other investors to deposit money in various branches of Wells Fargo Bank branches, where the truck stop maintained its business accounts.  Indictment at 5. Some investors instead opted to make their deposits by wire transfer.  See Indictment at 5.  The truck stop issued the investors promissory notes for their investments, often from Federal Express, which promised to repay the investment plus a percentage of fuel sale profits later.  See Indictment at 5.  Herlihy signed or stamped almost all of these promissory notes.  See Indictment at 5.  Most of the investments were deposited into Herlihy's account.  See Indictment at 5.  The promissory notes and Uniform Commercial Code ("UCC") statements filed with the County Clerk's office "stated that the investors' investments were secured by the assets on the truck stop."  Indictment at 5.  Beckner and Herlihy did not tell these investors about the truck stop's pre-existing debts to Virtual Reality Enterprises and to U.S. Bank Development Corp., which made the promissory notes and UCC statements "essentially worthless."  Indictment at 5.

On July 11, 2011, after the truck stop had been operating at a loss for several months, Herlihy sent J.D. an email stating falsely that revenues were climbing and that a new, serious investor was interested in supporting the business.  See Indictment at 6.  The truck stop soon thereafter defaulted on the $16,000,000.00 in loans.  See Indictment at 6.  After the default, a New Mexico State judge appointed a receiver, who filed a bankruptcy petition.  See Indictment at 6.

Many of the investors in the "'fuel factoring opportunity' lost all of their principal investments," and Virtual Reality Enterprises and U.S. Bank Development Corp. suffered "significant losses." Indictment at 6.

**PROCEDURAL BACKGROUND**

A Grand Jury indicted Beckner with: (i) one count of bank fraud, and aiding and abetting, in violation of 18 U.S.C. §§ 2 and 1344; (ii) one count of wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 2 and 1343; and (iii) one count of conspiracy with Herlihy, and aiding and abetting, in violation of 18 U.S.C. §§ 2 and 1349. See Indictment at 1. The Grand Jury also indicted Herlihy with one count of wire fraud and aiding and abetting in violation of 18 U.S.C. §§ 2 and 1343, and one count of mail fraud, and aiding and abetting, in violation of 18 U.S.C. §§ 2 and 1341. See Indictment at 1, 6-7. Herlihy pled guilty and the Court sentenced him on August 11, 2017, and entered judgment on June 9, 2020. See Judgment in a Criminal Case, filed June 9, 2020 (Doc. 101). As the parties prepare for Beckner's trial, they ask the Court to resolve various evidentiary disputes.

     **1.**       **Sentencing MIL.**

The United States argues that, at trial, Beckner should not be allowed to offer evidence, discuss, or mention in the jury's presence "any evidence or statements" about his "potential punishment, or any other issues related to his potential sentencing, including the maximum period off [sic] imprisonment authorized by statute and the application of the federal sentencing guidelines to his case." Sentencing MIL at 1. The United States notes that Beckner faces three charges: (i) bank fraud, which carries a maximum imprisonment term of thirty years and up to a $1,000,000.00 fine; (ii) wire fraud, which carries a twenty-year maximum imprisonment term and up to a $250,000.00 fine, but thirty years and a $1,000,000.00 fine when the crime affects a

financial institution; and (iii) conspiracy, which, as charged, carries a thirty-year imprisonment maximum and up to a $1,000,000.00 fine.  See Sentencing MIL at 1.  The United States cites to United States v. Edwards, 266 F. Supp. 1290, 1292 (D.N.M. 2017)(Browning, J.), in which the Court states that, because it must "faithfully apply controlling Supreme Court and Tenth Circuit precedent," it "'will grant the United States' motion to prevent [the defendant] from discussing sentencing-related issues in front of the jury during trial.'"  Sentencing MIL at 2 (quoting United States v. Edwards, 266 F. Supp. at 1292).  The United States argues that the Supreme Court notes that, when a jury has "'no sentencing function, it should be admonished to reach its verdict without regard to what sentencing might be imposed.'"  Sentencing MIL at 2 (quoting Shannon v. United States, 512 U.S. 573, 579 (1994)).  The United States contends, therefore, that the Court should preclude Beckner from discussing his potential sentence or "other issues related to his potential sentencing."  Sentencing MIL at 3.

      **2.**       **Sentencing MIL Response**.

Beckner Responds to the Sentencing MIL, arguing that excluding any evidence of his potential punishments violates rights that the Sixth Amendment to the Constitution of the United States of America protects.  See Defendant's Response in Opposition to the United States' Motion in Limine to Prevent Evidence or Discussion of Sentencing or Punishment at Trial at 1, filed October 5, 2020 (Doc. 108)("Sentencing MIL Response").  Beckner notes that the Sixth Amendment guarantees criminal defendants the right to an impartial jury, and argues that this right "includes the right to instruct the jury about its inherent nullification power and allows defense counsel to argue for nullification."  Sentencing MIL Response at 3.  Becker, therefore, contends that the Court should permit him to introduce evidence of his potential sentence and not preclude him from arguing for jury nullification.  See Sentencing MIL Response at 3.

3.    **<u>Alias MIL</u>**.

The United States requests that the Court allow it to introduce, "as intrinsic to the crimes charged in the present case," evidence of Beckner's alleged use of a false alias, as well his prior convictions on mail fraud, conspiracy to commit mail fraud, securities fraud, and his "use of a co-conspirator to engage in immigration fraud" for his benefit and his girlfriend's benefit. Alias MIL at 1. The United States also asks the Court to allow it to admit evidence of Beckner's "ties to Honduras and Belize and his flight from the United States to Honduras, and subsequent extradition, as intrinsic to the crimes charged in the present case." Alias MIL at 1. The United States also notes that it intends to "offer evidence of other crimes or bad acts pursuant to Fed. R. Evid. 404(b)." Alias MIL at 1.

The United States contends that Beckner's "use of an alias and his prior convictions provides context and background information that the jury needs to know to understand and fairly consider the charges in this case," because they are "inextricably intertwined with" the evidence of Beckner's alleged crimes. Alias MIL at 6. The United States argues that the Court should admit this evidence, because it is intrinsic to the crimes charged. <u>See</u> Alias MIL at 6. In the alternative, the United States contends that Beckner's alias use and prior convictions indicate Beckner's "motive, opportunity, intent, preparation, and plan," so they are admissible under rule 404(b) of the Federal Rules of Evidence. Alias MIL at 8. Finally, the United States alleges that Beckner's alias use and prior criminal convictions are relevant, and not unduly prejudicial under rule 403. <u>See</u> Alias MIL at 11-12.

4.      **Alias MIL Response**.

Beckner responds to the Alias MIL, asserting that the Court must exclude evidence of Beckner's criminal history and some evidence of his alias use.  See Defendant's Response in Opposition to the United States' Motion to Admit Evidence of Defendant's Use of a False Alias, Defendant's Prior Criminal Convictions, Defendant's Use of a Co-Conspirator to Engage in Immigration Fraud, and Defendant's Flight to Honduras and Extradition Therefrom, and, in the Alternative, Notice of Intent to Offer Evidence of Other Crimes or Bad Acts Pursuant to Fed. R. Evid. 404(b) at 1, filed April 26, 2021 (Doc. 128)("Alias MIL Response").  Becker argues that the United States' case against him is neither "exciting" nor "compelling," because the "architect of all of the financial transactions that lead [sic] to the charging of Mr. Beckner inexplicably has been treated as an unwilling dupe," while Beckner is the "target of an aggressive prosecution" for "unsexy alleged financial crimes."  Alias MIL Response at 1.  Beckner asserts, moreover, that the Court should exclude evidence of Beckner's criminal history from the 1990s, because: (i) it is irrelevant and not intrinsic to any of the crimes charged; (ii) "other rules of Evidence preclude its admission"; and (iii) "such evidence, while having very little, if any probative value, presents the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, [and] wasting time."  Alias MIL at 2.  Beckner notes, however, that he does not object to the United States submitting evidence that he used the name "Evans" "in some settings."  Alias MIL Response at 11.

5.      **Jimenez MIL**.

Beckner asks that the Court exclude evidence relating to his relationship with Jimenez and their three minor children.  See Jimenez MIL at 1.  Specifically, Beckner asks the Court to exclude evidence that "Mr. Beckner schemed with Sean Curtis to instigate sham marriage between Sean

Curtis" and Jimenez to "bring her to the United States."  Jimenez MIL at 1.  According to Beckner,

any evidence about his relationship with Jimenez, their three children, or "any alleged schemes to

bring" Jimenez to the United States is irrelevant and unduly prejudicial.  Jimenez MIL at 1.

Beckner contends that the United States makes "various allegations" about Jimenez, including that

Beckner instigated a "sham marriage" between Curtis and Jimenez to help bring Jimenez to the

United States.  Jimenez MIL at 2.  Beckner argues that the United States makes these allegations

only to "paint Mr. Beckner as a schemer or swindler," but that this evidence "is not relevant to any

fact that will be at issue at trial."  Jimenez MIL at 2.  Beckner asserts that this evidence serves only

to make his life "look salacious to prejudice the members of the jury against him on irrelevant

matters," and is "not appropriate for trial in this case and will not shed light on whether

Mr. Beckner is guilty of any of the charges in the Indictment."  Jimenez MIL at 2.

      **6.**    **Extradition MIL.**

      Beckner requests that the Court exclude evidence relating to his travel to Honduras or his

extradition from Honduras to the United States.  See Extradition MIL at 1.  Beckner argues that

the United States "will likely seek to tell the Jury that Mr. Beckner fled to Honduras and then was

extradited to the United States to stand trial," but that this "narrative is inaccurate, untrue, and

irrelevant."  Extradition MIL at 1.  According to Beckner, rule 401 and rule 403 bar the United

States from admitting this evidence.  See Extradition MIL at 1.  According to Beckner, the

Supreme Court "has 'consistently doubted the probative value in criminal trials of evidence that

the accused has fled the scene of an actual or supposed crime.'"  Extradition MIL at 2 (quoting

Wong Sun v. United States, 371 U.S. 471, 483 n.10 (1963)).  Moreover, Beckner contends that

flight evidence "'is of questionable probative value unless the inferences of guilt that accompany

the particular facts associated with it are strong.'"  Extradition MIL at 1 (quoting United States v.

Martinez, 681 F.2d 1248, 1257 (10th Cir. 1982)).  Beckner argues that the inference of flight to avoid potential prosecution is "far too attenuated to allow a valid inference of a guilty conscience," because he "had decades-long family ties to Honduras" and "spent most of his time there in the years before involving himself with the truck stop."  Extradition MIL at 3.  Beckner contends that he was "not on notice that he was the subject of a criminal charge when he went to Honduras" and that he "had been there for approximately three years by the time the Indictment in this case issued."  Extradition MIL at 3.  Further, Beckner asserts that he was not hiding when he was in Honduras, but that he was "living openly with his family" and that "authorities knew of his whereabouts," because Curtis "made sure that investigators knew where to find" Beckner.  Extradition MIL at 3.  Beckner argues, therefore, that his travel to Honduras is "not really evidence of flight," and that allowing the jury to hear about his travel and time in Honduras would be confusing and unduly prejudicial.  Extradition MIL at 3.

Moreover, Beckner asserts that, because the evidence of his time in Honduras is not admissible, evidence of his extradition from Honduras to the United States also is not admissible.  See Extradition MIL at 3.  Beckner contends that evidence of the extradition unfairly will prejudice him, because the Jury will have an emotional and impassioned reaction.  See Extradition MIL at 3-4.  Beckner argues that, although it may be "exciting" to "regale the Jury with stories of international intrigue, this case is really about the financial goings-on of a truck stop near Deming," which is "not sexy."  Extradition MIL at 4.

7.   **Amended MIL.**

The United States requests that the Court permit it to introduce evidence that Beckner used a false alias, has prior criminal convictions, used a co-conspirator to engage in immigration fraud, sought to escape from government investigators within the United States, escaped to Honduras,

and was extradited from Honduras, because this evidence is "intrinsic to the crime charged." Amended MIL at 1. In the alternative, the United States alerts the Court of its intent to offer evidence of other crimes or bad acts under rule 404(b). See Amended MIL at 1. The United States indicates that it intends to introduce: (i) documentary evidence and witness testimony which demonstrate that Beckner used the alias "Bill Evans" to "conceal his true identity and his prior criminal convictions"; (ii) evidence of Beckner's "prior convictions on charges of mail fraud, conspiracy to commit mail fraud, and securities fraud, as well as the restitution obligations imposed on" Beckner "as a result of those convictions"; (iii) evidence that Beckner "operated through other individuals, including co-conspirators, in order to prevent financial institutions, individual investors, and other business counterparties from learning of his true identity and criminal convictions"; (iv) evidence that Beckner "convicted a coconspirator to sign fraudulent immigration documents and enter into a fraudulent marriage for the purpose of conferring immigration benefits upon" Jimenez; (v) evidence that, when investigators asked him to provide identification, Beckner "fled in a vehicle in order to avoid disclosing his true identity"; (vi) evidence that, shortly after investigators approached him, Beckner crossed the border into Mexico and then flew to Honduras; and (vii) evidence that Beckner has "ties to Honduras and Belize, that he directed proceeds of the fraud to several bank accounts outside of the United States, including in Honduras," that Beckner "planned to evade the legal consequences of the fraud by fleeing to Honduras," and that Beckner lived in Honduras "until he was extradited to the United States" for this case. Amended MIL at 5-6.

In the Amended MIL, the United States makes four arguments: (i) rule 404(b) does not bar the evidence that the United States intends to offer, because it is intrinsic to Beckner's alleged offenses in this case; (ii) if the evidence is not intrinsic, the United States offers it for a proper

purpose under rule 404(b); (iii) the evidence is relevant, and therefore admissible under rule 401; and (iv) the evidence's prejudicial effect does not substantially outweigh its probative value and that it is, therefore, admissible under rule 403.  See Amended MIL at 6-15.

      **8.**      **Amended MIL Response.**

      Beckner responds to the Amended MIL.  See Defendant Bruce Beckner's Response to the Amended Notice of Intent to Introduce Evidence That is Intrinsic, filed November 2, 2021 (Doc. 144)("Amended MIL Response").  In the Amended MIL Response, Beckner argues that, although Beckner's use of an alias is relevant at trial, "various other ancillary items are not" relevant, and that the Court should not permit the United States to introduce evidence of Jimenez' immigration status or any activities associated with her status, evidence of Beckner's ties to Honduras, his travel to Honduras, his extradition from Honduras, or any evidence of Beckner's criminal history.  Amended MIL Response at 1.  Beckner makes three arguments.  See Amended MIL Response at 1-11.  First, Beckner argues that evidence about Jimenez' immigration status or any activities associated with her status is not relevant, because there is "no colorable argument that she is a co-conspirator or that she had anything at all to do with the travel center that is at the heart of this prosecution."  Amended MIL Response at 1.  Second, Beckner asserts that the Court should not admit at trial his ties to Honduras, travel to Honduras, and extradition from Honduras, because the improper inference that his travel was a flight from investigators unfairly would prejudice him.  See Amended MIL Response at 5-7.  Third, Beckner contends that the Court should not admit evidence of his criminal history, because his criminal history is extrinsic to this case's charges, and because it is unfairly prejudicial.  See Amended MIL Response at 7-10.  According to Beckner, the United States "can put on its entire case without a deep dive into" his criminal history, but, if the Court permits the United States to admit some evidence of Beckner's criminal

history, the Court should "carefully limit the details that are shared to the jury to avoid unfair prejudice and confusion of issues," which, Beckner asserts, accords with rule 403. Amended MIL Response at 8.

9.     **CAD MIL**.

The United States requests that the Court permit it to introduce evidence that the New Mexico Securities Division issued a cease-and-desist order to Beckner on September 7, 2011, "and that his true identity was discovered in connection with the service of this order." CAD MIL at 1. According to the United States, this evidence either is intrinsic to the crimes charged here and therefore admissible under rule 404(b). See CAD MIL at 1. The United States notes that it anticipates introducing "documentary evidence" and "witness testimony" about the New Mexico Securities Division's cease-and-desist order to Beckner, about how the New Mexico Securities Division could "not positively identify 'Bill Evans' . . . at the time he was served," and about how Beckner "fled in his truck at high speeds" when he was asked to provide identification information from "Evans". CAD MIL at 5 (no citation for quotation). Moreover, the United States notes that it intends to introduce evidence that the New Mexico Securities Division was able to serve the cease-and-desist order the day after Beckner fled and that the New Mexico Securities Division "learned the true identify of 'Bill Evans' in connection with serving the order." CAD MIL at 5 (no citation for quotation). According to the United States, the proposed witness testimony is relevant "to other evidence of flight because the service of the cease-and-desist order and discovery [of] Defendant's true identity were extremely proximate to Defendant's departure from the United States and travel to Honduras." CAD MIL at 5. The United States argues that the Court should admit this evidence, because it is intrinsic to the crimes charged in this case, is offered for a proper

purpose under rule 404(b), and is relevant, and because its risk of unfair prejudice does not substantially outweigh its probative value.  See CAD MIL at 5-8.

      **10.**    **The Hearing.**

      The Court held a hearing on December 8, 2021.  See Clerk's Minutes, filed December 8, 2021 (Doc. 168).  The hearing began by discussing the admissibility of Beckner's criminal history, which involves the Sentencing MIL, the Amended MIL, the Alias MIL Response, and the Amended MIL Response.  See Transcript of Omnibus Proceedings before the Honorable James O. Browning, United States District Judge, Albuquerque, Bernalillo County, New Mexico, commencing on December 8, 2021 at 3:1-8, filed December 16, 2021 (Doc. 159)("Tr.")(Court). The United States noted that it intends to introduce evidence of Beckner's 1997 conviction for securities fraud in the Central District of California and, if Beckner testifies, that it intends to impeach him with the same conviction as well as with a separate criminal conviction in the State of Nevada for burglary.  See Tr. at 3:14-15 (Hartstein).  The United States argues that the securities fraud conviction from the Central District of California prevented Beckner from "approaching potential investors in his own name or from putting his own name on documents with First New Mexico Bank, with New Mexico Finance Authority, and with other counterparties that he sought to get to invest money in his enterprise."  Tr. at 4:18-23 (Hartstein).  According to the United States, the securities conviction "carried with it a restitution amount of over $15 million" and involved approximately 559 victims, but that Beckner has paid "only about $4,000."  Tr. at 5:2-8 (Hartstein).

      In response to the Court asking why the United States Attorney's Office in the Central District of California's inability to collect is relevant, the United States noted that it would be "okay not presenting" that fact to the jury, but argued that the "outstanding $15 million restitution

obligation" is relevant, because, "were Bruce Beckner to make money and put it into an account, account that he was the signatory of, that would be more subject to the discovery and collection of people in the Central District of California who are looking for it."  Tr. at 6:7-11 (Hartstein).  The United States suggested that Beckner is "using other individuals to represent him in business interests" and as "instrumentalities of his own profits from his frauds scheme."  Tr. at 6:12-18 (Hartstein).  The United States explained that it seeks to establish that Beckner's prior criminal history means that "he knew what he was doing in this case, and tried to hide the proceeds of the current fraud in a similar manner to his prior case."  Tr. at 7:3-5 (Harstein).

The Court stated that the United States' argument sounds "very close to just propensity" and that it is "more persuaded" by the United States' argument that "he owed a lot of money," which is "one of the reasons that he was not putting things in his name."  Tr. at 7:7-10 (Court). The United States responded that the restitution amount on the securities fraud conviction "directly impacts this case," Tr. at 7:25 (Hartstein), because Beckner submitted a financial statement to First New Mexico Bank that did not list his $15,000,000.00 restitution as a liability, meaning that investors were not able to "perform[] diligence on Mr. Beckner" when deciding whether to invest with him, Tr. at 8:21 (Hartstein).

After the Court indicated that the fact that Beckner owes "a lot of money" and "is using aliases to try to keep people [from] knowing that" "seems to have some force," Beckner responded. Tr. at 9:8-13 (Court).  Beckner countered that, to the "extent that" this evidence has "some minor amount of force," rule 403 bars the Court from admitting the evidence, because it is not relevant, and it presents a risk of unfair prejudice that substantially outweighs its probative value.  See Tr. at 9:14-12:16 (Ray).  Beckner asserted that the United States "want[s] the propensity inference," but that Beckner is "not the borrower on anything" and that investors "weren't investing with Bill

Evans or an enterprise owned by him." Tr. at 10:22-11:1 (Ray). According to Beckner, he was not "involved in the finances," so it "doesn't end up being very strong at the end of the day, when you look at how the facts come together." Tr. at 11:18-23 (Ray). Beckner contended, in sum, that the evidence's probative value is "just not strong enough when you weigh it against the risk of substantial and really unfair prejudice." Tr. at 12:13-16 (Ray).

The United States then noted that the "new identity" and representing that investors were dealing with "Evans", when they in fact were dealing with somebody who had a criminal history, "is material to the fraud, both in the financial statements submitting to First New Mexico Bank, and also on a resume that glossed over . . . information about what Bill Evans was doing at the time that he actually was in custody." Tr. at 12:24-13:4 (Hartstein). According to the United States, investors were under the impression that "Evans" "was the go-to person in soliciting investment," but he spoke with investors while representing himself "under a different identity, using an alias, in order to distance himself from any association with a prior criminal conviction," which is "material to the fraud." Tr. at 13:17-22 (Hartstein).

The Court indicated that it "wants to think about this," but stated that it is inclined to permit "whoever wants to say it" to tell the jury that Beckner "owed a lot of money from another failed business, and he owed a lot of money," and that, "if people had known about that money, that debt, and the circumstances as to how it was incurred, it's likely they would not have invested or given him loans and money." Tr. at 14:1-6 (Court). The Court stated that it is not "necessary to mention the criminal history." Tr. at 14:6-7 (Court). The Court acknowledged that, if Beckner takes the stand, then "we get into impeachment, because it's a felony," but that "we can get your bang without necessarily mentioning the type of crime and what it was." Tr. at 14:8-11 (Court). The Court noted, however, that Beckner is "going to have to live with the fact that he had another failed

transaction; he owed a lot of money; and if investors had known the circumstances of that, they would not have invested with him." Tr. at 14:11-16 (Court).  In response to questions from the United States and Beckner, the Court noted that there can be no mention of criminal history in the United States' case-in-chief, but that the parties can tell the jury that Beckner "owed a lot of money" to "a lot of people," and that the United States can say that, if investors "knew the circumstances of that, they would not have invested with him this time," but the specifics numbers should be kept out.  Tr. at 15:19-16:2 (Court, Hartstein).  The Court reiterated that conclusion is its inclination, stating that, if "we drop in a securities fraud conviction and $15 million, and how many investors, ooh, that hits him pretty hard."  Tr. at 17:13-15 (Court).

Next, the parties addressed the use of aliases.  See Tr. at 18:13-14 (Court).  Disposition of the introduction of alias testimony followed a similar path as did the criminal history issue.  The use of aliases, the Court recognized, is central to the United States' case and the Court should not exclude entirely this evidence.  See Tr. at 21:13-14 (Court).  Beckner agreed that the Court should permit to some extent the United States to introduce evidence that he used the "Evans" alias.  See Tr. at 21:23-22:5 (Ray).  For the same reason that the details of Beckner's criminal history are too prejudicial, however, the aliases cannot be used as a backdoor to let in the prejudicial criminal history details.  See Tr. at 21:23-22:5 (Ray).  Accordingly, the Court indicated it permits the United States to introduce evidence about the aliases and say that Beckner used aliases to hide a past that included failed business ventures and large sums owed to many investors, but that the United States cannot explain that the alias hides Beckner's securities fraud conviction.  See Tr. at 23:16-19 (Court).  The Court noted, however, that Beckner could still argue to the jury that the use of an alias was not material.  See Tr. at 23:16-19 (Court).

- 18 -

The hearing next addressed Beckner's travel out of the United States to Central America and practice of sending money to relations in Honduras. See Tr. at 24:20-34:16 (Court, Hartstein, Ray). The United States indicated that its interest in presenting evidence of Beckner's foreign travel was to demonstrate the background for his sending money overseas where it could not be reached by American authorities or creditors. See Tr. at 24:20-25:27:23 (Hartstein, Court). Beckner responded that he had a wholly innocent explanation for this practice, namely, that he had long had relations with Honduras and with Panama, and specifically that, in Honduras, he had children with a Honduran woman who still lives there. See Tr. at 27:25-31:20 (Ray, Court). The United States indicated that it wants to demonstrate at trial that Jimenez, the mother of Beckner's children, "act[ed] as a nominee for him" by serving as the sole owner of the company to which Fuel 4 Less sent all its profits. Tr. at 33:17 (Hartstein). The United States argued that by sending money out of the country, essentially to Jimenez, Beckner ultimately was funneling the money back to himself; "it's money that goes from Bruce Beckner to Bruce Beckner." Tr. at 33:19-20 (Hartstein). The Court determined that the United States could introduce evidence of Beckner's practice of sending money out of the United States, but that the United States could not name specifically the countries to which Beckner sent money. See Tr. at 34:3-16 (Court). The Court said that the mentioning of the names of these Central American countries was too prejudicial, as they are often associated in the public's mind with money laundering and tax evasion; the Court instead provided that the parties could use "Country A" and "Country B." See Tr. at 34:3-16 (Court). As to evidence that Beckner's flight -- he initially fled from authorities when New Mexico securities industry officials investigated him and later moved to Honduras until the United States extradited him -- the parties disputed whether the evidence demonstrated an inference of flight at all. See Tr. at 36:1-11 (Ray). The Court held it would admit the evidence, but that it would also

permit evidence that Beckner had a child who lived outside the United States.  See Tr. at 38:11-

39:24 (Court, Ray, Hartstein).  The parties indicated the Court's ruling was acceptable to them:

> THE COURT:          [T]hat sanitized story, I think, get the basics out
> there.  Anything else on that, Mr. Ray?
>
> MR. RAY:          Nothing else to add, Judge.
>
> THE COURT:          How about you, can you live with that,
> Mr. Hartstein?
>
> MR. HARTSTEIN:   Yes, Your Honor, as far as countries, I think the
> Government would be okay with saying that there is a child and relationship in a
> country that's not the United States, and that is one of the reasons these border
> crossings were taking place.
>
> THE COURT:          I think that's fair enough.  That's pretty sanitized.

Tr. at 39:1-14 (Court, Ray, Hartstein).

The parties next addressed that Beckner participated in an immigration fraud for which he

was not charged; he convinced Curtis to enter into a fraudulent marriage with Jimenez, Beckner's

girlfriend, so that she could reside with Beckner in the United States.  See Amended MIL at 6-15.

The Court permitted this evidence's introduction to demonstrate that Beckner controlled Curtis

and would do whatever he wanted, but that it would exclude a salacious supposed love-letter

penned as part of the fraud.  See Tr. at 46:24-49:15 (Court, Ray, Hartstein).  The parties indicated

their agreement with the Court's ruling:

> THE COURT:          I'd be inclined to keep the letter out that Curtis wrote,
> and the romance and all that, so that we don't dwell on the fraud aspects of the
> immigration issue, but just try to keep it pretty basic to show that Mr. Curtis will
> do what Mr. Beckner says. So that letter and those things I'd be inclined to keep
> out.
>
> MR. RAY:          Okay. I understand, Your Honor.
>
> THE COURT:          Is there anything I'm taking away from you that kills
> you, or can you live with that story and move on?

MR. HARTSTEIN:    Your Honor, I think that admitting the evidence except for the letter is acceptable to the Government.

THE COURT:        Yeah, because that's pretty fraudulent, if he's just saying he loves her because of that, and that goes more to his fraud. But let's keep that out. Go ahead.

MR. HARTSTEIN:    The Government will say that, according to the prior statements and testimony of Sean Curtis, he didn't actually write the letter. He just signed it or it's signed on his behalf by the defendant.

THE COURT:        Yeah.

MR. RAY:          But I understand the letter is not coming in.

MR. HARTSTEIN:    Right.

THE COURT:        He's just explaining to me the history of the letter. I said that he wrote it. And we'll keep that out. That gets a little too much fraud. All right. I'm going to take it under advisement, but that's what I'm inclined to do with the immigration fraud.

Tr. at 48:6-49:17 (Court, Ray, Hartstein).   The parties next addressed whether Beckner could introduce evidence that Herlihy was the operation's mastermind; the Court permitted such evidence but explained that Beckner cannot introduce evidence that Herlihy received a one-day sentence for his guilty plea.  See Tr. at 55:11-56:1 (Court, Ray).  Beckner stated he was amenable to that ruling.  See Tr. at 55:11-23 (Court, Ray).

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative

value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)(interpolation the Court's). The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787.

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it will likely provoke an emotional response from the jury or otherwise tends to affect adversely the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d

1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).  See Leon v. FedEx Ground Package Sys., Inc., No. CV 13-1005, 2016 WL 836978, at *9 (D.N.M. February 11, 2016)(Browning, J.)("E. Leon has demonstrated that the photographs here are relevant to a live issue -- M. Leon's possible pain and suffering. . . . E. Leon should have the opportunity to present her case as she sees fit.  The Court will, upon request, instruct the jury to view the photographs dispassionately."); United States v. Aranda-Diaz, 31 F. Supp. 3d 1285, 1290 (D.N.M. 2014)(Browning, J.)("[B]ecause the jury might use gang membership to conclude Aranda-Diaz intended to distribute drugs because of his gang association -- rather than consider the United States' evidence against him -- the danger of unfair prejudice that this evidence presents to him substantially outweighs its probative value.").

## LAW REGARDING RULE 404(B)

Under rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  The reason for this rule is not that evidence of other crimes is not relevant or probative, but that it is too probative; it violates the Anglo-American principle that a defendant should be tried only for the crime with which he is charged.  See, e.g., People v. Zackowitz, 254 N.Y. 192, 172 N.E. 466, 468 (1930)(Cardozo, J.).  The Court can admit that sort of evidence, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  "In other words, one cannot present evidence the relevance of which is based on the

forbidden inference: the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too." <u>Wilson v. Jara</u>, No. CIV 10-0797, 2011 WL 6739166, at *5 (D.N.M. November 1, 2011)(Browning, J.).

The Supreme Court has enunciated a four-part process to determine whether evidence is admissible under rule 404(b).  <u>See</u> <u>Huddleston v. United States</u>, 485 U.S. at 691-92.  The Tenth Circuit consistently has applied that test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

<u>United States v. Zamora</u>, 222 F.3d 756, 762 (10th Cir. 2000)(citing <u>United States v. Roberts</u>, 185 F.3d 1125 (10th Cir. 1999)).  <u>See</u> <u>United States v. Higgins</u>, 282 F.3d 1261, 1274 (10th Cir. 2002); <u>United States v. Hardwell</u>, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing <u>Huddleston v. United States</u>, 485 U.S. at 691-92).

When bad-act evidence is both relevant and admissible for a proper purpose, "'the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged.'" <u>United States v. Morley</u>, 199 F.3d 129, 133 (3d Cir. 1999)(quoting <u>United States v. Himelwright</u>, 42 F.3d 777, 782 (3d. Cir. 1994)).  The Tenth Circuit has also stated that district courts must "identify specifically the permissible purpose for which such evidence is offered and the inferences to be drawn therefrom." <u>United States v. Youts</u>, 229 F.3d 1312, 1317 (10th Cir. 2000)(citing <u>United States v. Kendall</u>, 766 F.2d 1426, 1436 (10th Cir. 1985)).  "[A] broad statement merely invoking or restating Rule 404(b) will not suffice."  <u>United States v. Youts</u>, 229 F.3d at 1317.

Rules 401-403 and the conditional relevancy rules in rule 104(b) govern the applicable burden the United States must meet to offer successfully evidence under rule 404(b).  See Huddleston v. United States, 485 U.S. at 686-91.

The Advisory Committee Notes to rule 404(b) was amended in 2020:

**2020 Amendments**

Rule 404(b) has been amended principally to impose additional notice requirements on the prosecution in a criminal case. In addition, clarifications have been made to the text and headings.

The notice provision has been changed in a number of respects:

- The prosecution must not only identify the evidence that it intends to offer pursuant to the rule but also articulate a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose.  The earlier requirement that the prosecution provide notice of only the "general nature" of the evidence was understood by some courts to permit the government to satisfy the notice obligation without describing the specific act that the evidence would tend to prove, and without explaining the relevance of the evidence for a non-propensity purpose.  This amendment makes clear what notice is required.

- The pretrial notice must be in writing -- which requirement is satisfied by notice in electronic form.  See Rule 101(b)(6).  Requiring the notice to be in writing provides certainty and reduces arguments about whether notice was actually provided.

- Notice must be provided before trial in such time as to allow the defendant a fair opportunity to meet the evidence . . . .

Fed. R. Evid. 404(b), Advisory Committee Notes 2020 Amendments.  See United States v. Ferguson, No. CR 19-3121, 2020 WL 5849683, at *1 (D. Neb. October 1, 2020)(Gerrard, J.)("The government must also articulate the permitted purpose for the evidence and the reasoning supporting the purpose, and do so in writing before trial.").  See also United States v. Martinez, No. CR 19-3725, 2021 WL 2291111, at *5-6 (D.N.M. March 4, 2021)(Browning, J.)(admitting as res gestae evidence testimony that a defendant charged with gang-related violence offenses engaged in gang activities in prison); United States v. DeLeon, No. CR 15-4268, 2020 WL 19269,

at *45-56 (D.N.M. 2020)(Browning, J.)(admitting prior gang related activities as intrinsic evidence instead of under rule 404(b)), aff'd sub nom. United States v. Herrera, 51 F.4th 1226 (10th Cir. 2022); United States v. Ballou, 59 F. Supp. 3d 1038, 1063-71 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING RES GESTAE

The Tenth Circuit has explained that "[e]vidence of other crimes should not be suppressed when those facts come in as res gestae -- 'as part and parcel of the proof of the offense[] charged in the indictment.'" United States v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995)(quoting United States v. Gano, 560 F.2d 990, 993-93 (10th Cir. 1977)(alterations in United States v. Kimball, not in United States v. Gano). The Tenth Circuit has approved using res gestae evidence "when it provides the context for the crime, 'is necessary to a full presentation of the case, or is appropriate in order to complete the story of the crime on trial by proving its immediate context or the res gestae.'" United States v. Kimball, 73 F.3d at 272 (quoting United States v. Masters, 622 F.2d 83, 86 (4th Cir. 1980)). The Sixth Circuit has defined res gestae as "those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." United States v. Hardy, 228 F.3d 745, 748 (6th Cir. 2000). See United States v. McVeigh, 153 F.3d 1166, 1203 (10th Cir. 1998)(describing res gestae evidence as "'inextricably intertwined with proper evidence'" (no quotation given for quoted material)). The Sixth Circuit in United States v. Hardy has explained:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense. Jennifer Y. Schuster, *Uncharged Misconduct Under Rule 404(b): The Admissibility of Inextricably Intertwined Evidence,* 42 U. Miami Law Review 947 (March/May 1998).

- 26 -

228 F.3d at 748.  In <u>Wilson v. Jara</u>, No. CIV 10-0797, 2011 WL 6739166, at *1 (D.N.M. November 1, 2011)(Browning, J.), the Court allowed evidence that, in the course of an allegedly unlawful arrest, a plaintiff spat on and touched the defendant police officers.  See 2011 WL 6739166, at *8-9.  The Court concluded that the spitting was "res gestae of the incident," because it placed the plaintiff's conduct "in context": "[i]f Wilson's touching of a police officer, and other conduct and speech, contributed to [her son's] resisting arrest, her conduct could be viewed as disturbing the peace and disorderly conduct. . . . Wilson should not be able to suggest that everything was calm and her son did not resist arrest."  2011 WL 6739166, at *8.

In <u>United States v. Ganadonegro</u>, No. CR 09-0312, 2011 WL 3957549 (D.N.M. August 30, 2011)(Browning, J.), <u>aff'd</u>, <u>United States v. Ganadonegro</u>, 560 F. App'x 716 (10th Cir. 2014), the Court allowed evidence that a defendant, accused of causing the death of an infant child, called a family member on three occasions to complain that he could not get the infant to stop crying and that the infant was crying when the family member arrived.  See 2011 WL 3957549, at *5.  The Court concluded that the evidence was res gestae and background information useful to "paint the picture that the baby cried a lot" and not that the defendant acted in conformity with his previous conduct.  2011 WL 3957549, at *5 ("[T]he evidence that the United States seeks to introduce is not 404(b) evidence . . . . [I]t is closer to background evidence or res gestae evidence . . . .").  Additionally, in <u>United States v. Zuni</u>, No. CR 05-2369 JB, 2006 WL 4109664 (D.N.M. July 7, 2006)(Browning, J.), the Court admitted evidence that an alleged rape and kidnapping occurred after a defendant had a dispute with a victim regarding their children, and that the dispute escalated into violence and culminated in the charged offenses.  See 2006 WL 4109664, at *2-3.  The Court determined that this evidence made the charged offenses understandable "by describing the context in which they arose," as these events had a "causal, spatial, and temporal connection with the

charged offense." 2006 WL 4109662, at *6. See United States v. Martinez, No. CR 19-3725, 2021 WL 2291111, at *5-6 (D.N.M. March 4, 2021)(Browning, J.)(admitting as res gestae evidence testimony that a defendant charged with gang-related violence offenses engaged in gang activities in prison); United States v. DeLeon, No. CR 15-4268, 2020 WL 19269, at *45-56 (D.N.M. 2020)(Browning, J.)(admitting prior gang related activities as intrinsic evidence instead of under rule 404(b)), aff'd sub nom. United States v. Herrera, 51 F.4th 1226 (10th Cir. 2022).

## **LAW REGARDING JURY NULLIFICANTION**

One of the most precious and treasured rights that United States citizens and residents have is the Sixth Amendment to the Constitution's right to "an impartial jury." U.S. Const. amend. VI. See Pena-Rodriguez v. Colorado, 580 U.S. 206, 210 (2017). This fundamental right is a cornerstone of the American criminal justice system, and the Sixth Amendment has long embodied and protected this means of resolving criminal charges that the government brings. "That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." Blakely v. Washington, 542 U.S. 296, 305-06 (2004). The jury trial right as preserved in the Bill of Rights was passed down from the right that the Magna Carta enshrines. See United States v. Booker, 543 U.S. 220, 239 (2005)("The Founders presumably carried this concern from England, in which the right to a jury trial had been enshrined since the Magna Carta.").

### 1.    **The Jury's Role at the Founders' Time.**

"The colonial jury played a vital and celebrated role in American resistance to British tyranny leading up to the revolution. American counsel regularly argued the validity of laws directly to juries, which often refused to enforce British laws they felt were unjust." Andrew J.

Parmeter, <u>Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification</u>, 46 Washburn L.J. 379, 382-83 (2007)(footnotes omitted).  The Honorable Jack Weinstein, United States District Judge for the Eastern District of New York, has noted that, in 1791, at the time of the Sixth Amendment's ratification, "[i]t was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt.  In later years this fundamental power of the jury -- and the right of the accused -- has been termed the power to 'nullify.'"  <u>United States v. Polouizzi</u>, 549 F. Supp. 2d 308, 405 (E.D.N.Y. 2008)(Weinstein, J.)(no source given for quoted material), <u>vacated and remanded on other ground sub nom.</u> <u>United States v. Polouizzi</u>, 564 F.3d 142 (2d Cir. 2009).  The Supreme Court has recognized that the jury trial right that the Sixth Amendment affords to defendants was understood at the Founders' time to provide essential protections against government tyranny and to safeguard liberty:

> [T]he historical foundation for our recognition of these principles extends down centuries into the common law.  "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties,"  2 J. Story, <u>Commentaries on the Constitution of the United States</u> 540-541 (4th ed. 1873), trial by jury has been understood to require that "the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . ."  4 [Sir William Blackstone, <u>Commentaries on the Laws of England: In Four Books</u> 343 (William D. Lewis ed., 2007)](1769).

<u>Apprendi v. New Jersey</u>, 530 U.S. 466, 477 (2000)("<u>Apprendi</u>").  As Alexander Hamilton first noted, this belief in the jury trial right as a safeguard to liberty was widely shared during the Constitution-framing era:

> The friends and adversaries of the plan of the Convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury.  Or if there is any difference between them, it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government.

<u>The Federalist No. 83</u> at 456 (Scott ed. 1894)(Hamilton).  The jury trial right was part and parcel

of the Framers' belief that the common person should participate in government, and essential to this participation was ensuring that the judiciary was justly and correctly effectuating the laws, whether the laws were written or natural laws. See Clay S. Conrad, Jury Nullification 45 (1998)(citing Note, The Changing Role of the Jury in the Nineteenth Century, 74 Yale L.J. 170, 172 (1964)); Diary of John Adams, Feb. 12, 1771, in 2 The Works of John Adams 253 (1850)(quoted in Blakely v. Washington, 542 U.S. at 306 ("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature [as in the legislature.]")); Letter from Jefferson to L'Abbe Arnold, July 19, 1789, in 3 Works of Thomas Jefferson, 81, 82 (1854)(quoted in Mark D. Howe, Juries as Judges of Criminal Law, 52 Harv. L. Rev. 582, 582 (1939)("Were I called upon to decide, whether the people had best be omitted in the legislative or judiciary department, I would say it is better to leave them out of the legislative. The execution of laws is more important than the making of them.")).

The criminal jury's role at the Founders' time was primarily that of a factfinder, but also included as a secondary role acting as the community's conscience to determine whether the law, or the application of law to the facts, was conscionable. See United States v. Courtney, 960 F. Supp. 2d 1152, 1164 (D.N.M. 2013)(Browning, J.). Professor Irwin A. Horowitz, of Oregon State University, notes: "While the fact-finder role of the jury is the judicially preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is just and what is not." Irwin A. Horowitz, Jury Nullification: An Empirical Perspective, 28 N. Ill. U. L. Rev. 425, 427 (2007-2008)(quoting Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 110 (1998)). Similarly, Clay S. Conrad, a trial lawyer in Houston, Texas with the law firm of Looney, Smith & Conrad, P.C., asserts that the Sixth Amendment jury trial right implicitly recognizes

criminal juries' right to determine the law -- and thus jury nullification if they believe the law

wrong -- because, at the Framers' time, the concept of a jury included the idea that the jury not

only decided the facts of a case, but also the law:

> The Sixth Amendment itself implicitly recognizes the right of criminal trial jurors to judge the law.  Although it does not mention that power explicitly, it can logically be assumed that the definition of a jury used in that document would be consonant with the prevailing definition in the legal dictionaries of the period.  The most common legal dictionary in Colonial Virginia was the British Jacob's Law Dictionary [(1782)]; and within the encyclopedic definition given in Jacob's, the word 'jury' is defined as:
>
> > Jury . . . [s]ignifies a certain number of men sworn to inquire and try the matter of fact, and declare the truth upon such evidence as shall be delivered them in a cause: and they are sworn judges upon evidence in matter of fact . . . .  Juries are . . . not finable for giving their verdict contrary to the evidence, or against the direction of the court; for the law supposes the jury may have some other evidence than what is given in court, and they may not only find things of their own knowledge, but they go according to their consciences.
>
> The right of jurors to judge "according to conscience," then, was implicit within the word "jury" as the drafters of the Bill of Rights understood it.  This was the trial by jury the founders knew, and this was the trial by jury they intended to pass on to their progeny.

C. Conrad, supra, at 46-47 (footnotes omitted).  The assertion that criminal juries embraced

decisions of law as well as fact finds support in precedent caselaw from the Founders' era.

In Georgia v. Brailsford, 3 U.S. (3 Dall.) 1 (1794),[1] a civil case, the Supreme Court noted

---

[1]Georgia v. Brailsford is the only published case in which the Supreme Court has presided over a jury trial.  The Seventh Amendment to the Constitution of the United States of America preserves the use of a jury in federal common law suits that would have used a jury when the Seventh Amendment was adopted.  Although it would seem remarkable for the Supreme Court to preside over a jury trial today, the Supreme Court historically impaneled juries at the beginning of every term.  The Supreme Court even heard at least three cases with juries in the 1790s.  Georgia v. Brailsford is, however, the only case that was reported.  The Supreme Court has shifted its practice in modern times by delegating any fact finding to a special master.  The Supreme Court, moreover, when exercising its original jurisdiction hears mostly equitable cases, which do not require a jury.  See Lochlan F. Shelfer, Special Juries in the Supreme Court, 123 Yale L.J. 208, 210-11 (2013).

that the role of the jury is to be the ultimate finder both of the facts and of the law.  See 3 U.S. at

4.  A jury decided the case even though the Supreme Court had original jurisdiction, because the

State of Georgia was a party to the case.  The Honorable John Day, then-Chief Justice of the

Supreme Court, charged the jury:

> It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide.  But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy.  On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law.  But still both objects are lawfully, within your power of decision.

3 U.S. at 4.  In People v. Croswell, 3 Johns. Cas. 337 (N.Y. Sup. Ct. 1804), meanwhile,

Alexander Hamilton was counsel for the defendant, who was indicted for libel against then-

President Thomas Jefferson.  The trial court in the case instructed the jury that they were to enter

a special, as opposed to general, verdict limited to finding only two issues: (i) whether the article

was published; and (ii) whether the article's innuendos were true or false.  See 3 Johns. Cas. at

342.  The jury was instructed that the defendant's intent -- the element requiring that the defendant

intended the statements to be libelous -- was a matter of law exclusively for the court.  See 3 Johns.

Cas. at 341-42.  Mr. Hamilton argued:

> The Chief Justice misdirected the jury, in saying they had no right to judge of the intent and of the law.  In criminal cases, the defendant does not spread upon the record the merits of the defence, but consolidates the whole in the plea of not guilty.  This plea embraces the whole matter of law and fact involved in the charge, and the jury have an undoubted right to give a general verdict, which decides both the law and the fact. . . .  All the cases agree that the jury have the power to decide the law as well as the fact; and if the law gives them the power, it gives them the right also.  Power and right are convertible terms, when the law authorizes the doing of an act which shall be final, and for the doing of which the agent is not responsible.

The intent constitutes crime.  To deny, then, to the jury the right to judge of the intent, and yet to require them to find a general verdict of guilty, is requiring them to commit perjury.  The particular intent constitutes the crime, in cases of libel, beca[us]e the act is not, of itself, unlawful; and where the particular intent alone constitutes the guilt, the court cannot judge of that intent, and the jury must find it. . . .

It is admitted to be the duty of the court to direct the jury as to the law, and it is advisable for the jury in most cases, to receive the law from the court; and in all cases, they ought to pay respectful attention to the opinion of the court.  But, it is also their duty to exercise their judgments upon the law, as well as the fact; and if they have a clear conviction that the law is different from what it is stated to be by the court, the jury are bound, in such cases, by the superior obligations of conscience, to follow their own convictions.  It is essential to the security of personal rights and public liberty, that the jury should have and exercise the power to judge both of the law and of the criminal intent.

2 Johns. Cas. at 345-46 (emphasis omitted).   The prosecution countered that the sound administration of court business requires that juries be permitted to determine the facts only:

The jury have, undoubtedly, the power, in criminal cases, to decide the law as well as the fact, if they will take upon themselves the exercise of it; but we must distinguish, in this case, between power and right.  It is the right of the jury to decide the fact, and only the fact; and it is the exclusive province of the court to decide the law in all cases, criminal as well as civil.  A jury is wholly incompetent, and necessarily must be, from the nature of their institution, to decide questions of law; and if they were invested with this right, it would be attended with mischievous and fatal effects.  The law, instead of being a fixed rule, would become uncertain and capricious, and there would not remain any stability or uniformity of decision, or certainty of principle, in the administration of justice. . . .

If the jury were to judge of the law in the case of libels, why not of the effect of writings in civil cases, and of the law in all cases where the plea is the general issue?  Surely the counsel on the other side are not prepared to carry their doctrine to this extent.

3 Johns. Cas. 350-51.  Mr. Hamilton replied:

But it is not only the province of the jury, in all criminal cases, to judge of the intent with which the act was done, as being parcel of the fact; they are also authorized to judge of the law as connected with the fact.  In civil cases, the court are the exclusive judges of the law, and this arose from the nature of pleadings in civil suits; for, anciently, matters of law arising in the defence, were required to be spread upon the record, by a special plea, and the jury were liable to an attaint for finding a verdict contrary to law.  But in criminal cases, the law and fact are

necessarily blended by the general issue, and a general verdict was always final and conclusive, both upon the law and the fact.  Nor were the jury ever exposed to an attaint for a verdict in a criminal case; and this is decisive to prove that they had a concurrent jurisdiction with the court on questions of law; for where the law allows an act to be valid and definitive, it presupposes a legal and rightful authority to do it.  This is a sure and infallible test of a legal power.

In England, trial by jury has always been cherished, as the great security of the subject against the oppression of government; but it never could have been a solid refuge and security, unless the jury had the right to judge of the intent and the law.

The jury ought, undoubtedly, to pay every respectful regard to the opinion of the court; but suppose a trial in a capital case, and the jury are satisfied from the arguments of counsel, the law authorities that are read, and their own judgment, upon the application of the law to the facts, (for the criminal law consists in general of plain principles,) that the law arising in the case is different from that which the court advances, are they not bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions?  To oblige them, in such a case, to follow implicitly the direction of the court, is to make them commit perjury, and homicide, under the forms of law.  Their error is fatal and cannot be corrected.  The victim is sacrificed; he is executed; he perishes without redress. Was he a juror, in such a case, he would endure the rack rather than surrender his own convictions on the altar of power, rather than obey the judicial mandate.

People v. Croswell, 3 Johns. Cas. at 355-56.

The Supreme Court of New York was equally split, with two justices agreeing with Mr. Hamilton and two justices siding with the prosecution.  The Honorable James Kent, then-Associate Justice of the Supreme Court of New York, wrote in agreement with Mr. Hamilton that "[t]here is nothing peculiar in the law of libels, to withdraw it from the jurisdiction of the jury" by requiring a special verdict.  3 Johns. Cas. at 365-66.  Justice Kent reasoned that, in all other areas of criminal law, the jury is charged with finding intent:

The jury are called to try, in the case of a traitor, not only whether he committed the act charged, but whether he did it traitorously; and in the case of a felon, not only whether he killed such a one, or took such a person's property, but whether he killed with malice prepense, or took the property feloniously.  So in the case of a public libeller, the jury are to try, not only whether he published such a writing, but whether he published it seditiously.  In all these cases, from the nature of the issue, the jury are to try not only the fact, but the crime, and in doing so, they must judge

of the intent, in order to determine whether the charge be true, as set forth in the indictment. . . .  The law and fact are so involved, that the jury are under an indispensable necessity to decide both, unless they separate them by a special verdict.

3 Johns. Cas. at 366-67 (emphasis omitted).  He thus concluded:

[U]pon every indictment or information for a libel, where the defendant puts himself upon the country, by a plea of not guilty, the jury have a right to judge, not only of the fact of the publication, and the truth of the innuendoes, but of the intent and tendency of the paper, and whether it be a libel or not; and, in short, of "the whole matter put in issue upon such indictment or information."  That in this, as in other criminal cases, it is the duty of the court, "according to their discretion, to give their opinion and direction to the jury on the matter in issue;" and it is the duty of the jury to receive the same with respectful deference and attention, and, unless they choose to find a special verdict, they are then to exercise their own judgments on the matter in issue, with discretion and integrity.

3 Johns. Cas. at 376-77 (quoting Stat. 32 Geo. III).

The Honorable Morgan Lewis, then-Chief Justice of the Supreme Court of New York, disagreed with Mr. Hamilton and Justice Kent, and concluded that the policies behind not constricting a jury to deciding matters of law are not present in the United States as they were in England:

It has been urged, that to deny a jury the right of deciding on the law and the fact, in all cases of criminal prosecution, is contrary to the spirit and genius of our government.  But how, has not been attempted to be shown.  In England, where the judges are appointed by the crown, and juries form a substantial barrier between the prerogatives of that crown and the liberties of the people, the reasons for extending the powers of the latter are certainly much stronger than with us, where the judges are, in effect, appointed by the people themselves, and amenable to them for any misconduct.

People v. Croswell, 3 Johns. Cas. at 409.

As Judge Weinstein notes in United States v. Polouizzi, the negative connotations surrounding nullification "ignore history and the meaning of the Sixth Amendment."  549 F. Supp. 2d at 405.  The history to which Judge Weinstein refers is the dual roles that the common-law jury played at the Founders' time: its primary role was as factfinder, but its secondary role was to also

find the law, often by acquitting if the jury found the law unjust.  See I. Horowitz, supra, at 427

("While the fact-finder role of the jury is the judicially preferred model of jury functioning, a

second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense

justice,' the application of a rough and ready sense of what is just and what is not." (quoting Amar,

The Bill of Rights: Creation and Reconstruction, supra, at 112)).

The jury's nullification power was well-known and used during the Founders' time, as

common-law juries during the seventeenth and eighteenth century saw the development of the

jury's power to acquit against the facts, or, as it was referenced in the time, to find the law in

addition to the facts.  See United States v. Courtney, 960 F. Supp. 2d at 1189-90.  In the late-

seventeenth century, Edward Bushell, who had been imprisoned for his role in acquitting -- against

the court's direction to convict -- two Quakers of the offenses of unlawful assembly and breaching

the peace resulting from their preaching, petitioned for a writ of habeas corpus.  See United States

v. Polouizzi, F. Supp 2d at 405; C. Conrad, supra, at 24.  When the judge instructed the jury about

the facts which the prosecution needed to prove to convict, the judge instructed the jury that the

prosecution had proved those facts and instructed the jury it was their job to find as fact that the

defendants had committed the crimes.  See C. Conrad, supra, at 26 (quoting The Tryal of Wm.

Penn and Wm. Mead for Causing a Tumult . . . , How. St. Tr. at 6:951 (1670)).  When the jury

refused to convict, and Bushell was imprisoned for his failure thereafter to pay a fine, the

Honorable John Vaughn, then-Chief Justice of the Court of Common Pleas, held that to require a

jury to find guilt because the court believed that all elements of the law were proven is to make

the use of a jury superfluous.  See C. Conrad, supra, at 27.  As one scholar notes, Chief Justice

Vaughn's decision "ushered in . . . 'the heroic age of the English jury,' during which 'trial by jury

emerged as the principle defense of English liberties,'" C. Conrad, supra, at 28 (quoting J.M.

- 36 -

Beattie, London Juries in the 1690's 214, in J. S. Cockburn & Thomas A. Green, eds., Twelve Good Men and True (1988)), and which influenced the common-law jury to the point that, at the Founders' time, "jury [nullification] [w]as an accepted part of the American law for the next several generations," C. Conrad, supra, at 32.

The Supreme Court in its recent sentencing opinions has not only discussed that the Sixth Amendment jury trial right guarantees the "historical foundation" of the jury as "guard[ing] against a spirit of oppression and tyranny on the part of rulers, and as the great bulwark of [our] civil and political liberties," Booker, 543 U.S. at 239 (quoting Apprendi, 530 U.S. at 477)(alterations in Booker, not Apprendi), but specifically has pointed to the jury's nullification power at common law. The Supreme Court referenced the jury's power to find against the facts that the evidence establishes in both Apprendi and Jones v. United States, 526 U.S. 227 (1999), noting that "juries devised extralegal ways of avoiding jury verdicts . . . ." Apprendi, 530 U.S. at 479 n.5. In Jones v. United States, the Supreme Court similarly noted that "[t]his power to thwart Parliament and Crown took the form . . . of flat-out acquittals in the face of guilt . . . ." 526 U.S. at 245 (quoting 4 W. Blackstone, supra, at 238-39). The authorities suggest that the common-law jury at the Founders' time had the ability to nullify by acquitting the defendant against the facts that the evidence establishes at trial, or -- as it was called at the time -- to determine the law.

There is, therefore, a tension between the historical authority about the common-law jury's role and the Supreme Court's finding in Sparf v. United States "that the law in England at the date of our separation from that country . . . falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court." 156 U.S. at 90. Justice Harlan's inclusion of the word "rightfully" before "refuse" leaves this statement open to interpretation that, although the nullification power was part of the common-

law jury's role, it was nevertheless wrongful to exercise it.  Such an argument is, however, irreconcilable with the recent Supreme Court decisions' recognition of the crucial importance of the common-law jury's mitigation power to the Sixth Amendment's preservation of the jury trial right.

### 2.     **The Evolution of the Jury's Role and** Sparf v. United States.

The Honorable Joseph Story, then-Associate Justice of the Supreme Court of the United States, riding circuit in Massachusetts, issued the first American opinion explicitly limiting the role of jurors in United States v. Battiste, 24 F. Cas. 1042 (C.C.D. Mass. 1835).  See United States v. Polouizzi, 687 F. Supp. 2d at 190 (noting that the first of "[t]wo major Supreme Court Justices' opinions in the nineteenth century . . . restricting the Sixth Amendment's jury" right to decide the law is "Justice Story's in . . . United States v. Battiste . . ."); C. Conrad, supra, at 65 (noting that 160 years had passed since the introduction of jury nullification, or jurors as deciders of the law, "before Supreme Court Justice Joseph Story, riding circuit in Massachusetts, rendered the first major American court opinion limiting the role of juries . . .").  In United States v. Battiste, the defendant was on trial for violating a newly enacted law punishing human trafficking in slaves, and Justice Story was concerned that, because Massachusetts was the first state to abolish slavery and was home to much of the abolitionist movement, the jury would convict him based on their beliefs about slavery rather than on the facts.  See United States v. Polouizzi, 687 F. Supp. 2d at 190-91 ("Justice Story's statement was made in the context of *preventing a conviction unfounded under the statute as he construed it, not to prevent the jury from refusing to convict a person technically guilty*." (emphasis in original)); C. Conrad, supra, at 66.  Justice Story instructed the jury as to his opinion that the jury determining guilt based on the jurors' own beliefs, rather than on the law as the court told them -- jury nullification -- is inconsistent with the notion of a fair trial:

Before I proceed to the merits of this case, I wish to say a few words upon a point, suggested by the argument of the learned counsel for the prisoner upon which I have had a decided opinion during my whole professional life.  It is, that in criminal cases, and especially in capital cases, the jury are the judges of the law, as well as of the fact.  My opinion is, that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case, tried upon the general issue.  In each of these cases, their verdict, when general, is necessarily compounded of law and of fact; and includes both.  In each they must necessarily determine the law, as well as the fact.  In each, they have the physical power to disregard the law, as laid down to them by the court.  But I deny, that, in any case, civil or criminal, they have the moral right to decide the law according to their own notions, or pleasure.  On the contrary, I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law.  It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court.  This is the right of every citizen; and it is his only protection.  If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views, which different juries might take of it; but in case of error, there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury.  Indeed, it would be almost impracticable to ascertain, what the law, as settled by the jury, actually was.  On the contrary, if the court should err, in laying down the law to the jury, there is an adequate remedy for the injured party, by a motion for a new trial, or a writ of error, as the nature of the jurisdiction of the particular court may require.  Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness, or ignorance, or accidental mistake, to interpret it.  If I thought, that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial.  But believing, as I do, that every citizen has a right to be tried by the law, and according to the law; that it is his privilege and truest shield against oppression and wrong; I feel it my duty to state my views fully and openly on the present occasion.  It is not, indeed, an occasion, on which there is any reason to doubt, that an intelligent jury can understand the principles of law applicable to the subject, as well as the court; for they are the principles of common sense.  And as little reason is there, in my view, to suppose, that they can operate injuriously to the real merits of the case of the prisoner.

24 F. Cas. at 1043.

In Pierce v. State, 13 N.H. 536 (1843), the Supreme Court of New Hampshire cited United

States v. Battiste in holding that the right to return a verdict based on a finding that the law is

otherwise than the court gives it to the jury is inconsistent with the proposition that the Constitution

of the United States of America is the supreme law of the land:

> [T]he result at which we have arrived is that the juries have not the right to decide the law in any case; that this accords with the best authorities in the common law, and with other legal rights which must be surrendered if they may decide the law; and that they are bound by the law, as laid down to them by the court. . . .
>
> The constitution of the United States, and the acts of Congress made in pursuance thereof, are the supreme law of the land, and the judges in every state are bound thereby.  If juries are not bound also, the question can never be settled whether a law be in pursuance of the constitution, and the courts must suspend their judgments until a sufficient number of verdicts has been returned, one way or the other, to render it probable that juries generally in future will return their verdicts the same way, -- for no nearer approach to certainty could be made.
>
> We cannot believe that impartial and reflecting men, of whatever profession they may be, can advocate doctrines which may lead to such results as the right of the jury to decide the law may end in.  We cannot think that the people or their representatives would be content with an exposition of the constitution which would cause the constitutionality of the license law to remain an open question, until it could be settled by the verdict of a jury; of a body admirably adapted to the decision of questions of fact, but irresponsible, giving no reasons for their decisions, not subject to impeachment or attaint, without access to the sources of the law, and therefore unfitted for the investigation of legal rights.  No reflecting man in the jury box would be willing to take upon himself this responsibility.  He would feel that the question could not be examined with the deliberation it required; that the law could not be expounded with quite so much facility as it could be made, -- and that there was no such inspiration in the jury box as would enable twelve men to determine, per saltum, grave questions which, elsewhere, require care, and thought, and patient study, and time for undisturbed reflection.  And it is the opinion of the court, that it is inconsistent with the spirit of the constitution that questions of law, and still less, questions of constitutional law, should be decided by the verdict of the jury, contrary to the instructions of the court.

Pierce v. State, 13 N.H. at 551-54 (internal citations omitted).  Courts around the country began to

follow suit and adhere to the proposition that allowing juries to decide the law in a case, and to

decide against the law as the court gave it to them, is inconsistent with the constitutional right for

a fair trial.  See, e.g., Commonwealth v. Porter, 51 Mass. 263, 263, 10 Metcalf 263, 263

(1845)("[I]t is the duty of the court to give instructions to the jury on all questions of law which

arise in a cause tried by them; and it is the duty of the jury to receive the law from the court, and to conform their . . . decision to such instructions . . . ."); State v. Burpee, 65 Vt. 1, 25 A. 964, 973 (1892)("The doctrine that jurors are judges of the law in criminal cases is repugnant to . . . the constitution of Vermont, which guaranty to every person within this state 'a certain remedy' for all wrongs, conformably to the laws . . . .")(quoting Vt. Const. art. 4, 10).

Sixty years after United States v. Battiste, the Honorable John Marshall Harlan, then-Associate Justice of the Supreme Court of the United States, writing for the majority in Sparf v. United States, decided whether a district court could find that manslaughter did not apply as a matter of law and the jury had to follow that instruction, or whether it was wholly the jury's determination.  See United States v. Courtney, 960 F. Supp. 2d at 1170.  The defendants in Sparf v. United States, tried jointly for murder, asserted on appeal that the court invaded the jury's province to determine the law and the facts in criminal cases, where the judge instructed the jury on manslaughter and murder, but also instructed the jury:

> I do not consider it necessary, gentlemen, to explain [manslaughter] further, for if a felonious homicide has been committed, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder.  In other words, it may be in the power of the jury, under the indictment by which these defendants are accused and tried, of finding them guilty of a less crime than murder, to wit, manslaughter, or an attempt to commit murder; yet, as I have said in this case, if a felonious homicide has been committed at all, of which I repeat you are the judges, there is nothing to reduce it below the grade of murder.

156 U.S. at 60.  The judge additionally instructed the jury: "[A]s one of the tribunals of the country, a jury is expected to be governed by law, and the law it should receive from the court."  156 U.S. at 63.  The Supreme Court held that the district court did not err in giving these instructions:

> We are of opinion that the court below did not err in saying to the jury that they could not, consistently with the law arising from the evidence, find the defendants guilty of manslaughter, or of any offense less than the one charged; that if the defendants were not guilty of the offense charged, the duty of the jury was to return a verdict of not guilty.  No instruction was given that questioned the right of

the jury to determine whether the witnesses were to be believed or not, nor whether the defendant was guilty or not guilty of the offense charged.  On the contrary, the court was careful to say that the jury were the exclusive judges of the facts, and that they were to determine -- applying to the facts the principles of law announced by the court -- whether the evidence established the guilt or innocence of the defendants of the charge set out in the indictment.

The trial was thus conducted upon the theory that it was the duty of the court to expound the law, and that of the jury to apply the law as thus declared to the facts as ascertained by them.  In this separation of the functions of court and jury is found the chief value, as well as safety, of the jury system.  Those functions cannot be confounded or disregarded without endangering the stability of public justice, as well as the security of private and personal rights.

156 U.S. at 106.

Justice Harlan notes the varied opinions of jurists and court decisions dating back to Georgia v. Brailsford, which had recognized that juries necessarily have the right to determine matters of law in addition to fact, but concludes: "We are of the opinion that the law in England at the date of our separation from that country . . . falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court."  Sparf v. United States, 156 U.S. at 90.  Justice Harlan reasoned that the incorrect belief about the jury's ability to depart from the law which the court gives to it arises from the jury's ultimate ability to decide guilt or innocence in rendering a general verdict: "The contrary view rests, as we think, in large part, upon expressions of certain judges and writers, enforcing the principle that when the question is compounded of law and fact a general verdict, ex necessitate, disposes of the case in hand, both as to law and fact."  156 U.S. at 90.  He determined, therefore, that "the general common-law rule in criminal cases" at the time of the Sixth Amendment's ratification was

the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury, by a general verdict, of necessity determined in the particular case both law and fact, as compounded in the issue submitted to them.

156 U.S. at 98.  Justice Harlan thus rejected the defendants' contention that the district judge's instructing the jury that it was to follow the law that he gave to them was improper, reasoning:

> We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence.  Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be.

156 U.S. at 102.  Justice Harlan, articulating the policy behind the Supreme Court's holding, noted that requiring juries to adhere to courts' instructions ensures that laws, even if they may be unpopular, are enforced:

> "As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to purposes of injustice.  But, on the other hand, I do consider that this power and corresponding duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen.  The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men.  To enforce popular laws is easy.  But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, -- there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne."

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 26 F. Cas. 1323, 1336 (C.C.D. Mass. 1851)).

States quickly followed on the heels of the Supreme Court's decision in Sparf v. United States to restrict the role of juries.  Pennsylvania, for instance, clarified its opposition to jury nullification in the case of Commonwealth v. Bryson, 120 A. 552 (1923), where the defendant challenged the district court's instruction, which provided: "[I]n this sort of case you are the judges of the law and the facts, the law as well as the facts, but you are to take the law from the court as the proper source of information."  120 A. at 554.  The Supreme Court of Pennsylvania noted that

correctness of the instruction "is now settled in Pennsylvania," holding: "There is nothing in the instructions of which defendant can justly complain.  It is the duty of the jury to take the law from the court, to the same extent in a criminal case as in any other, and a trial judge can properly so instruct."  120 A. at 554.  Further, the Supreme Court of Illinois in 1931 held unconstitutional a statute which provided that juries in criminal cases are the judges of both fact and law, reasoning that the statute "abrogates an essential attribute of the trial of a criminal case by a jury as known to the common law, and results in the deprivation of a right which has been uniformly guaranteed by our successive Constitutions."  People v. Bruner, 175 N.E. 400, 404 (1931).  The Supreme Court of Illinois cites Sparf v. United States as authority for the proposition that, at common law, it is a jury's duty to take and apply the law as the judge gives it to the jury.  See People v. Bruner, 175 N.E. at 403 (noting that the Supreme Court in Sparf v. United States, "following the rule and practice at common law, [held that] it was the duty of the jury in every criminal case . . . to take the law from the court and to apply the law so received to the facts as they found them from the evidence").  The Supreme Court has not directly addressed nullification since Sparf v. United States.  See Col. Jeremy S. Weber, Court-Martial Nullification: Why Military Courts Needs a "Conscience of the Commander", 80 A.F. L. Rev. 1, 16-17 (2019).

**3.      The Jury's Current Role.**

"It is well-established that the court instructs the jury as to the rules of law and that the jury applies the facts as they find them to those rules."  United States v. Grismore, 546 F.2d 844, 849 (10th Cir. 1976)(citing Sparf v. United States, 156 U.S. at 51).  "One touchstone of a fair trial is an impartial trier of fact -- 'a jury capable and willing to decide the case solely on the evidence before it.'"  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)(quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)).  A juror meets the constitutional standard for

impartiality where the juror "can lay aside his opinion and render a verdict based on the evidence

presented in court." Patton v. Young, 467 U.S. 1025, 1037 n.12 (1984). As the Tenth Circuit has

explained, a "defendant's right to an impartial jury does not include a right to a jury composed of

persons who will disregard the district court's instructions." United States v. James, 203 F.3d 836

(10th Cir. 2017)(table opinion).[2] Cf. United States v. Fredette, 315 F.3d 1235, 1240-41 (10th Cir.

2003)("'The instructions as a whole need not be flawless, but we must be satisfied that, upon

hearing the instructions, the jury understood the issues to be resolved and its duty to resolve

them.'")(quoting Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999)).

The Tenth Circuit has held that "there is no right to jury nullification." Crease v. McKune,

189 F.3d 1188, 1194 (10th Cir. 1999). Jury nullification is defined as a

> jury's knowing and deliberate rejection of the evidence or refusal to apply the law
> either because the jury wants to send a message about some social issue that is
> larger than the case itself or because the result dictated by law is contrary to the
> jury's sense of justice, morality, or fairness.

Jury Nullification, Black's Law Dictionary at 936 (9th ed. 2009). "'While we recognize that a jury

may render a verdict at odds with the evidence or the law, neither the court nor counsel should

---

[2]United States v. James is an unpublished opinion, but the Court can rely on a United States
Court of Appeals for the Tenth Circuit unpublished opinion to the extent its reasoned analysis is
persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not
precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we
> have generally determined that citation to unpublished opinions is not
> favored. . . . However, if an unpublished opinion or order and judgment has
> persuasive value with respect to a material issue in a case and would assist the court
> in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing In re Citation of Unpublished
Opinions/Ords. & Judgments, 151 F.R.D. 470 (10th Cir. 1993)). The Court concludes that United
States v. James and United States v. Gehringer, 385 F. App'x 830 (10th Cir. 2010), have persuasive
value with respect to a material issue, and will assist the Court in its disposition of this
Memorandum Opinion and Order.

encourage jurors to violate their oath.'" United States v. Gonzalez, 596 F.3d 1228, 1237 (10th Cir. 2010)(quoting United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983)).  "[W]e disapprove of the encouragement of jury nullification."  United States v. Gonzalez, 596 F.3d at 1237.  The Tenth Circuit in Crease v. McKune cited with approval the United States Court of Appeals for the Second Circuit's holding in United States v. Thomas, 116 F.3d 606 (2d Cir. 1997), in which the Second Circuit stated that "the powers of juries to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."  United States v. Thomas,116 F.3d at 615.  Moreover, the Tenth Circuit has held that "the law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law."  United States v. Rith, 164 F.3d at 1337.  See United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992)(holding that criminal defendants are "not entitled to jury nullification instructions").

In United States v. James, the Tenth Circuit upheld a district court judge's sua sponte dismissal of a potential juror who stated his belief that the juror had the power to disregard the judge's admonition on the law and acquit if the juror felt it just to do so.  See 2000 WL 136816, at *4.  The district court judge asked the juror, an emeritus professor of law at the University of Denver, whether he was "willing to accept the law from me as I give it in the instructions," to which the juror responded that his "inclination is to follow the judge's instructions."  2000 WL 136816, at *2.  The juror noted, however, that he had one "qualm" and that was the view that "a jury always has the power to acquit . . . . [n]otwithstanding the evidence."  2000 WL 136816, at *2.  The judge then, immediately, sua sponte dismissed the juror and provided the following explanation to the venire:

Now, we were on the subject of experience with the law.  I just excused the professor because he expressed a view that the jury can disregard the law.  I'm surprised to hear that's being taught, if it is being taught.  But at any rate, that's not the law.  As I have explained patiently and carefully, the jury has to accept the law as it is, and it's up to the jury to decide on the evidence, you know, whether the evidence meets this high standard of proof, and can certainly decide on an acquittal, as he said, if the evidence doesn't persuade or convince you beyond a reasonable doubt.  But the jury can't make up the law, and that's the little exchange that we had there, and I'm sure you followed along with that, but I wanted to make it plain why it was that I excused this teacher.

2000 WL 136816, at *2.  When the defendant appealed, asserting that the judge's sua sponte dismissal of the juror and instruction to the venire violated his Sixth Amendment jury trial rights, the Tenth Circuit affirmed, holding:

In light of his responses to questions during voir dire, the district court did not abuse its discretion or commit plain error in sua sponte dismissing [the] prospective juror . . . .  A person who is either unwilling or unable to follow the court's instructions is not qualified to be a juror.  Nor did the district court commit any error when it informed the jurors that it is their obligation to follow the law as it instructs.  In short, the defendant was not deprived of his right to a fair trial.

2000 WL 136816, at *4.

The Supreme Court and the Tenth Circuit bind the Court, and the Court may not provide the jury with an instruction inviting nullification.  See United States v. Courtney, 960 F. Supp. 2d at 1189.  While in United States v. Courtney, the Court stated that the defendant

perhaps should be afforded the opportunity to have the Court instruct the jury, or his counsel be allowed to tell the jury, that, if it finds "the law arising in the case is different from that which the court advances," the jurors are "bound by their oaths, by their duty to their creators and themselves, to pronounce according to their own convictions," rather than according to the dictates of the law,

960 F. Supp. 2d at 1196 (quoting People v. Croswell, 3 Johns. Cas. at 355-56), the Court ultimately held that current Supreme Court and Tenth Circuit controlling law required denial of the requested instruction.  See United States v. Courtney, 960 F. Supp. 2d at 1196-97.  The defendant appealed the denial of the instruction, and the Tenth Circuit responded:

In a lengthy exposition, the district court correctly noted that the role of the Sixth Amendment, like many other portions of our Constitution, has changed over time. However, rather than embarking on a winding and uncertain[3] journey into the minds of the framers, we must follow Supreme Court and Tenth Circuit precedent. Therefore, we state once again that "a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law."

United States v. Courtney, 816 F.3d 681, 681(10th Cir. 2016)(quoting United States v. Rith, 164 F.3d at 1338).  See United States v. Warwick, 16-CR-4572, 2017 WL 5027295 (D.N.M. October 30, 2017)(Armijo, C.J.)(concluding that the court's role to instruct the jury on the law and the duty of the jury to obey the instructions have been clearly defined since 1895).  See also United States v. Jensen, No. 17-CR-2566, 2018 WL 878963 (D.N.M. February 13, 2018)(Johnson, J.)(stating that the Tenth Circuit repeatedly has affirmed that a defendant is not entitled to an instruction advising or encouraging the jury to exercise the power of nullification); United States v. Edwards, 266 F. Supp. 2d 1290, 1322 (D.N.M. August 22, 2017)(Browning, J.)(concluding the same).

### 4. Withholding From the Jury Information About its Mitigation or Nullification Right Has Lessened the Jury's Control in Judicial Proceedings and Eroded the Common-Law Jury's Role.

The Supreme Court has stated that not all changes to the jury's role implicate the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost not only by gross denial, but by erosion.'"  Apprendi, 530 U.S. at 483 (quoting Jones v. United States, 526 U.S. at 247-48).  The question for the Court to decide is whether the judicial exertion of power has changed trial practices to the point where the jury trial right has been unconstitutionally eroded or denied.  Requiring courts to keep information about the mitigation or

---

[3]With all due respect to the Tenth Circuit, the Court does not think it is "uncertain" what was in the Framers' minds regarding jury nullification.

nullification power from the jury has not wholly taken away a defendant's jury trial right.  Given

that: (i) the Founders contemplated the jury's role to include its right to be the ultimate decider of

the law; and (ii) the mitigation power played such a large role in the common-law jury's resolution

of a case, however, the contemporary judicially created requirement to keep all information from

the jury about its "power" to nullify is inconsistent with the Sixth Amendment jury trial right at

the Founders' time.

The Supreme Court has noted that "the Sixth Amendment by its terms is not a limitation

on judicial power, but a reservation of jury power.  It limits judicial power only to the extent that

the claimed judicial power infringes on the province of the jury." Blakely v. Washington, 542

U.S. at 308.  Even though an organic change leading to the courts' omissions of any information

about the jury's nullification would perhaps not be sufficient to find a judicial exertion of power,

such a small evolution is not what occurred.  Sparf v. United States and its progeny effectively

took away, by the exertion of judicial power, any possibility that the jury might be informed about

its role including its nullification or mitigation power.  The Supreme Court's decision in Sparf v.

United States, which established that it is correct for courts to instruct the jury that the law is the

court's determination to make and solely in its province, and that it is the jury's duty to apply the

law as given, is inconsistent with the practices of the Supreme Court in Georgia v. Brailsford and

of the New York Supreme Court in People v. Croswell.  To stake out the position that the law is

solely the court's province and that it is the jury's duty to apply the law as the court gives it to the

jury is in tension with the Supreme Court's direction that it is the jurors' "right to take upon

yourselves to judge . . . both . . . the law as well as the fact in controversy," Georgia v. Brailsford,

3 U.S. at 4, and that, when, in the jurors' eyes, "the law arising in the case is different from that

which the court advances," the jurors are "bound by their oaths, by their duty to their creator and

themselves, to pronounce according to their own convictions," rather than according to the law's

dictates, <u>People v. Croswell</u>, 3 Johns. Cas. at 355-56.  The question thus becomes whether this

judicial power infringes on the jury's province.

Like the modern-day jury's lack of knowledge about sentencing information, it may be that

any lack of the jury's knowledge about its nullification power does not implicate the Sixth

Amendment's jury trial right, because, even if the jurors' knowledge about nullification has

receded, the jury's power to nullify still exists to the same extent that it did in the Founders' time.

<u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1193-94.  As the Honorable Judge Learned

Hand, United States Circuit Judge for the United States Court of Appeals for the Second Circuit,

observed in <u>Steckler v. United States</u>, 7 F.2d 59 (2d Cir. 1925), however inconsistent jury

nullification may be with the jury's role as factfinder and duty to apply the law as given to its

findings of fact, the jury retains this nullification power and exercises this power when the jury

sees fit to do so regardless whether the court informs the jury about the power:

> The most that can be said in such cases is that the verdict shows that either in the
> acquittal or the conviction the jury did not speak their real conclusions, but that
> does not show that they were not convinced of the defendant's guilt.  We interpret
> the acquittal as no more than their assumption of a power which they had no right
> to exercise, but to which they were disposed through lenity.

7 F.2d at 60.

The Supreme Court and especially the Tenth Circuit have also concluded that this change

in practice -- affirmatively to instruct the jury to follow the law which the district court gives to

it -- has not eroded unconstitutionally the jury's role from the Founders' conception of that role.

This conclusion finds support in the policy considerations which Justice Harlan noted in <u>Sparf v.

United States</u>.  Justice Harlan noted that many of the concerns present in England and the colonies

in the Framers' era about the injustice that stems from judges as arms of the oppressive state

dissipated with the requirements in the United States that judges give their opinions publicly and

explain the reasoning behind their opinions, and with the repercussion of impeachment that the

United States Constitution guarantees:

> "As long as the judges of the United States are obliged to express their opinions
> publicly, to give their reasons for them when called upon in the usual mode, and to
> stand responsible for them, not only to public opinion, but to a court of
> impeachment, I can apprehend very little danger of the laws being wrested to the
> purposes of injustice."

156 U.S. at 107 (quoting United States v. Morris, 26 F. Cas. at 1336).  He reasoned, rather, that

placing the duty to expound the law in the courts and requiring the citizens to follow them furthers

the interests of justice by helping to ensure that laws which the democratic government enacts are

enforced regardless of their popularity:

> "I do consider that this power and corresponding duty of the court authoritatively
> to declare the law is one of the highest safeguards of the citizen.  The sole end of
> courts of justice is to enforce the laws uniformly and impartially, without respect
> of persons or times or the opinions of men.  To enforce popular laws is easy.  But
> when an unpopular cause is a just cause; when a law, unpopular in some locality,
> is to be enforced, -- there then comes the strain upon the administration of justice;
> and few unprejudiced men would hesitate as to where that strain would be most
> firmly borne."

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 26 F. Cas. at 1336).  As

Judge Weinstein notes, Sparf v. United States produces a court system that efficiently can deal

with the realities of the organic evolution of the American legal system and the jury pool:

> Justice Harlan's majority opinion was well designed to produce a more efficient
> court system calculated to deal with the growing complexity of the law; the much
> improved training and professionalism of bench and bar; a lay public increasingly
> out-of-touch with the law's details; and a desire to provide predictable rules
> protecting our growing national industry and commerce.

United States v. Polouizzi, 549 F. Supp. 2d at 421.  These courts have, therefore, been very clear

about what a trial court should do when asked to inform the jury about its nullification power or

to allow the lawyers to do so: "[N]either the court nor counsel should encourage jurors to violate

their oath." United States v. Gonzalez, 596 F.3d at 1237 (internal quotation marks omitted)(quoting United States v. Trujillo, 714 F.2d at 106). See United States v. Gonzalez, 596 F.3d at 1237 ("[W]e disapprove of the encouragement of jury nullification.").

The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism. See United States v. Courtney, 960 F. Supp. 2d at 1195. That the jurors' lack of knowledge stems at least in part from the judicial exertion of power, and that the jury's nullification power played an important role in criminal jury trials at the Founders' time, counsels in favor of finding this evolution unconstitutional. In Blakely v. Washington, the State of Washington asserted that, although the jury did not find the aggravating fact supporting the enhancement which the sentencing judge applied, and the sentencing range based on the facts submitted to the jury corresponded with a 49-to 53-month range, the 90-month sentence imposed nevertheless was constitutional, because the statutory maximum for the crime was ten years, and the sentence imposed was under that statutory maximum. See 542 U.S. at 303. Justice Scalia, then-Associate Justice of the Supreme Court, noted, however, that "[o]ur precedents make clear that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict," 542 U.S. at 303, noting that, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority," 542 U.S. at 304 (quoting 1 J. Bishop, Criminal Procedure § 87, at 55 (2d ed. 1872)). Justice Scalia explained that Apprendi and its progeny are based on commitment to the Framers' intention in providing the Sixth Amendment jury trial right: the people's ultimate control of the judiciary.

> Our commitment to Apprendi in this context reflects not just respect for
> longstanding precedent, but the need to give intelligible content to the right of jury

trial.  That right is no mere procedural formality, but a fundamental reservation of
power in our constitutional structure.  Just as suffrage ensures the people's ultimate
control in the legislative and executive branches, jury trial is meant to ensure their
control in the judiciary.  See Letter XV by the Federal Farmer (Jan. 18, 1788),
reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed.
1981)(describing the jury as "secur[ing] to the people at large, their just and rightful
control in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771),
reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850)("[T]he common
people, should have as complete a control . . . in every judgment of a court of
judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux
(July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed.
1958)("Were I called upon to decide whether the people had best be omitted in the
Legislative or Judiciary department, I would say it is better to leave them out of the
Legislative"); Jones v. United States, 526 U.S. 227, 244-48 . . . (1999).  Apprendi
carries out this design by ensuring that the judge's authority to sentence derives
wholly from the jury's verdict.  Without that restriction, the jury would not exercise
the control that the Framers intended.

Blakely v. Washington, 542 U.S. at 305-06.  To take away the defendant's ability to inform the

contemporary jury about its nullification power, which was central to the common-law jury's role

in ensuring that the people kept "ultimate control . . . in the judiciary," 542 U.S. at 306, effectively

takes away the modern jury's ability to withhold a guilty verdict where it believes to nullify is just.

This situation is particularly the case when a court instructs the jury that it must follow the court's

instructions on the law and set aside any beliefs it may have about what the law should be.  In such

a case, because the jury does "not exercise the control that the Framers intended," the sentence that

the court subsequently imposes on the defendant does not "derive[] wholly from the jury's

verdict," as the Framers contemplated "jury," and therefore violates the Framers' intent in

preserving the jury trial right in the Sixth Amendment.  Blakely v. Washington, 542 U.S. at 305-

06.

Because the common-law jury at the Founders' time was in control of the judiciary by

virtue of rendering the ultimate decision in its verdict, and because the courts at the time of the

Founders told the jury that the jury was the master of the law and of the facts, the Supreme Court's

and the Tenth Circuit's precedent that the trial court should not instruct the jury about nullification is inconsistent with the Framers' intention in adopting the Sixth Amendment jury trial right. Moreover, the requirement that the court not allow the lawyers to encourage nullification is inconsistent with the practice at the time of the Framers, as Mr. Hamilton's conduct in People v. Croswell exhibits.  Even though it is messy to talk openly to the jury about jury nullification in the modern American judicial system, the Constitution is not structured solely to efficiently convict defendants.

The Court has made clear its belief that the jury has the power to put off the law as the Court gives it and to convict according to the jury's conscience.[4]  This power has been a long-standing bulwark against the threat of judicial despotism and congressional tyranny, yet the Court is left no choice but to deny defendants' motions requesting this right.  Despite the Supreme

---

[4]A potential criticism of the Court's position is that jury nullification might be misused for racial reasons.  For example, the fear may be that a white jury might engage in jury nullification when there is a white defendant officer accused of killing an African-American.  The Court would not take away jury nullification in these circumstances, because a prosecutor might be under political pressure to bring a case, and, more importantly, because the jury may often have an African-American defendant, and the jury might want to take race into consideration in those circumstances.  See United States v. Lewis, 432 F. Supp. 3d 1237, 1296 (D.N.M. 2020)(Browning, J.)("Data abounds, however, that African Americans are far more likely to be arrested and sentenced than are whites."); Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 Yale L.J. 677, 715-18 (1995)(arguing that African-American jurors should sometimes vote to acquit in criminal cases where African-American defendants are factually guilty, because the benefits of returning the defendant to the community may outweigh the harms that incarceration causes).  This country has fought a Civil War and engaged in a long struggle to attempt to rid itself of racial divide.  See Pena-Rodriguez v. Colorado, 580 U.S. at 222.  Although the Court would not necessarily take away race-based nullification, the Court could also live with telling the jury that it cannot base jury nullification on race.  The jury could be told that race is an illegitimate factor on which to base nullification, just as it is an illegitimate factor on which to base a conviction.  See Pena-Rodriguez v. Colorado, 580 U.S. at 225-26.  Such an instruction might not be effective, but a court can never rule out all jury misconduct, and the Court's experience is that American juries work hard to follow the Court's instructions.

Court's possible receptiveness to reconsider the issue of jury nullification and the courts' role in educating the jury of its power, the Supreme Court has not ruled recently on the issue.  The Court must defer, therefore, to the Supreme Court's guidance to district courts that, where a recent decision casts doubt about Supreme Court caselaw's precedential value, district courts must adhere to the established precedent until the Supreme Court explicitly reconsiders it.  See Hohn v. United States, 524 U.S 236, 252-53 (1998)("[O]ur decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued validity."); United States v. Courtney, 960 F. Supp. 2d at 1199 ("Thus, although the recent Supreme Court case law discussing the Sixth Amendment jury trial right calls into question the language in this instruction, the Court cannot say that the Supreme Court has effectively ruled this instruction unconstitutional.").  See also Clay S. Conrad, Jury Nullification: The Evolution of a Doctrine 11 (2014)(discussing at length "why and how the [criminal justice] system must come to grips with the power of jurors to judge the law"); Daniel Epps & William Ortman, The Informed Jury, 75 Vand. L. Rev. 823, 827, 833-35 & 834 n.51 (2022)(drawing on the Court's cases in concluding that "our judicial system has lost sight of the original promise of a jury guaranteed in our Constitution," because "informing juries about the *full* statutory range of potential punishment . . . is most consistent with the basic premises of the criminal jury system" (citing United States v. Woody, 336 F.R.D. 293, 311-17 (D.N.M. 2020)(Browning, J.)); Michael G. Bliss, The American Jury and Justice Story: How One Supreme Court Justice Nullified the Conscience of the Community, 46 Am. J. Trial Advoc. 1, 50-52 (2022)("[D]elivering a general verdict is not amoral mathematics, and that criminal guilt does not exist in any trial, no matter the judge, until all twelve jurors say that it does." (citing United States v. Woody, 336 F.R.D. at 339)).

**LAW REGARDING JURY KNOWLEDGE OF SENTENCING RAMIFICATIONS**

In criminal cases, the United States and the defendant often work together to keep the jury ignorant of the ramifications of its determination of guilt. The Supreme Court has consistently directed that, "when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" Shannon v. United States, 512 U.S. 573, 579 (1994)(footnote omitted)(quoting Rogers v. United States, 422 U.S. 35, 40 (1975)). This ignorance likely was absent at the time of the Sixth Amendment's ratification.

### 1.   <u>Jury Knowledge of Sentencing Ramifications at the Founders' Time</u>.

The common-law jury exercised its role as the conscience of the community by nullifying severe sentencing laws; the historical record suggests that the common-law jury not only used its nullification power, but also that jury nullification was a well-known, common jury power to guard against what it saw as unjust laws. See United States v. Courtney, 960 F. Supp. 2d at 1191. As discussed above, the historical background also suggests that juries at the Framers' time did not have to be provided instructions about their ability to nullify. See United States v. Courtney, 960 F. Supp. 2d at 1191. The frequency with which juries mitigated the verdict or acquitted a guilty defendant, because they saw the law as unjust, suggests that jurors knew about their ability to nullify without any information from the courts about that ability and that this nullification power was essential "to ensure their control in the judiciary." Blakely v. Washington, 542 U.S. at 305. Nevertheless, courts at the Founders' time, including the Supreme Court in 1794, instructed juries that it was their right to be the ultimate judge of both the facts and the law. See United States v. Courtney, 960 F. Supp. 2d at 1191.

Colonial and British jurors at the Founders' time came to the courts from the same vicinity as the defendant, "were well-informed and self-confident property owners . . . , and knew the essentials of the local criminal law and its punishments." United States v. Polouizzi, 549 F. Supp.

2d at 406 (citing Randolph A. Jonakit, The American Jury System 107-09 (2003); Jeffrey B.

Abramson, We, The Jury: The Jury System and the Ideal of Democracy at 32 (1994)).  Professor

Jeffrey B. Abramson, then of Brandeis University, has noted that jurors at the Founders' time did

not "come to the jury with minute skill in the laws," but rather the local knowledge jurors would

have possessed included knowledge of the laws.  Abramson, supra, at 32.  Professor Abramson

explains:

> Not only was formal legal training unnecessary, but jurors did not even need to rely
> on a judge's instructions to know the common law of the land, rooted as it was in
> fundamental principles of natural justice. . . .  Thus, members of a Massachusetts
> grand jury in 1759 were told that they "need no Explanation" as to most legal
> matters because "your Good Sence & understanding will Direct ye as to them."

Abramson, supra, at 32.  John Adams similarly noted that "in many cases judges gave the jury no

instructions on the law."  1 The Legal Papers of John Adams at 230 (L. Kinvin Wroth & Hiller B.

Zobel eds., 1965).

Jurors' knowledge of the law can be seen in a case that Professor Julius Goebel, Jr., of

Columbia Law School, chronicles, where he notes that, in 1702, a jury verdict was overturned

based on the jurors' lack of knowledge about the laws under which the defendant was convicted:

> After being tried in a well-publicized trial and found guilty of treason in 1702,
> Nicholas Bayard, a former commanding officer of the New York militia and mayor
> of New York under British rule, appealed to the British Crown based on
> irregularities in the jury composition -- i.e., the jurors' ignorance of the law:
>
> > In his petition and "appeal" to Queen Anne, Nicholas Bayard stated
> > among other things that he had been "convicted by an illegal petty
> > jury of Aliens and Dutch unduly returned and very ignorant of the
> > English Laws and Language". . . .  Among the affidavits taken by
> > John Bridges and Samson Shelton Broughton, under the Queen's
> > order of reference for the collection of evidence in connection with
> > the Bayard appeal, are statements of some of the petit jurors who
> > had joined in the verdict declaring Bayard guilty of high treason.
> > Thomas Sanders and Isaac Stoutenbergh, two of the trial jurors,
> > made oral statements as follows, confirming the allegations made by
> > Bayard in his petition: ". . . these [depend on] their great Ignorance

> of the Laws of England at that time not knowing what was High
> Treason . . . the Foreman . . . Did assert it was High Treason . . . to
> disturb the peace good and quiet of this Government and that
> Colonel Bayard had disturbed the peace by the addresses and eight
> or nine jurors were for clearing . . . Bayard but were perswaded by
> the foreman."

Julius Goebel, Jr. & T. Raymond Naughton, Law Enforcement in Colonial New York 604 n.7

(1944). Professor Goebel notes that New York jurors in revolutionary times often mitigated crimes

based on their knowledge of the potential sentences that the defendants faced if the jurors found

them guilty of the greater crime:

> We have spoken of the grooves in which the jury might exercise its charity[, that
> is, the jury's mercy for a defendant]: the verdict in thefts for amounts under the 12d.
> boundary between grand and petit larceny, and the privilege of finding
> manslaughter, self-defense or accident upon indictments for murder.  These
> prerogatives the juries in New York did not hesitate to assert, and to these old and
> established powers of mitigation may be added, perhaps, the avoidance in New
> York of the incidents of felony judgment by the persistent finding of no goods or
> tenements.  Of considerably greater significance than these possible interferences
> of the jury, but connected therewith in the case of verdicts for crimes of a less
> degree when murder, burglary, arson, highway robbery and certain others were
> charged, is the mitigation obtained by benefit of clergy.

Goebel & Naughton, supra, at 751 (footnote omitted).  "[T]he benefit of the clergy" was a system

of mitigation in which a first-time offender convicted of a lesser crime would be branded on the

thumb rather than sentenced to death.  United States v. Polouizzi, 549 F. Supp. 2d at 411 (quoting

John H. Langbein, The Origins of the Adversary Criminal Trial at 193 (2003)).  See 1 Sir William

Blackstone, Commentaries on the Laws of England: In Four Books at 1753 (William D. Lewis ed.,

2007)("[T]he benefit of the clergy at present stand[s] . . . considerably different from its original

institution . . . [,] what was at first an unreasonable exemption of particular popish ecclesiastics

into a merciful mitigation of the general law with respect to capital punishment.").

Sir Dudley Ryder, who served as a trial judge for the trial judiciary of the Old Bailey[5] from

1754 to 1756, at least in one case, instructed the jury on the possible ramifications of a guilty

verdict at trial and documented his belief that the jury determined the verdict based on availability

of the benefit of the clergy:

> Ryder sometimes found time to jot down a little of what he was telling the jury. John Taplin was tried before Ryder in October 1754 on an indictment charging theft from a dwelling house of a watch, valued at forty shillings, and of more than twenty guineas in money. The [Old Bailey] report of the outcome is as curt as possible, "Guilty 39s.," meaning that the jury convicted him but determined the combined value of what was stolen to be thirty-nine shillings (less than two guineas, hence well below the value charged in the indictment). Ryder's notes explain why. "The jury found him guilty to the value of 39s., which they did after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy. It is by Act of 12 Ann." Ryder thus records his own role in guiding the jury's prerogative of 'valuing' the loot. Because the statute of 1713 to which Ryder refers withdrew so-called benefit of clergy from thefts of forty shillings' value or more when committed in a dwelling house, it foreclosed the primary ground upon which a convict could escape the death penalty for such an offense. The convention of the day, immortalized in Blackstone's phrase as the jury's "pious perjury," was that the jury could "downvalue" the goods, in this instance to thirty-nine shillings, in order to consign the convict to the lesser sanction of transportation[, a punishment involving temporary exile and a term of indentured servitude,] for seven years.

John H. Langbein, Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder

Sources, 50 U. Chi. L. Rev. 1, 22 (1983)(footnotes omitted)("Ryder Sources"). Professor John H.

Langbein concludes from Ryder's notebook chronicling many of his trials during his tenure on the

Old Bailey bench that the jury's paramount, if not only, purpose was to determine the sentence:

> Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In most cases the accused had been caught in the act or otherwise possessed no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings. The main object of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction from death to transportation, or

[5]Old Bailey was London, England's central criminal court from 1674 to 1913. See The Proceedings of the Old Bailey, https://www.oldbaileyonline.org// (last visited May 13, 2024).

to lower the offense from grand to petty larceny, which ordinarily reduced the sanction from transportation to whipping. . . .

The jury not only decided guilt, but it chose the sanction through its manipulation of the partial verdict.  Since guilt was typically although not inevitably a forgone conclusion in many (perhaps most) cases, sentence is what was at stake when these cases were "contested."

Ryder Sources, supra, at 41, 55 (footnotes omitted).  Professor Langbein notes that, in Ryder's two years on the bench at Old Bailey, although he tried over one-hundred and seventy-one cases, there were only sixteen different crimes with which the defendants were charged.  See Langbein, supra, at 42.  Professor Langbein, in addition to reviewing Ryder's notebook, also reviewed a group of reports called the Old Bailey Session Papers ("OBSP") from the 1670s to the 1730s, concluding:

[T]he jury of that time had a large role in what we think of as sentencing, that is, in determining the sanction.  In a significant fraction of the cases that went to trial, the real issue was whether the jury would choose to exercise its power to "value" stolen goods in ways that would affect the applicable sanction.  It was understood that the value that the jury assigned was fictional, and that the jury was in truth deciding whether to rescue the culprit from the ordinary sanctions of transportation and death by so characterizing the crime that only a lesser sanction could be invoked.  If the goods were valued below 12 pence (in practice the Old Bailey juries used the figure of 10 pence), the crime became petty larceny, hence a misdemeanor, and the convict escaped with a whipping or a short jail term.  Under certain circumstances the jury could, by valuing goods below other monetary ceilings, bring the culprit under the rubric of benefit-of-clergy, for which the sanction was branding in the thumb.  The decision between finding an accused guilty of murder or manslaughter, which also belonged to the jury, can be seen as the choice between capital punishment and branding.  It could be argued that in all these situations the jury was in reality discharging a sentencing function, and even today we expect sentencing officers to consult past conviction evidence.  But we have seen that the OBSP show that the juries were using past conviction evidence to determine guilt, and with no constraint from the bench.

John H. Langbein, The Criminal Trial Before the Lawyers, 45 U. Chi. L. Rev. 263, 303-04 (1978)(footnotes omitted).

In United States v. Battiste, the case in which Justice Story first intimated that it was the jury's duty pursuant to the Sixth Amendment to follow the law as the judge provides it to the jury,

the judge read to the jury the indictment, which included the mandatory sentence for conviction. See 24 F. Cas. at 1044. The indictment included the statutory language for the law under which the defendant was convicted, providing in relevant part: "[I]f any citizen . . . shall land . . . on any foreign shore, [and] seize any negro or mulatto . . . with intent to make such negro or mulatto a slave . . . such citizen or person shall be adjudged a pirate, and on conviction thereof . . . shall suffer death." 24 F. Cas. at 1044.

The caselaw from the Framers' era discussing whether courts should instruct juries about their ability to determine the law in libel cases, on the one hand, does not necessarily lend support to the position that courts should inform juries about the ability to nullify the verdict, because, given the special verdict form provided to juries at this time, libel cases may be seen as unique. See United States v. Courtney, 960 F. Supp. 2d at 1191. Although Mr. Hamilton in People v. Croswell used broad and sweeping language to advocate for the jury's role to decide the law in addition to the facts -- and thus to allow them to nullify even if they believed the defendant had factually committed the crime -- Mr. Hamilton was arguing that it was unconstitutional to take away the jury's power to find that the defendant had the required intent for libel. See United States v. Courtney, 960 F. Supp. 2d at 1191. In essence, he was arguing for the jury's power to reach a verdict, because all that the district court allowed the jury to return in People v. Croswell was a special verdict, limited only to finding whether there was publication and whether the statement's inference was true. See 3 Johns. Cas. at 342. Even though Justice Kent's language in People v. Croswell is, therefore, subject to, and often cited for, a reading that it embraces the jury's role as being able to disregard the law given to them by the court as "the jury are under an indispensable necessity to decide both [the law and the fact]," 3 Johns. Cas. at 366, the court's otherwise unsurprising conclusion is that, in a libel case, "the jury have a right to judge . . . whether it be a

libel or not . . . in short, . . . 'the whole matter put in issue . . . .'" 3 Johns. Cas. at 376-77.

The Founders nevertheless believed it proper for the court to instruct the jury on the law. In People v. Croswell, while Justice Kent writes that the jury should decide the whole of the matter, he still notes that it is the court's duty to instruct the jury about the law: "[A]s in other criminal cases, it is the duty of the court, 'according to their discretion, to give their opinion and direction to the jury on the matter in issue,' and it is the duty of the jury to receive the same with respectful deference and attention . . . ." 3 Johns. Cas. at 377. Justice Kent did not hold that the court had the affirmative obligation to instruct the jury that it was to find the facts as well as the law but held merely that it was error to deny the jury the ability to exercise its power to, at that time, do both in reaching the ultimate conclusion of guilt or innocence; People v. Croswell appears, therefore, to go only as far as to recognize the longstanding proposition that the jury has the power to nullify, or to decide the ultimate issue of guilt, regardless whether the evidence establishes guilt, but does not stand for the proposition that the defendant has the right to demand instruction from the court about the jury's ability to exercise its nullification power. Rather, it falls in line with Justice Harlan's conclusion about the common-law jury's role that he articulated in Sparf v. United States:

> [T]he general common-law rule in criminal cases . . . [is that it is] the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury, by a general verdict, of necessity determined in the particular case both law and fact, as compounded in the issue submitted to them.

156 U.S. at 98.

Regardless whether libel cases are viewed as unique, however, the historical authority shows that the Founders viewed the jury's role to return a verdict based on its conscience, notwithstanding the court's instructions about the law. See United States v. Courtney, 960 F. Supp. 2d at 1192. To say that libel cases are unique cannot account for Chief Justice Day's

charge to the jury in <u>Georgia v. Brailsford</u> -- not a libel case -- "that by the same law, which recognizes th[e] reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy." 3 U.S. at 4. Rather, dictionaries at the Founders' time included in the definition of jury: "Juries are . . . not finable for giving their verdict contrary to the evidence, or against the direction of the court . . . and they may not only find things of their own knowledge, but they go according to their conscience." <u>Jacob's Law Dictionary</u> (1782)(quoted in C. Conrad, <u>supra</u>, at 46-47).

Changes in juror qualifications have resulted in a situation in which, at the time that the Founders ratified the Sixth Amendment, the common-law juries were vastly different from our contemporary juries. <u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1180. Whereas Professor Goebel notes that New York juries had a "high property qualification . . . , which rested upon the presumed higher responsibility and intelligence of propertied persons," courts today do not require property ownership, let alone a high property value qualification, as a prerequisite for juror qualification. New Mexico state courts do not get their jury pool only from property ownership records, but rather from the Department of Motor Vehicles, <u>see</u> N.M.S.A. 38-5-3, or, in the United States District Court for the District of New Mexico, from the state of New Mexico's voter registration list. <u>See</u> Misc. No. 08-00004-40, Order Adopting Modified Jury Plan ¶ 4, at 2, filed December 2, 2008. Similarly, whereas Judge Weinstein notes that British and colonial jurors at the Founders' time "were from the vicinage, were well-informed and self-confident property owners, . . . and knew the essentials of the local criminal law and its punishments," <u>United States v. Polouizzi</u>, 549 F. Supp. 2d at 406, the juries today do not have those same requirements and jurors do not often have those same qualities, <u>see</u> J. Goebel & T. Naughton, <u>supra</u>, at 603 ("The [New York] Judicature Act of 1691 and 1692 also contained provisions that no man's rights or

property should be determined . . . unless the facts be found by verdict of twelve men of the neighborhood").  Although the jury pools contain only persons who are registered to vote in a certain New Mexico county or licensed to drive in the State, especially in a geographically large state like New Mexico with a smaller population density, jurors may not hail from within what in the eighteenth century would have been considered the defendant's vicinity.

The twenty-first century American jury pool has less knowledge about the law than the common-law jury pool of the Founders' time.  See United States v. Courtney, 960 F. Supp. 2d at 1180.  As Professor Langbein notes in looking at Ryder's personal notebook from 1754 to 1756, in two years on the bench at the central criminal court in London, trying over 170 cases, there were only sixteen laws with which a mid-eighteenth-century Londoner may have been charged, and with which the freeholder jury pool thus likely would have been familiar.  See Ryder Sources, supra, at 42.  In modern times, however, "[f]or decades, the task of counting the total number of federal criminal laws" has been attempted by "lawyers, academics and government officials," largely without success: a 1982 United States Department of Justice study attempting to count the number of federal criminal laws as part of an effort to persuade Congress to revise it, "produced only an educated estimate: about 3,000 criminal offenses."  Gary Fields & John R. Emshwiller, Many Failed Efforts to Count Nation's Federal Laws, Wall St. J., July 23, 2011.  Thus, while Professor Abramson notes that jurors in the late-eighteenth century American colonies did not "come to the jury with minute skill in the laws," the local knowledge jurors would have possessed included knowledge of the laws.  Abramson, supra at 32.  The same cannot be said for contemporary juries in federal courts.  The 1702 trial of Nicholas Bayard, a New York mayor while under British rule, exemplifies the extent of colonial juries' knowledge of the law: Bayard appealed his conviction on grounds that the trial was improper, because two of the jurors did not

have their own independent knowledge of treason's elements, "but were perswaded [sic] by the foreman."  Goebel & Naughton, supra, at 603.

At the time of the Sixth Amendment's ratification, juries knew what the ramifications of a guilty verdict would be, because of the limited sentences available.  Importantly, of the sixteen offenses at issue in the Old Bailey trials, only two of those sixteen laws were misdemeanors, while the rest were felonies.  See Ryder Sources, supra, at 42.  At that time, juries knew well the repercussions of a guilty verdict for felonies.  See United States v. Courtney, 960 F. Supp. 2d at 1181.  Punishment for the first offense was the "benefit of the clergy," which meant the judge would choose between seven years' banishment or immediate release with a branding on the thumb.  See United States v. Courtney, 960 F. Supp. 2d at 1181.  Punishment for the second offense was death.  See Ryder Sources, supra, at 39.  For misdemeanors, although the judge had more discretion, it almost invariably was lashings.  See Ryder Sources, supra, at 53.  Juries at the Founders' time likely knew a substantial amount more about the law with which the defendant was charged and almost certainly knew the repercussions of a guilty verdict.

The Supreme Court, in its recent sentencing decisions discussing the Sixth Amendment jury trial right as it existed at the Founders' time, has similarly noted both the vicinity tenet and that offenses were sanction-specific when the Sixth Amendment was ratified in 1791.  See United States v. Courtney, 960 F. Supp. 2d at 1181.  In Blakely v. Washington, the Supreme Court noted that a tenet of the Sixth Amendment jury trial right at the Founders' time was "that the 'truth of every accusation' against a defendant should afterwards be confirmed by unanimous suffrage of twelve of his equals and neighbours . . . ."  542 U.S. at 301 (quoting 4 W. Blackstone, supra, at 343).  The Supreme Court in Apprendi recognized that, at least with respect to felonious conduct, "the English trial judge of the later eighteenth century had very little explicit discretion in

sentencing.  The substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense."  530 U.S. at 479.  Cf. id. 530 U.S. at 481 (noting that there was a "19th-century shift in this country from statutes providing fixed-term sentences to those providing judges discretion within a permissible range").  The Supreme Court has noted the very limited sentences available to American judges at the Founders' time and the nature of mandatory sentencing in contrast to its recent sentencing opinions: "In the early days of the Republic, when imprisonment had only recently emerged as an alternative to the death penalty, confinement in public stocks, or whipping in the town square, the period of incarceration was generally prescribed with specificity by the legislature.  Each crime had its defined punishment."  United States v. Grayson, 438 U.S. 41, 45 (1978).

Even if the Court instructed modern-day juries that the crime with which the defendant in the case is charged is a felony or a misdemeanor, given the multiple crimes with specific statutory minimum and maximum sentences, those juries likely would not know the possible sentences the defendants face if found guilty, unless they were educated with Guidelines experts, counsels' argument, and/or court instruction.  Whereas the Supreme Court noted in Apprendi that the nineteenth century saw a shift from mandatory, definite sentences to a system in which the court could impose a sentence at the court's discretion, because courts today are not permitted to inform the modern-day jury about the possible sentencing range flowing from the defendants' guilty verdicts, and given the complexity of the United States Sentencing Guidelines, the modern-day jury is likely without knowledge of the possible sentencing ramifications of their guilty verdict. The Court, in its experience on the bench, has found that present-day jurors, beyond lacking knowledge about sentencing ramifications for felonies or misdemeanors, often do not recognize the difference between criminal and civil jury trials.  Numerous times conducting voir dire, when

the Court inquires about a potential juror's past experience on a civil or criminal jury trial, the

juror's answers show that what the juror believes was a criminal trial was actually civil and vice

versa.  Judge Weinstein similarly has noted that the vast difference between late-eighteenth century

juries' knowledge about criminal law and sentencing ramifications of guilty verdicts, and

contemporary juries' knowledge, is not surprising given the vast difference in criminal law as it

then existed compared with the law today: "Criminal law then was much simpler than today, now

requiring tomes of highly abstruse, convoluted definitions and extraordinary combinations of

statutory prison maximums and minimums, fines, restitutions, forfeitures, probationary terms,

treatment for mental health and other problems in and out of prison, sentencing guidelines, case

law and local practice."  United States v. Polouizzi, 549 F. Supp. 2d at 407.  Considering the small

number of offenses in the late-seventeenth century and eighteenth century, and that there were

only two sanctions available for a felony conviction, support for withholding sentencing

information from the jury and the jury's resulting lack of knowledge cannot be found in the

historical reality of the common-law jury known to the Founders at the time of the Sixth

Amendment's ratification.

> **2.** **Jurors on Common-Law Juries Used Their Knowledge of Their Verdict's Sentencing Ramifications in Reaching Their Verdict.**

Juries at the Founders' time not only knew about the sentencing ramifications of their

verdicts, but historical evidence shows that juries weighed heavily the defendant's sentence in

reaching their verdicts.  In looking at jury verdicts throughout the eighteenth century in colonial

New York, Professor Goebel concludes:

> The verdicts . . . are illustrative of one of the most important aspects of the jury's
> prerogative -- the power to effect a mitigation in the severity of the law by verdicts
> which would let off an obvious offender with penalties less than the worst of the
> charges against him would make inevitable.  This power was not confined to the
> selection of a relatively innocuous count on which to return a conviction, but

> extended, as indicated above, to a finding of an offense less in degree than that charged in the indictment.  The importance of this rule in the case of felonies was obvious, since it was possible thus for the defendant to pray clergy and escape the rigor of the otherwise inevitable judgment of life and limb.

J. Goebel & T. Naughton, supra, at 673 (footnotes omitted).  The eighteenth-century jury in England also consistently exercised its power to effect a mitigation of the defendant's sentence. Professor Langbein notes that "only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence . . . .  To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings."  Ryder Sources, supra, at 41.

The Supreme Court has twice noted the common-law jury's mitigation power stemming from their knowledge of the repercussion of guilty verdicts.  In Jones v. United States, the Supreme Court notes that "competition developed between judge and jury," and provided the jury's mitigation power as an example: "The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences."  Jones v. United States, 526 U.S. at 245.  In Apprendi, the Supreme Court again referenced this mitigation power, noting that, at the Founders' time:

> [J]uries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant.  [Jones v. United States, 526 U.S.] at 245 . . . ("This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses, manifestations of what Blackstone described as 'pious perjury' on the jurors' part. 4 Blackstone 238-239").

Apprendi, 530 U.S. at 480 n.5.  It is thus clear that the Supreme Court's conception of the common-law jury which the Sixth Amendment protects includes a jury with knowledge of the sentences a

guilty defendant faces and a jury that uses this knowledge to reach its verdict.

That there was knowledge germane to common-law jurors does not clearly suggest that preventing parties from educating juries about sentencing ramifications is inconsistent with the Sixth Amendment's jury trial right.  If, for instance, a juror at the Founders' time knew the sentence that a guilty defendant faced only because there existed a very limited number of laws and a much more limited class of potential sentences, then courts' refusal today to admit parties' proffered evidence on this subject does not clearly violate the defendant's Sixth Amendment right.  It thus may seem tenuous to argue that the Sixth Amendment is implicated, because of knowledge lost given that, since the Framers' time, the jury pool has enlarged and grown relatively less educated about the criminal law, without any affirmative judicial conduct besides excluding evidence about sentencing information.  The Supreme Court has recognized that the Sixth Amendment "limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury," Blakely v. Washington, 542 U.S. at 308; a change resulting from the inclusion of a broader base of citizens in the jury pool, or from an evolution of the jurors in the jury pool, without courts' affirmative exertion of power, may not implicate the Sixth Amendment jury trial right; that is, merely leaving unbothered the modern jury in its state of ignorance may not infringe on the Sixth Amendment jury right, if Sixth Amendment concerns arise primarily when the judiciary invades affirmatively the jury's province.  That is, refusing to permit parties to rehabilitate the jury to its former, fuller knowledge of sentencing ramifications may raise no Sixth Amendment stakes.  On the other hand, however, even if the jury's lack of knowledge about the sentence that the defendant faces is diminished, because the modern-day jury is left without information that appears to have been important to the common-law jury's verdict and its power to mitigate the defendant's sentence, the substance of the defendant's Sixth Amendment jury trial right appears to have

deteriorated substantially.  See Booker, 543 U.S. at 237 (stating that the Supreme Court's holding

that the Sentencing Guidelines are unconstitutional if mandatory "is an answer not motivated by

Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance").  To be

consistent with what the Framers thought a jury was at the time of the Bill of Rights' adoption, it

may no longer be defensible to keep the jury so ignorant of the verdict's sentencing ramifications;

on this view, courts should not prevent parties from educating a jury about the ramifications of its

verdict.

### 3.       Jury Knowledge of Sentencing Ramifications in Modern Times.

"It is well established that, when a jury has no sentencing function, it should be admonished

to 'reach its verdict without regard to what sentence might be imposed.'"  Shannon v. United

States, 512 U.S. at 579 (quoting Rogers v. United States, 422 U.S. at 40).  The Supreme Court

explains that its reasoning is to avoid confusion and keep separate the jury's factfinding role from

the judge's role in determining the sentence the law requires:

> The principle that juries are not to consider the consequences of their verdicts is a
> reflection of the basic division of labor in our legal system between judge and jury.
> The jury's function is to find the facts and to decide whether, on those facts, the
> defendant is guilty of the crime charged.  The judge, by contrast, imposes sentence
> on the defendant after the jury has arrived at a guilty verdict.  Information regarding
> the consequences of a verdict is therefore irrelevant to the jury's task.  Moreover,
> providing jurors sentencing information invites them to ponder matters that are not
> within their province, distracts them from their factfinding responsibilities, and
> creates a strong possibility of confusion.

Shannon v. United States, 512 U.S. at 579.  In support of this proposition, the Supreme Court cites

Rogers v. United States, in which the Supreme Court held that the district court erred when,

without notice to the defendant and out of the defendant's presence, it answered in the affirmative

a communication which the jurors sent during their deliberations inquiring whether the court would

accept a verdict of guilty as charged "with extreme mercy of the Court."  422 U.S. at 37, 40.  The

Supreme Court concluded that the district court's statements to the jurors irreparably prejudiced

the defendant, reasoning that the court's statements might have induced a verdict that the jury

would not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of "guilty with extreme mercy" within five minutes "after being told unconditionally and unequivocally that it could recommend leniency," United States v. Glick, 463 F.2d 491, 495 (2d Cir. 1972), strongly suggests that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise.

Rogers v. United States, 422 U.S. at 40.

The Tenth Circuit has stated: "The authorities are unequivocal in holding that presenting

information to the jury about possible sentencing is prejudicial.  Breach of this standard has often

been grounds for reversal."  United States v. Greer, 620 F.2d at 1384.  The Tenth Circuit has held

specifically that an instruction on possible minimum sentences is not required absent a jury's

required participation in sentencing and that a district court has no discretion to instruct the jury

on sentencing ramifications.  See United States v. Parrish, 925 F.2d 1293, 1299 (10th Cir.

1991)("We hold a jury instruction about mandatory minimum sentences was properly omitted

because the offenses do not specifically require jury participation in sentencing."); United States

v. Gehringer, 385 F. App'x 830, 834 (10th Cir. 2010)(unpublished)("In light of established Tenth

Circuit and Supreme Court authorities, the district court had no discretion to instruct the jury on

the sentencing penalties, and therefore did not abuse its discretion in denying the defendant's

request.").

### 4.   Withholding Knowledge About Sentencing From The Modern-Day Jury Leaves The Jury Without Knowledge That It Would Have Had At The Framers' Time.

Judicial power as it relates to sentencing in the modern criminal court system appears to

infringe on the Sixth Amendment's reservation of jury power in two interrelated areas.  At the Framers' time, judges had discretion regarding sentences for misdemeanors -- largely between corporal punishment and banishment -- but, for felonies, judges until the nineteenth century had no discretion in relation to sentencing.  See Apprendi, 530 U.S. at 481 (noting "the 19th-century shift in this country from statutes providing fixed-term sentences to those providing judges with discretion within a permissible range"); id. at 482 (noting "[t]he historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties . . . ."); Ryder Sources, supra, at 41 (noting the mandatory sentences for felonies either were transportation/banishment if the benefit of the clergy was available, or death if the benefit was not available, and, for misdemeanors, the punishment was transportation or whipping).  While Congress' power to make law includes "the power to fix the sentence for a federal crime," Mistretta v. United States, 488 U.S. 361, 364 (1989), Congress' creation of over 3,000 federal laws presents significant problems for jurors who may wish to educate themselves about sentencing repercussions for certain criminal offenses, and the federal Sentencing Guidelines have made self-education of potential sentences virtually impossible.  Although a juror may be educated about statutory minimums and maximums, a juror cannot educate fully him or herself about a defendant's potential sentence according to the Guidelines, because the Guidelines take into account the defendant and the crime's circumstances, and, after Booker, allow a judge to depart from a Guidelines sentence.  The Sentencing Guidelines are enacted pursuant to Congress' power to make laws and to delegate that power.  See Mistretta v. United States, 488 U.S. at 361. The amount of information available about sentencing has eroded the jury's ability to take into consideration the potential penalty that the defendant faces and eroded its ability to use its mitigation power, see Apprendi, 530 U.S. at 483 (noting "the Framers' fears 'that the jury right could be lost not only by

gross denial, but by erosion'" (quoting <u>Jones v. United States</u>, 526 U.S. at 247-48)).

Second, judges had some discretion at the Framers' time to sentence within a prescribed range, even if it applied only in the limited situations of misdemeanors. The prohibition on any mention to the jury of a guilty verdict's sentencing implications does not find support in the Ryder in the 1750s, who, at least, was not required to keep information about the sentencing implications of the verdict from the jury. <u>Ryder Sources</u>, <u>supra</u>, at 22. Similarly, in <u>United States v. Battiste</u>, Justice Story in 1835 read to the jury the statute pursuant to which the defendant was charged, which included the sentencing ramification: "Death." 24 F. Cas. at 1044. Judges therefore were not required to keep anyone from informing juries about the verdict's sentencing implications.

**5.** **Where the Verdict Does Not Alter the Minimum and/or Maximum Sentence Imposed on the Defendant, the Court is Not Free to Give the Jury Sentencing Information.**

Neither Supreme Court nor Tenth Circuit precedent prohibits, wholesale, any mention of possible sentences. <u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d at 1185. Rather, the modern-day principle is limited to those situations in which "a jury has no sentencing function." <u>Shannon v. United States</u>, 512 U.S. at 579. The Supreme Court in <u>Apprendi</u> held that "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. at 490, and the jury is therefore required to participate in finding a fact that, by changing the mandatory maximum, changes substantially the nature of the sentence. Similarly, in <u>Jones v. United States</u>, the Supreme Court construed 18 U.S.C. § 2119 to constitute three separate offenses, rather than one sentence with three factual considerations for sentencing, because it reasoned that, to leave to a judge factual findings which would mean the difference between a sentence of up to fifteen years, up to twenty-five years, or up to life, implicates the defendant's Sixth Amendment jury trial right. <u>See</u> <u>United</u>

States v. Courtney, 960 F. Supp. 2d at 1185.  On the one hand, the Supreme Court's constitutional requirement that a jury participate in factfinding where the fact is necessary to a sentence with a substantially different punishment is analogous to the factual finding required in the case which Ryder notes, where the jury was to determine whether the total value of stolen goods was forty shillings or more, as a finding of forty shillings makes mandatory a death sentence and precludes the possibility of the benefit of the clergy.  See United States v. Courtney, 960 F. Supp. 2d at 1185. Similarly, whereas Justice Story in United States v. Battiste instructed the jury by reading them the statute which included the punishment, see United States v. Courtney, 960 F. Supp. 2d at 1185 -- courts instruct contemporary juries if the death sentence is a possible punishment for their potential jury's return of a guilty verdict, see United States v. Courtney, 960 F. Supp. 2d at 1185. Moreover, modern juries may know that the return of a guilty verdict in a capital case -- such as first-degree murder -- in their jurisdiction puts at issue a possible death sentence.  See United States v. Courtney, 960 F. Supp. 2d at 1185.  On the other hand, in Ryder's example, he appears not only to have required the jury to find a fact upon which an enhanced sentence depends, but to have gone further and instructed the jury specifically about the implications of finding the particular fact. Ryder notes that "I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy," Ryder Sources, supra, at 22; by telling the jury that fact, he instructed it specifically that the implications of the factual finding meant an increased maximum sentence, or, rather, the preclusion of anything except for the maximum sentence, see United States v. Courtney, 960 F. Supp. 2d at 1186.

Even when a juror's participation is required to enhance a mandatory minimum sentence, modern courts do not instruct the jury on the sentencing implications of the factual findings that they make.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  In the case of drug-trafficking,

for example, where the amount of the drugs in which the defendant traffics determines the statutory maximum and minimum, the jury is not told, as Ryder told the jury in another context, the line at which the possible relief from the death sentence becomes impossible, or that there is a line at which the statutory maximum and minimum sentence changes.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  Requiring courts to withhold from jury instructions a guilty verdict's ramifications therefore violates the defendant's Sixth Amendment jury trial right as the Founders thought of that right.

Current Supreme Court and Tenth Circuit law makes clear, however, that withholding sentencing information from juries not directly participating in sentencing does not unconstitutionally invade the province of the jury.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  The Supreme Court, in the majority opinion that the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court of the United States, authored in Apprendi, stated that there are organic changes which take place in trial practices without violating the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost only by gross denial, but by erosion.'"  530 U.S. at 483 (quoting Jones v. United States, 526 U.S. at 247-48).  The Supreme Court has thought to date that the evolution of judicial practice to prohibit instructions about sentencing ramifications where the jury's factfinding does not fundamentally affect the defendant's sentencing ramifications to avoid "distract[ing] them from their factfinding responsibilities, and creat[ing] a strong possibility of confusion," Shannon v. United States, 512 U.S. at 579, is such a Constitutional change in trial practice.  The Supreme Court's recent sentencing opinions, represent a narrow construction of the Sixth Amendment's jury trial right.  The Supreme Court in Booker held that the Sentencing Guidelines' mandatory

nature is unconstitutional, in part because the Guidelines, in taking into consideration the defendant's relevant conduct, often produces a sentencing range higher than the mandatory maximum allowed based on facts which the jury found.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  The Supreme Court construed the Guideline sentencing range that the Sentencing Guidelines produces as advisory rather than mandatory, because requiring a sentence imposed beyond the maximum sentence that the jury's verdict allows violated the defendant's Sixth Amendment jury trial right to "in a meaningful way guarantee[] that the jury would still stand between the individual and the power of the government under the new sentencing regime." Booker, 543 U.S. at 237.  The Supreme Court noted that this construction "is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance."  543 U.S. at 237.  In Apprendi, the Supreme Court quoted its recognition in Jones v. United States that the Sixth Amendment's substance, as the Founders saw it, is its protection against substituting new methods of trial in place of the jury trial:

> As we stated in Jones: "One contributor to the ratification debates, for example, commenting on the jury trial guarantee in Art. III, § 2, echoed Blackstone in warning of the need 'to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY.' A [New Hampshire] Farmer, No. 3, June 6, 1788, quoted in The Complete Bill of Rights 477 (N. Cogan ed. 1997)."

Apprendi, 530 U.S. at 484 n.11 (quoting Jones v. United States, 526 U.S. at 248).  See Booker, 543 U.S. at 238-39 ("The Framers of the Constitution understood the threat of 'judicial despotism' that could arise from 'arbitrary punishments upon arbitrary convictions' without the benefit of a jury in criminal cases." (quoting The Federalist No. 83 at 499 (C. Rossiter ed. 1961))).  Whereas the Supreme Court has held that certain facts necessary to impose a greater mandatory maximum statutory sentence require jury participation in finding those facts, substituting a court's finding of

those facts, especially where the standard of proof is a preponderance of the evidence rather than beyond a reasonable doubt, effectively would introduce a new method of trial.  The Supreme Court's recent sentencing decisions requiring jury participation in this factfinding and precluding a court's substitution of facts for the jury's, therefore, preserves the jury's factfinding role as it existed at the Founders' times.  Presumably the Supreme Court justifies the contemporary practice to withhold sentencing ramifications from the jury at trial where its factfinding does not affect substantially the sentence imposed -- i.e., does not affect the range in which the judge can exercise discretion -- effectively does not introduce a new arbitrary method of trial as a substitute for a jury trial, but rather continues the practice of allowing the judge to exercise discretion in sentencing. See Apprendi, 530 U.S. at 482 n.9 ("Under the common-law procedure, the court determines in each case what within the limits of the law shall be the punishment -- the question being one of discretion." (emphasis in original)(quoting 1 J. Bishop, Criminal Law §§ 933-34(1) (9th ed. 1923))).  The Supreme Court in Booker noted that, as Mr. Hamilton wrote in The Federalist No. 83, the Framers' intent in ratifying the Sixth Amendment was to protect from judicial despotism by mandating a jury trial in criminal cases; the Supreme Court apparently has concluded that to withhold instruction about sentencing ramifications from a jury whose facts do not affect the defendant's possible mandatory maximum sentence does not change that the criminal jury trial right is exercised, and fully protected and satisfied, when the jury finds as fact whether the defendant committed the crime.  Moreover, the Supreme Court apparently has decided that, in a contemporary society in which Congress has enacted over 3,000 federal criminal laws and substituted mandatory criminal sentences for the Sentencing Guidelines, the requirement to not allow evidence or argument about possible sentences stems from the concern that their knowledge of sentencing ramifications "distracts them from their factfinding responsibilities, and creates a

strong possibility of confusion," <u>Shannon v. United States</u>, 512 U.S. at 579, and that keeping the jurors ignorant preserves the defendant's criminal jury trial right.

The Supreme Court's conclusion that withholding sentencing information may help protect the defendant's Sixth Amendment jury trial right finds support in the Supreme Court's decision in <u>Rogers v. United States</u>, in which the Supreme Court held that the district court erred when it told the jury that it would accept a guilty verdict "with extreme mercy of the Court." 422 U.S. at 40. The Supreme Court reasoned that the district court's statements to the jurors prejudiced the defendant, reasoning that the court's statements might have induced a verdict that the jury would not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of "guilty with extreme mercy" within five minutes "after being told unconditionally and unequivocally that it could recommend leniency," <u>United States v. Glick</u>, 463 F.2d at 495, strongly suggests that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise.

<u>Rogers v. United States</u>, 422 U.S. at 40. Were the parties permitted to produce evidence and raise argument to the jury about the defendant's possible sentence, there is then the issue of what the parties would say. They likely could give statutory minimum and maximum, or educate the jury about the Sentencing Guidelines and their advisory nature. The Sentencing Guidelines are often difficult for those with legal training to understand, but the Supreme Court's concern for instructions about sentencing possibilities leading to jury confusion underestimates the intelligence of juries, which need not engage with information beyond what the sentencing possibilities may be; the jury does not have to determine what the sentence will be, but just would need to understand

what it may be.[6]  Moreover, defendants may find that, as the jury in Rogers v. United States quickly

decided to convict after they learned that the court may be lenient toward the defendant, knowledge

about the Sentencing Guidelines range the defendant faces, and the possibility that a court may

vary downward from the guidelines sentence, may result in a guilty verdict where a jury might not

otherwise reach one.  Even though the discretion to inform the jury about possible sentences likely

would be left to the defendant's wishes, the defendant may learn to be careful about what he or

she wishes.

The Court does not minimize the difficulties that fully informing juries about the

sentencing ramifications that its verdicts would present, but they are not any more difficult than

other issues that parties must explain to the jury.[7]  There may be good prudential reasons why the

modern American court system has decided to tell the jury not to think about sentencing.  See

---

[6]There are not as many federal criminal trials as there used to be.  See [The Honorable] Robert J. Conrad Jr., [United States District Judge for the United States District Court for the Western District of North Carolina; Member of the Executive Committee of the U.S. Judicial Conference], and Katy L. Clements, The Vanishing Criminal Jury Trial: From Trial Judges to Sentencing Judges, 86 Geo. Wash. L. Rev. 99, 99 (2018)(stating that "Federal criminal jury trials are dying.  Surely, but not slowly.  Within the ten-year span from 2006 to 2016, the absolute number of cases disposed of by jury trial declined by forty-seven percent").  The Court tried nineteen criminal cases in its first two years; last year, it had five criminal trials.  The United States Probation Office ("USPO") could generate a Form 13 for the relatively few defendants who go to trial.  A Form 13 is a pre-plea Presentence Investigation Report,  see United States v. Vasquez, No. CR 09-3613, 2011 WL 5238817, at *2 (D.N.M. October 24, 2011)(Browning, J.), that the USPO prepares for many defendants who need to know what the guideline range will be if they plea or go to trial.  If there are no objections to the Form 13, the parties could tell the jury that the guidelines calculation will be the one the judge will likely use.  If there is an objection, the Court can deal with it pre-trial or, if that is not possible, tell the jury that there is an objection to an enhancement and what impact that objection may have on the sentencing guidelines range.

[7]The fear of juries often comes from appellate courts that do not deal with juries often, if ever, in their careers.  Juries are, however, quite capable.  After Blakely v. Washington and before Booker, the Court and the Honorable Bruce D. Black, then-United States District Judge for the District of New Mexico, submitted guidelines enhancements to the jury, out of concern that an enhancement without the jury finding the underlying conduct as fact, would render the Court's enhancement unconstitutional.  More jury inclusion can, therefore, be done.

United States v. Courtney, 960 F. Supp. 2d at 1188.  The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism.  To keep the jury ignorant of sentencing ramifications is not consistent with the concept of a jury trial at the Founders' time.  See United States v. Courtney, 960 F. Supp. 2d at 1188.  To protect fully the defendant's right to a jury trial, it appears necessary to allow him or her to advise the jury about the sentencing ramifications of its verdict.  Cf. Clay S. Conrad, Jury Nullification: The Evolution of a Doctrine 11 (2014)(discussing at length "why and how the [criminal justice] system must come to grips with the power of jurors to judge the law"); Daniel Epps & William Ortman, The Informed Jury, 75 Vand. L. Rev. 823, 827, 833-35 & 834 n.51 (2022)(drawing on the Court's cases in concluding that "our judicial system has lost sight of the original promise of a jury guaranteed in our Constitution," because "informing juries about the *full* statutory range of potential punishment . . . is most consistent with the basic premises of the criminal jury system" (citing United States v. Woody, 336 F.R.D. 293, 311-17 (D.N.M. 2020)(Browning, J.)); Michael G. Bliss, The American Jury and Justice Story: How One Supreme Court Justice Nullified the Conscience of the Community, 46 Am. J. Trial Advoc. 1, 50-52 (2022)("[D]elivering a general verdict is not amoral mathematics, and that criminal guilt does not exist in any trial, no matter the judge, until all twelve jurors say that it does." (citing United States v. Woody, 336 F.R.D. at 339)).

Nevertheless, the Court is obligated to follow controlling Supreme Court and Tenth Circuit precedent.  See, e.g., Zamora v. Wells Fargo Home Mortg., 831 F. Supp. 2d 1284, 1305 (D.N.M. 2011)(Browning, J.)("While the Court realizes that its decision . . . may in some ways be unfair and unduly harsh . . . , the Court is bound to follow binding precedent from the Tenth Circuit.").  These courts have been very clear about what a trial court should do: the trial court is not to present any information about possible sentencing unless the jury's participation in sentencing is required.

See Shannon v. United States, 512 U.S. at 579 ("It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting Rogers v. United States, 422 U.S. at 40)); United States v. Parrish, 925 F.2d at 1299 ("We hold a jury instruction about mandatory minimum sentences was properly omitted because the offenses do not specifically require jury participation."); United States v. Greer, 620 F.2d at 1384 ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial.  Breach of this standard has often been grounds for reversal.").

## ANALYSIS

The Court will admit much of the evidence that the United States seeks to introduce against Beckner, because it is intrinsic evidence, but the Court will temper that evidence's prejudicial character under rule 403.  Much of the evidence also is admissible under rule 404(b), but rule 403 balancing demands mitigating some of the evidence's prejudicial character.  Below, the Court addresses the evidence at issue by subject matter, in the following order: (i) the Court excludes evidence of sentencing ramifications of the jury's verdict; (ii) the Court admits as intrinsic evidence the evidence that Beckner used an alias and, specifically, that he owed large sums of money to investors from the 1990s, but the Court will not permit introduction of the fact that Beckner has a pervious securities fraud criminal conviction; (iii) the Court will admit as intrinsic evidence the evidence that Beckner traveled to and from the United States to foreign countries and sent money to those countries, but will not permit the United States to inform the jury of the names of those countries for rule 403 undue prejudice reasons; the Court permits the same evidence to the same extent under rule 404(b), but similarly limits it under rule 403; (iv) the Court will admit as intrinsic evidence the evidence that Beckner directed Curtis to engage in a fraudulent marriage

with Jimenez, because it is intrinsic to the United States' theory that Beckner dominated Curtis, who engaged in the offenses with which the United States charged Beckner; the same information is also admissible under rule 404(b), subject to the same rule 403 balancing; (v) the Court will admit as intrinsic evidence that Beckner fled from authorities and later left the United States for another country, from which he was extradited; the Court will exclude the country's name under rule 403.  Accordingly, the Court grants in part and denies in part the United States' motions in limine and grants in part and denies in part Beckner's motions in limine.

I.    **BECKNER MAY NOT PUT ON EVIDENCE CONCERNING THE SENTENCING CONSEQUENCES THAT HE FACES AS A RESULT OF A GUILTY VERDICT.**

Whether to permit a defendant to present evidence concerning sentencing ramifications is an issue that has confronted the Court numerous times.  See, e.g., United States v. Woody, 336 F.R.D. 293 (D.N.M. 2020); United States v. Young, 403 F. Supp. 3d 1131 (D.N.M. 2019)(Browning, J.); United States v. Baker, 342 F. Supp. 3d 1189 (D.N.M. 2018)(Browning, J.); United States v. Edwards, 266 F. Supp. 3d 1290 (D.N.M. 2017)(Browning, J.).  As the Court has repeatedly stressed, while the Court is sympathetic to defendants' arguments that not permitting juries to hear about the sentencing ramifications of their verdicts is contrary to the juries' role at the country's founding, see, e.g., United States v. Courtney, 960 F. Supp. 2d at 1154, the Court is bound to follow clear precedent from the Tenth Circuit and the Supreme Court, which currently hold that juries may not hear this information.  See Rogers v. United States, 422 U.S. at 40; United States v. Courtney, 816 F.3d 681 (10th Cir. 2016).  Accordingly, the Court grants the Sentencing MIL.

II.   **THE COURT ADMITS AS INTRINSIC EVIDENCE THE EVIDENCE THAT BECKNER USED AN ALIAS AND THAT BECKNER OWED SUBSTANTIAL DEBTS, BECAUSE OF PAST VENTURES, BUT WILL NOT PERMIT EVIDENCE THAT BECKNER HAS A PRIOR SECURITIES FRAUD CONVICTION.**

The Court will permit the United States to introduce evidence that Beckner used the alias "Evans" when engaging in the transactions at issue here and will permit the United States to introduce evidence that Beckner used the "Evans" alias, because Beckner had large debt obligations. The Court will not, however, permit the United States to proffer evidence that the debt obligations arise from a prior securities fraud conviction, because, as a matter of rule 403 balancing, the evidence's undue prejudicial effect substantially outweighs its probative value. Evidence does not come under rule 404(b) if the evidence is intrinsic to the crime charged. See United States v. O'Brien, 131 F.3d 1428, 1432 (10th Cir. 1997)("It is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime charged . . . ."); United States v. Arney, 248 F.3d 984, 992 (10th Cir. 2001)("Evidence is direct or intrinsic to the crime charged if 'both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.'" (quoting United States v. Lambert, 995 F.2d 1006, 1007 (10th Cir. 1993)). As is described in greater detail below, the Court reaches these conclusions as a matter of analyzing the evidence as intrinsic evidence, but the Court would reach essentially the same conclusions if the matter is treated as one of rule 404(b) extrinsic evidence, because, while the evidence serves permissible rule 404(b) purposes, it nevertheless is too prejudicial under rule 403 to tell the jury that Beckner has a prior securities fraud conviction. See United States v. Tan, 254 F.3d 1204, 1208 (10th Cir. 2001)("[I]f the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403.").

### A.   THE COURT WILL ADMIT EVIDENCE THAT BECKNER USED THE ALIAS "EVANS".

The Court will admit evidence that Beckner used the alias "Evans", because that evidence is intrinsic to the United States' theory of the case, and because it is not unduly prejudicial under

rule 403.  Evidence is intrinsic if it is an essential part of the narrative that a party seeks to tell a jury.  See United States v. Parker, 553 F.3d 1309, 1314-15 (10th Cir. 2009)("'[I]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury.  Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" (quoting Thomas M. DiBiagio, Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to a Fair Trial, 47 Syracuse L. Rev. 1229, 1231 (1997)).  Such evidence, although not excludable under rule 404, still is subject to rule 403 probativity-prejudice balancing.  See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").  The evidence that Beckner used the "Evans" alias is intrinsic to the United States' theory of the case, because the United States' theory of how Beckner defrauded his victims in part is that Beckner hid his true identity from them with the alias: obscuring his identity is a material misrepresentation, because had Beckner's victims known his identity, then they may have learned of his past improper business practices and refused to invest with Beckner.  Although concealing one's identity may not always constitute a material misrepresentation for the federal fraud statutes' purpose, here, the United States alleges that the unique circumstances of Beckner's identity, and his concealment thereof, was a material misrepresentation supplying a basis for criminal liability.  See Indictment ¶ 10, at 4 ("[Beckner] sign[ed] documents . . . using the false name of 'Bill Evans.' During the loan application process . . . BECKNER also submitted a resume in the name of 'Bill Evans' that omitted material information and falsely stated that he had business experience that he did not

have."); id. ¶¶ 11, 13 at 4, 6 ("BECKNER and HERLIHY . . . solicited and obtained money from various individual investors . . . . As BECKNER had done previously, he misled these investors about his true identity. . . . In the end, many of the investors in the 'fuel factoring opportunity' lost all of their principal investments." (no source given for quoted material)).  Beckner's use of a fake alias forms a core of the fraud conspiracy charges under 18 U.S.C. § 1349.  See 18 U.S.C. § 1349 ("Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."); 18 U.S.C. § 1341 ("Whoever, having devised or intending to devise any scheme or artifice to defraud . . . for the purpose of executing such scheme or artifice  . . . places in any  . . . any . . . thing whatever to be sent . . . by the Postal Service . . . shall be fined under this title or imprisoned not more than 20 years, or both."); 18 U.S.C. § 1343 ("Whoever,   having   devised   or   intending   to   devise   any   scheme   or   artifice   to defraud, . . . transmits . . . by means of wire . . . communication in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."); Indictment ¶ 19(b)-(c), at 8 ("BECKNER signed documents in connection with a business loan from 1st New Mexico . . . [and] BECKNER signed documents in connection with loans facilitated by the NMFA in the name of 'Bill Evans' for the purpose of concealing his true identity.").  Indeed, that Beckner used the "Evans" alias is so central to the United States' narrative that the "Evans" alias is a named defendant in the Indictment's header: the United States versus "BRUCE BECKNER a/k/a 'Bill Evans' and ARTHUR HERLIHY."  Indictment at 1.  The evidence cannot be theorized as extrinsic to the United States' theory of the case.

Moreover, the Court does not exclude this evidence pursuant to rule 403, because its prejudicial effect does not outweigh substantially its probative value. The evidence is highly probative: as noted above, Beckner's use of the "Evans" alias is central to the United States' theory of Beckner's criminal liability, presenting a need for the evidence which exceeds rule 403's lower standard. See United States v. Burgess, 576 F.3d 1078, 1098-99 (10th Cir. 2009)("Although it may be a factor, the [rule 403] test is not necessarily whether the evidence is vital to the government's case. Vitality is often a matter of perspective. Within limits delineated in the Federal Rules of Evidence the government is entitled to introduce all relevant, probative evidence at its disposal."). On the other side of the ledger, the Court concludes that the evidence is also not very prejudicial to Beckner. That Beckner used the alias is no more prejudicial to him than any other evidence that the United States necessarily must introduce against him if it is to prove the case that it has framed; that is, the mere fact that the evidence harms Beckner's trial position is not undue prejudice for 403 purposes. See United States v. Burgess, 576 F.3d at 1098-99 ("[E]vidence [improper under rule 403] must do more than 'damage the Defendant's position at trial,' it must 'make[] a conviction more likely because it provokes an emotional response . . . or otherwise . . . affect[s] adversely the jury's attitude toward the defendant *wholly apart* from . . . his guilt or innocence [sic] of the crime charged.'" (quoting United States v. Tan, 254 F.3d at 1211-12)(correction in United States v. Burgess, but not in United States v. Tan)). The alias evidence also is not improper for other rule 403 reasons, because the alias use will not confuse or sidetrack the jury, given that the issue is central to the case. Beckner concedes that the United States must be permitted to introduce evidence about the "Evans" alias. See Alias MIL Response at 10-11 ("Mr. Beckner agrees that evidence of his use of the name Bill Evans is admissible for some purposes at trial. . . . Defendant does not object to the admissibility of evidence that he used the

name Bill Evans in some settings.").  Accordingly, the Court will admit the evidence that Beckner

used the "Evans" alias.

B.     **THAT BECKNER HAD A PRIOR SECURITIES FRAUD CONVICTION IS INTRINSIC TO THE CASE, BUT BECAUSE 403 BALANCING CUTS AGAINST IT, THE COURT WILL LIMIT THE INFORMATION ABOUT THE CONVICTION TO JUST THE FACT THAT BECKNER OWES LARGE DEBT OBLIGATIONS.**

The Court will admit a sanitized version of the evidence that Beckner has a prior securities

fraud conviction: the Court will not admit evidence that Beckner has a securities fraud conviction,

but will admit evidence that Beckner owes large sums of money to people from his past.  The

Court reaches that conclusion on the following bases.  Evidence that Beckner has a prior securities

fraud conviction is intrinsic evidence, because Beckner's prior conviction explains why he used a

fake name when dealing with investors, which is central to the United States' story about Beckner's

fraudulent activities.  Although the conviction evidence is intrinsic, nevertheless under rule 403

balancing, the fact of a conviction for an offense very similar to one on which Beckner presently

faces charges is highly prejudicial and outweighs substantially its probative value.  The jury might

well decide that, if Beckner did the same things in the past, he might have committed the crime in

the present case; it is damaging propensity evidence.  Accordingly, the Court will pare down this

evidence to its probative core, namely, that Beckner owes large sums of money to people from his

past, although the Court will not admit evidence that those obligations arise from Beckner's

securities conviction; such a paired-down story is probative for explaining Beckner's use of an

alias, but not unfairly prejudicial to him.  In the alternative, the Court concludes that even if the

conviction evidence is not intrinsic and instead is analyzable under rule 404(b), then it is admissible

largely to the same extent: the evidence serves one or more proper 404(b) purposes; the Court,

treating the conviction as proper-purpose 404(b) evidence, would subject it to rule 403 analysis

and conclude again that the fact of the conviction is itself too unfairly prejudicial.  This approach provides an alternative basis to admit only evidence that Beckner has large outstanding obligations, while excluding those obligations' source in Beckner's criminal history.

       1.       **The Conviction Evidence Is Intrinsic, But Under 403 Balancing, Information About the Conviction Is Too Prejudicial to Beckner.**

As a preliminary matter, evidence that Beckner has a securities fraud conviction is evidence intrinsic to the case and so not subject to rule 404's strictures.  Evidence is intrinsic if central to the theory of the case that the United States proposes in the Indictment or is information necessary for the jury to have a clear picture of the facts at issue.  See <u>United States v. Parker</u>, 553 F.3d at 1314-15 ("'[I]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" (quoting DiBiagio, <u>supra</u>, at 1231)).   The Court agrees with the United States that the prior conviction is important for the jury's understanding why Beckner concealed his true identity in the business dealings at issue; indeed, that he hid his prior conviction is part of the material misrepresentations in which the United States alleges he engaged that constitute the bank fraud crime with which the United States charged Beckner.  See Indictment ¶¶ 10-11, at 4; <u>id.</u> ¶ 13, at 6; <u>id.</u> ¶ 19(b)-(c), at 8.  It would have been material for persons with whom Beckner did business to know that he had a prior securities fraud conviction, so concealing that fact by concealing his identity contributed to his fraud.  As the United States Court of Appeals for the Sixth Circuit explains, several federal Courts of Appeals have held that a defendant's prior conviction for fraud is intrinsic evidence in a prosecution for bank fraud, if the defendant attempted to conceal that prior conviction from would-be investors:

Prior to trial, Jackson filed a motion in limine, asking the court to prohibit the government from introducing evidence of his prior convictions and the SEC judgment against him.  Jackson asserted that such evidence had no relevance to the charged offenses, would not be admissible for a legitimate purpose under Fed. R. Evid. 404(b) . . . . The government opposed the motion, contending the evidence of his prior convictions and the SEC judgment was not Rule 404(b) evidence at all. Rather, it was said to be "direct proof"' of the crimes with which Jackson and his coconspirators were charged, i.e., evidence of material information that Jackson and the others fraudulently failed to disclose to investors.

. . .

[O]ur sister circuits have held that a failure to disclose prior convictions can amount to a fraudulent omission of material fact.  In addition to the Second Circuit in [*United States v. Stitsky*, 536 F. App'x 98 (2d Cir. 2013)], the Eleventh Circuit has also held that evidence of a defendant's undisclosed twelve-year-old convictions was "material" and properly admitted in trial. *United States v. Bachynsky*, 415 Fed. Appx. 167, 172 (11th Cir. 2011).  The *Bachynsky* court expressly rejected the argument, here made by DeCiancio, that there could be no duty to disclose because no regulation required disclosure of convictions as old as his.  *Id.* at 173.  According to the court, under Rule 10b–5, "[t]he duty to disclose 'is a general one and arises whenever a disclosed statement would be misleading in the absence of the disclos[ure] of [additional] material facts needed to make it *not* misleading.'"  *Id.* at 172 (alterations in original)(quoting *S.E.C. v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996)).  The *Bachynsky* court held that because the defendant held himself out as a legitimate businessman while soliciting investments, he had a duty to disclose his prior convictions.  *Id.*  Invoking the standard established by the Supreme Court in *Basic*, the court held the evidence was material because it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Id.* at 172 (quoting *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978).  *See also United States v. Lewis*, 774 F.3d 837, 843 (5th Cir. 2014)(recognizing that nondisclosure of prior securities fraud conviction was material omission); *S.E.C. v. Johnson*, 174 Fed. Appx. 111, 115–16 (3d Cir. 2006)(no abuse of discretion in admitting evidence of undisclosed conviction as material omission).  Substantiating its position that Jackson's prior fraud-related convictions were "material" under this "reasonable person" standard, the government cites the trial testimony of numerous investors to the effect that knowing of Jackson's criminal past would have influenced their decisions. . . . DeCiancio contends these case law authorities are distinguishable. His arguments are not convincing.

<u>United States v. Donohue</u>, 726 F. App'x 333, 339, 343 (6th Cir. 2018).  Accordingly, as an initial matter, the Court determines that the prior securities conviction is not an "other crime" that is subject in the first instance to analysis under rule 404(b).

Although the securities conviction is not an "other act or crime" under rule 404(b), it nevertheless is evidence subject to 403 balancing, an analysis which, the Court concludes, compels the exclusion of the conviction itself. Rule 403 balancing applies to all evidence, including evidence that is intrinsic and not subject to 404(b). See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). That analysis excludes evidence whose unfair prejudicial effect substantially outweighs its probative value. Here, the conviction's probative value is high, but its prejudicial effect is substantially higher. When a prior conviction is for substantially similar conduct as a defendant's present charges, the situation lends itself too much to a propensity inference: if the defendant committed the crime before the new charge, the jury is too likely to think that he did it again here. Although the prior conviction's probative value is high -- as noted, it goes a ways toward explaining why, as the United States alleges, Beckner concealed his identity, deceiving investors about his history and his reliability as a business partner -- it is substantially prejudicial. Beckner's prior conviction for securities fraud, if presented to the jury, unduly prejudices him, because the jury may well think that Beckner has propensity for shady, illegal business dealings, and that once a crook always a crook. This information goes beyond simply damaging Beckner's trial position. See United States v. Burgess, 576 F.3d at 1098-99 ("[E]vidence [improper under rule 403] must do more than 'damage the Defendant's position at trial,' it must 'make[ ] a conviction more likely because it provokes an emotional response . . . or otherwise . . . affect[s] adversely the jury's attitude toward the defendant *wholly apart* from . . . his guilt or innocense [*sic* ] of the crime charged.'" (quoting United States v. Tan, 254 F.3d at 1211-

12)(correction in <u>United States v. Burgess</u>, but not in <u>United States v. Tan</u>)).  The prior conviction's undue prejudice is too great.

The Court therefore will not admit to the jury evidence of the conviction itself, but will pair down the pertinent information to its probative core: namely, that Beckner owed substantial sums of money to people from prior business dealings.  This core of information is important for the jury's understanding why Beckner concealed his identity in the present situation.  The jury does not need to know why precisely Beckner owed the money, <u>i.e.</u>, the jury need not be told that the obligations arise out of a criminal fraud conviction.  Instead, the United States may tell the jury only that Beckner owes the money, which is information probative for explaining his use of an alias: that Beckner had large debt obligations explains why Beckner concealed his identity and why that concealment was deceptive.  Accordingly, although the conviction evidence is intrinsic and not subject to 404, still it is too prejudicial under 403, so the Court admits information only to the extent that Beckner owes large sums of money from dealings in the 1990s.

## 2.     In the Alternative, the Conviction Evidence Is Proper Rule 404(b) Information, but Under 403 Would Be Limited to the Same Extent.

An alternative basis for the Court's conclusions above is that, even if the Court held the conviction evidence was not intrinsic to the offenses charged, the conviction evidence is authorized by a proper purpose under rule 404(b), but similarly 403 would limit it.  Rule 404(b) permits evidence of other crimes, acts or convictions if the evidence is offered for a proper purpose; these purposes include introducing the evidence to show motive, preparation, plan, and lack of mistake, among other purposes.  <u>See</u> Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").  The evidence, importantly, cannot be offered to show the defendant has a propensity to commit the crime charged.  <u>See</u> Fed. R. Evid. 404(b)(1)

("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). Other act evidence, even if offered for a proper rule 404(b) purpose, is subject to rule 403 balancing.  See United States v. Tan, 254 F.3d 1204, 1208-09 (10th Cir. 2001)("[I]f the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403.").  The overall approach to other-act evidence is analyzed in four parts:

> (1) [E]vidence of other crimes, wrongs, or acts must be introduced for a proper purpose; (2) the evidence must be relevant; (3) the court must make a Rule 403 determination whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) the court, upon request, must instruct the jury that the evidence of similar acts is to be considered only for the limited purpose for which it was admitted.

United States v. Diaz, 679 F.3d 1183, 1190 (10th Cir. 2012)(citing United States v. Morris, 287 F.3d 985, 990 (10th Cir. 2002)).  Here, the conviction evidence is admissible for a number of permissible 404(b) purposes: the past securities fraud conviction demonstrates a motivation for the bank fraud here, because the past offense shows Beckner's motive for deceiving his investors as to his identity; and the conviction demonstrates he had a plan to that respect.  Moreover, the conviction could show lack of mistake, which undercuts the central thrust of Beckner's defense that the truck stop business was not a fraudulent enterprise, but merely a business venture that was unsuccessful and motivated by good intentions.  The prior securities fraud conviction could demonstrate to the jury that Beckner was not a hapless businessman unlucky in the truck stop venture, but rather someone who knew what he was doing -- consciously and knowingly manipulating investors.  Each of these is a proper non-propensity purpose for the conviction evidence under rule 404(b).  See Fed. R. Evid. 404(b)(2) ("This evidence may be admissible

for . . . proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

Nevertheless, because rule 404(b) "other act" evidence is subject to 403 balancing, the Court, undertaking that analysis, concludes that the evidence would similarly have to be limited to avoid undue prejudice against Beckner.  As the Court discusses above, the conviction evidence is highly prejudicial even if it also is probative, because, although cognizable for a non-propensity purpose, still the likelihood of it raising a propensity inference is great.  Having defrauded business partners once, the jury may think that Beckner probably has done it again here.  Although rule 403's application is a rare remedy once a court establishes a proper 404(b) purpose, nevertheless, some sanitizing is appropriate here.   The core of the evidence's probativity can be crystalized to the following: that Beckner owed lots of money to people, which explains why he concealed his identity when dealing in his business activities here.

## III.   EVIDENCE OF BECKNER'S CONNECTIONS TO COUNTRIES OUTSIDE THE UNITED STATES IS ADMISSIBLE IN PART.

Evidence that Beckner crossed back and forth from the United States to Central American countries is admissible, but the Court will exclude the particular countries' names.  The evidence is intrinsic to the narrative the United States seeks to develop -- that Beckner traveled back and forth from the United States -- because its narrative is that Beckner sought to live abroad to escape the reach of creditors and authorities, and that Beckner's corporate entities were registered outside the United States; the United States also seeks to introduce that Beckner was extradited to the United States from Honduras.  The Court agrees that this information is intrinsic to the United States' theory that Beckner's actions in and connections with foreign countries demonstrate an overall goal to escape liability for his actions.  See United States v. Parker, 553 F.3d at 1314-15 ("'[I]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides

contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" (quoting DiBiagio, supra, at 1231).  The Court is, however, sympathetic to Beckner's position that he was not merely hiding out in Honduras, but had deep ties to that country; the Court, therefore, to avoid jury misconception and to provide the jury a full picture of Beckner's connections to Honduras, will also mandate that evidence be admitted that Beckner had children who lived in Honduras; that is, the evidence of the border crossings and Beckner's international connections cannot be introduced without also introducing information that he had family who actively resided there.  The Court also will require that the names of the countries to which Beckner traveled back and forth not be introduced, because the Court agrees that this information is prejudicial while being minimally probative.  Beckner is correct to maintain that visions of Caribbean-based scams, which may inflame the jury, need not be introduced.  Cf. United States v. Burgess, 576 F.3d at 1098-99 ("[E]vidence [improper under rule 403] must do more than 'damage the Defendant's position at trial,' it must 'make[ ] a conviction more likely because it provokes an emotional response . . . or otherwise . . . affect[s] adversely the jury's attitude toward the defendant *wholly apart* from . . . his guilt or innocense [*sic* ] of the crime charged.'" (quoting United States v. Tan, 254 F.3d at 1211-12)(correction in United States v. Burgess, but not in United States v. Tan)).  Accordingly, the information is admissible to demonstrate a connection to countries outside the United States, to demonstrate a long-term plan to live outside United States jurisdictions, and to escape liability.

Were the Court to treat the information as 404(b) "other act" evidence, it would reach a conclusion along the same lines.  The information is offered for a proper 404(b) purpose, namely to demonstrate Beckner's plan to live a life off the exploits of his criminal conduct outside the

reach of accountability in the United States; but similarly, a rule 403 analysis would limit the admissible evidence only to the facts of Beckner's ties to these countries, would omit the countries' names, and would demand that evidence also of his children's being based there be included.  See United States v. Diaz, 679 F.3d at 1190.  In conclusion, either on an intrinsic-evidence theory or on a 404(b) theory, evidence that Beckner traveled to and resided in countries outside the United States is admissible to demonstrate a life lived off the fruits of his offenses outside the reach of liability in the United States; nevertheless the names of the countries -- prejudicial without also being probative -- are not admissible, and information that Beckner's children live abroad must be admitted alongside the introduction of evidence regarding Beckner's foreign travels.

## IV.  EVIDENCE THAT BECKNER ENGAGED IN IMMIGRATION FRAUD IS ADMISSIBLE IN THAT IT DEMONSTRATES DRAMATICALLY THAT BECKNER DOMINATED CURTIS.

The Court admits the evidence of the immigration fraud that Beckner helped perpetrate, because it demonstrates Beckner's domination over Curtis, a family friend and later Beckner's daughter's husband.  This information is admissible either as intrinsic evidence, tempered by 403, or as 404(b) "other act" evidence admissible for a non-propensity purpose.  Here, the immigration fraud evidence is admissible as intrinsic to the offense, because it demonstrates how Beckner exercised control over Curtis, an uncharged co-conspirator; that Beckner could get Curtis to enter a fake marriage with Beckner's girlfriend, Jimenez, shows the lengths to which Curtis would go on Beckner's behalf; this narrative is important to the United States' theory of the case.  See United States v. Parker, 553 F.3d at 1314-15 ("'[I]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" (quoting DiBiagio, supra, at 1231)).

Because the evidence still is subject to 403 balancing, however, the Court will not admit all details about the immigration fraud.  The evidence is probative to demonstrate the enormous control that Beckner had over Curtis, but some details are salacious unnecessarily and would prejudice a jury against Beckner unduly.  Accordingly, the Court will exclude evidence of a purported love letter fabricated to demonstrate Curtis' love for his would-be bride, Jimenez, drafted as part of the immigration fraud.  As noted, what is important and probative about the immigration fraud is not its salacious details, but that it demonstrates Beckner's control over Curtis, an evidentiary proposition that excluding the letter accomplishes sufficiently.  Cf. United States v. Burgess, 576 F.3d at 1098-99 ("[E]vidence [improper under rule 403] must do more than 'damage the Defendant's position at trial,' it must 'make[ ] a conviction more likely because it provokes an emotional response . . . or otherwise . . . affect[s] adversely the jury's attitude toward the defendant *wholly apart* from . . . his guilt or innocense [*sic* ] of the crime charged.'" (quoting United States v. Tan, 254 F.3d at 1211-12)(correction in United States v. Burgess, but not in United States v. Tan)).

The Court also would admit the evidence to the same extent under rule 404(b), once subject to rule 403 balancing.  Conceptualized as an "other act," the immigration fraud evidence serves proper rule 404(b) purposes.  Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").  The fraud goes to show at least opportunity and planning: that Beckner so dominated Curtis that Curtis agreed to serve as Jimenez' putative husband so that Jimenez could enter the United States to be with Beckner demonstrates how Curtis, a loyal dupe, presented Beckner an opportunity for someone to do dirty work on Beckner's behalf, and how their power-imbalanced relationship formed the basis of a conspiratorial plan to execute

the charged scheme.  Accordingly, there exist proper 404(b) purposes.  Proper 404(b) evidence, however, is still subject to rule 403 balancing.  See United States v. Tan, 254 F.3d at 1208-09 ("[I]f the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403.").  That balancing, as discussed above, leads to the conclusion that some of the immigration fraud's more salacious details are prejudicial without being probative: the written letters' salacious character is unnecessary for a jury to know that the fraud existed and that Beckner controlled Curtis.  In conclusion, rule 404(b) provides a basis to admit the immigration fraud evidence to the same extent as that which treating it is as intrinsic evidence subject to rule 403 would permit: the evidence is admissible to demonstrate Beckner's control over Curtis except to the exclusion of the salacious love letter.

## V.   EVIDENCE OF BECKNER'S FLIGHT IS ADMISSIBLE AS INTRINSIC.

Evidence that Beckner fled authorities when they tried to apprehend him is admissible. Evidence that a defendant flees apprehension is probative of consciousness of guilt, although a court first must determine the defendant's actions fairly can be characterized as flight.  See United States v. Martinez, 681 F.3d 1248, 1256 (10th Cir. 1982)("[F]light evidence carries with it a strong presumption of admissibility. . . . Due to the fact that flight evidence is sometimes ambiguous, courts at times assert that such evidence is of questionable probative value unless the inferences of guilt that accompany the particular facts associated with it are strong.").  Beckner's actions are characterizable as flight, so the information thereof is probative of consciousness of guilt.  The United States seeks to produce evidence that, when persons from New Mexico's securities authority sought out Beckner at the gas station, to deliver a cease-and-desist order, Beckner got in his car and drove away at high speed.  Although Beckner emphasizes that he returned the next day,

allowing authorities to serve him, and although Beckner asserts that the officials did not identify themselves as government officials, some ambiguity whether the actions can be characterized as flight does not mean the evidence lacks all probative value for that proposition.  See United States v. Martinez, 681 F.3d at 1256.  Beckner left the United States two months later; he disputes whether this conduct can be characterized as flight, but it is sufficiently close in time that his leaving the United States can be interpreted as flight from authorities bearing down on him. Beckner need not have left the United States the next day after authorities first contacted him to fairly characterize his egress from the United States as flight and for it to be probative.  His high-speed escape by car the first time the New Mexico authorities tried to serve the cease-and-desist order, and his exit from the United States not long thereafter, together are sufficiently probative of flight.  The Court will let the jury draw what inferences it can from Beckner's actions, and Beckner of course is free to argue his actions' weight to the jury.  While probative of consciousness of guilt, the information here is not unduly prejudicial: it will not confuse or bog down the jury, and it is only prejudicial to the extent it hurts Beckner's trial position, i.e., not unfairly prejudicial. Accordingly, the evidence is admissible to develop Beckner's consciousness of guilt.

**IT IS ORDERED** that (i) the United States' Motion in Limine to Preclude Evidence or Discussion of Sentencing or Punishment at Trial, filed September 14, 2020 (Doc. 104)("Sentencing MIL"), is granted; (ii) the United States' Motion in Limine to Admit Evidence of Defendant's Use of False Alias, Defendant's Prior Criminal Convictions, Defendant's Use of a Co-Conspirator to Engage in Immigration Fraud, and Defendant's Flight to Honduras and Extradition Therefrom, and, in the Alternative, Notice of Intent of Intent to Offer Evidence of Other Crimes or Bad Acts Pursuant to Fed. R. Evid. 404(b), filed January 26, 2021 (Doc. 118), is granted in part and denied in part; (iii) the Defendant's Motion in Limine to Prohibit Evidence

Regarding Alleged Schemes to Bring Xiomara Romero to the United States, filed January 26, 2021 (Doc. 120), is granted in part and denied in part; (iv) the Defendant's Motion in Limine to Prevent Evidence Related to Travel to Honduras and Extradition, filed January 26, 2021 (Doc. 121), is granted in part and denied in part; (v) the United States' Amended Motion in Limine to Admit Evidence of Defendant's Prior Criminal Convictions, Defendant's Use of a Co-Conspirator to Engage in Immigration Fraud, Defendant's Flight From Government Investigators Within the United States, and Defendant's Flight to Honduras and Extradition Therefrom, and, in the Alternative, Notice of Intent to Offer Evidence of Other Crimes or Bad Acts Pursuant to Fed. R. Evid. 404(b), filed September 17, 2021 (Doc. 136), is granted in part and denied in part; and (vi) the United States' Supplemental Motion in Limine to Admit Evidence of Cease-and-Desist Order, filed December 6, 2021 (Doc. 152), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
   United States Attorney
Sean J. Sullivan
Taylor F. Hartstein
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

         *Attorneys for the Plaintiff*

Nicole Moss
The Law Office of Nicole Moss
Albuquerque, New Mexico

--and--

Marshall J. Ray
Law Offices of Marshall J. Ray, L.L.C.
Albuquerque, New Mexico

    *Attorneys for the Defendant*